IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DM ARBOR COURT, LTD.        §
                            §
            Plaintiff,      §
                            §   Civil Action No. 4:18-CV-01884
v.                          §
                            §
THE CITY OF HOUSTON,        §
                            §
            Defendant.      §

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff DM Arbor Court, Ltd. ("Plaintiff" or "Arbor Court") now files this Second Amended Complaint against Defendant The City of Houston ("Defendant" or "the City") alleging as follows:

## NATURE OF THE CASE

1.      At its core, this case is about a failure and/or abuse of process on the part of the City that is preventing displaced Houstonians from receiving affordable housing.  In August 2017, Hurricane Harvey ripped through the City of Houston and caused unprecedented damage to numerous homes and businesses.  Arbor Court, a 15-building multi-family apartment community, was not immune.  Indeed, the first-floor units at the complex incurred significant flooding that required the tenants who resided in those units to evacuate.  While all of the buildings suffered flood related damage, they are all structurally sound and would be fully habitable with interior repairs to the affected first floor apartment residences.

2.      In the aftermath of the hurricane, Arbor Court sought to repair its damaged units so that its displaced tenants, all of whom receive government housing subsidies, could return to their homes.  To that end, Arbor Court requested the necessary permits from the City to begin repairs.

1

The City initially denied Arbor Court's requests for permits by claiming (incorrectly) that all of the buildings were "substantially damaged" because the repairs would cost more than 50% of the buildings' values.

3.      After Arbor Court appealed this decision pursuant to the City's designated appeal process, the City concurred that several of Arbor Court's buildings were not "substantially damaged" and issued and agreed to release permits for seven of Arbor Court's buildings.  And despite denying the appeal with regard to the remaining eight buildings, City officials agreed, internally, that Arbor Court sufficiently had demonstrated that the repairs for each of the 15 buildings would be less than 50% of that building's respective value such that the City would classify the damage to *all* of the buildings as "non-substantial."  Permits should have issued and should have been released to Arbor Court, for all fifteen of Arbor Court's buildings based on the City's own criteria.  But when Arbor Court attempted to at least retrieve the already issued and approved permits for the seven buildings, it learned that the City had revoked approval for those permits.  The City failed to provide Arbor Court with written notice of the revocation or a hearing, which was a clear violation of the City's own policies and procedures.

4.      Just weeks before the filing of this Second Amended Complaint, Arbor Court received a call from the City stating that it had approved permits for eight of Arbor Court's buildings, that the permits were ready to be picked up and that if someone from Arbor Court did not retrieve them promptly, they would be destroyed.  When Arbor Court went to retrieve them, the City withheld them, once again revoking approval of the permits without warning or notice, claiming that only top level officials could authorize the release of any permits for Arbor Court repair work and informing Arbor Court there was no way the permits would ever be released.

5.     To be sure, Arbor Court has been and remains prepared, willing, and able to immediately begin repairs on the damaged buildings.  This is evidenced in part by the fact that Arbor Court has millions of dollars—including insurance proceeds obtained for the specific purpose of performing the repairs—sitting in an escrow account earmarked for the repairs. It is likewise evidenced by the fact that Arbor Court has contractual obligations, including obligations to the United States Department of Housing and Urban Development ("HUD") to repair the buildings, and continue providing affordable housing to Houstonians in need of the same, and who are entitled to return to their homes.  But the City, for reasons that will be discussed in this Second Amended Complaint, has obstinately refused to allow repair work to begin, and instead it has arbitrarily and capriciously prevented the repairs from taking place, thereby interfering with the Arbor Court's obligations to provide restored, affordable homes to citizens of Houston *who have been displaced for more than a year now*.  Lacking financial resources to find alternative homes, Arbor Court has come to understand that many of these citizens reside in vehicles, with friends, and perhaps on the streets of Houston, instead of their homes at Arbor Court.

6.     Beyond the City's obvious interference, Arbor Court has learned that such interference by the City has been discriminatory.  More particularly, the City has approved and released permits for similarly situated properties, meaning other two-story multi-family apartment complexes that are located in the flood plain to the same extent that Arbor Court is, and that suffered damage to the same extent as that suffered by Arbor Court.  These properties have been repaired and homes that were temporarily lost because of flooding now have residents in them. The only difference between Arbor Court and those similarly situated properties is that Arbor Court is a Section 8 complex that has a contract with HUD to provide subsidized housing for

residents in need of federal assistance.  Hence, Arbor Court is being treated differently in relation to those other properties based upon its status as a Section 8 property.

7.     There have been additional ramifications due to the City's unlawful actions. Specifically, current or former displaced tenants of Arbor Court have sued both Arbor Court and HUD, alleging in part that Arbor Court is in default of its obligation to provide habitable units following Hurricane Harvey, and because of the damage incurred from the flooding. Very recently, HUD has formally threatened to terminate its contract with Arbor Court if the repairs are not promptly made, after learning that a transactional resolution of this dispute that was being negotiated is no longer of interest to the City.

8.     Arbor Court has worked diligently with the City to resolve this dispute, but to no avail.  Thus, Arbor Court has no other option than to seek redress for the deprivation of its constitutional, common law, and statutory rights.

## PARTIES

9.     Plaintiff DM Arbor Court, Ltd. is a Texas limited partnership having is principle place of business in Texas, the state of its citizenship.

10.     Defendant the City of Houston is a municipal corporation and Texas Home-rule municipality.  The City has appeared for all purposes.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1441.  This civil action arises under Article 1 Section 10 and the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. § 1983.  This Court has jurisdiction over Arbor Court's claims asserted pursuant to the constitution and laws of the State of Texas pursuant to 28

U.S.C. § 1367 as those claims, and the claims over which this Court has original jurisdiction, derive from a common nucleus of operative facts.

12.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) as the City is located in this district, its agents and employees perform their official duties in this district, and a substantial part of the events giving rise to this claim occurred in this district. Arbor Court intends to seek consolidation of this case and the case brought by current and former tenants of Arbor Court against HUD and Arbor Court in Civil Action No. 4:18-CV-02468.  Arbor Court has suffered a concrete injury in fact, and there is a causal connection between such injury and the City's violations of federal and state law as alleged herein.

## NOTICE OF RELATED CASE

13.     On July 17, 2018, thirteen current or displaced Arbor Court tenants sued HUD and Arbor Court in Civil Action No. 4:18-cv-02468, *Daija Jackson, et al. v. HUD, et al*.  There, plaintiffs allege and seek relief for alleged injuries due to the current condition of Arbor Court following flooding in 2016 and 2017.  The related case plaintiffs allege that Arbor Court, as the property owner, is in default of its obligation to provide habitable units for resident tenants who are entitled to reside in those units pursuant to HUD regulations and HUD's contract with Arbor Court.

14.     The related case plaintiffs further allege numerous fair housing violations and, among other things, seek injunctive relief ordering HUD to temporarily abate its Section 8 contract with Arbor Court, and a final judgment terminating their leases with a return of all paid rentals or deposits.

## FACTS

### A.   Floodwaters damage Arbor Court's units.

15.     Arbor Court is a 15-building multi-family apartment community located at 802 Seminar Drive in Houston, Texas.  It is a two-story complex with 232 total units; 116 of the units are on the first floor, and 116 are on the second.  Arbor Court serves residents in need of federal housing assistance payments provided by HUD, and it is contractually obligated to HUD and qualified recipients of HUD supported housing, to abide by specific guidelines and regulations requiring the provision of safe and sanitary housing.   It also has individual leases in place with its tenants that require those tenants to have habitable access to their homes.  Because the property is located in Houston, Arbor Court also is subject to the City's municipal ordinances.

16.     In April 2016, Houston experienced what has become known as the "Tax Day Flood."  That storm started on April 15, 2016, and lasted for several days.  It caused widespread flooding to a number of homes and apartment complexes, including Arbor Court and similarly situated complexes surrounding Arbor Court.  Arbor Court suffered damage to its first-floor units. As a result, it immediately applied for permits from the City to repair the damaged units.  The City immediately approved those permits, and Arbor Court promptly made the necessary repairs that allowed its displaced tenants to promptly return back to their homes.  The City also approved permits for the similarly situated surrounding apartment complexes that also experienced first-floor damage to rebuild.

17.     In August 2017, Houston was once again hit with widespread flooding, this time brought on by Hurricane Harvey.  All of Arbor Court's 116 first-floor units flooded to some degree, which resulted in the displacement of the tenants who lived in those units.  Surrounding apartment complexes were also damaged by Harvey floodwater in a similar, if not greater, manner.

6

18.     Immediately after Harvey, Arbor Court's contractors engaged in clean-up work and removed damaged improvements to prepare the property for remedial reconstruction.  Arbor Court then promptly approached the City's Floodplain Management Office ("FMO") to apply for building permits to repair the damaged units.  But unlike the 2016 Tax Day Flood, Arbor Court did not walk out of the FMO office with the permits in hand.  Instead, the FMO stated that it would be in touch with Arbor Court in the near future.

19.     On October 10, 2017, Arbor Court received a letter from the FMO that denied Arbor Court's permits outright.  The FMO claimed that each of Arbor Court's fifteen buildings was "substantially damaged," which, according to the City and the relevant city ordinance, Chapter 19, means that each of the buildings was more than 50% damaged pursuant to FEMA cost estimation guidelines.

**B.      Arbor Court appeals the denial of the permits and receives permitting approval for seven of its buildings.**

20.     After receiving the denial letter, Arbor Court engaged a licensed real estate appraiser to determine the actual cash value of the buildings.  It also engaged a licensed architect to determine the cost to repair the buildings.  Using the same formula relied upon by the City in denying the permits, Arbor Court was able to show that none of the buildings was 50% or more damaged, and on average, the buildings were only 20% damaged.  Armed with this information, Arbor Court used the FMO's "Substantial Damage Determination Appeal" ("SDDA") form to timely appeal the City's initial decision to deny all of the requested permits, which Arbor Court needs to repair all of the buildings.

21.     On March 28, 2018, the City sent a letter from Choyce Morrow, Supervising Engineer in the Office of the City of Engineer/Floodplain Management, stating that the City had completed the SDDA process for Arbor Court.  The letter further stated that the City had approved

the appeal for Buildings 7-9 and 12-15, and that "the hold that had been placed in the City of Houston building permit system on your address has been removed."  The letter went on to state that Arbor Court could "now proceed with obtaining any City of Houston permits [Arbor Court] need[s] to complete the repairs to Buildings 7-9 and 12-15."  Stated differently, the City approved and issued seven of the fifteen permits requested by Arbor Court.  Indeed, the FMO provided notices regarding these permits stamped "Approved."  Thus, Arbor Court believed it would at least be able to begin repairs on the seven approved buildings.  Unfortunately, that did not turn out to be the case.

### C.    The City revokes the approved permits without notice or hearing.

22.    Arbor Court continued to protest the City's substantial damage determination for the remaining eight Arbor Court buildings.  To support its position, Arbor Court provided additional information from an architect demonstrating that the repair work would cost less than 50% of the building values.  The City acknowledged this in an email on May 1, 2018 from Choyce Morrow, where she stated in relevant part that:

> I have re-reviewed Chapter 19's definition of Substantial Damage and it does not specifically state that, "Repair costs should be at fair market value".  Arbor Court has provided cost estimates prepared and sealed by a State of Texas Architect that show that repairs will cost less than 50% of building values*, therefore all buildings will be classified as non-substantial* . . .

23.    This decision by and notification from the City led Arbor Court to believe that it would receive all of its requested permits.  Thus, it planned to use the previously approved permits to immediately begin repairs and to obtain the other permits as soon as they could be retrieved.  But when Arbor Court attempted to retrieve the physical permits for the seven previously approved buildings, it learned that the City had revoked the permits.  Further, Arbor Court learned that the City was requiring either the Mayor's Office or Director of Public Works for the City to approve

the issuance and release of any permits.  These requirements for additional approvals which, upon information and belief, were uniquely imposed on Arbor Court, are not authorized by Chapter 19. Arbor Court did not receive any notice or hearing before this revocation, which was in complete disregard for the City's policies.  Indeed, section 19-23 of the City's floodplain ordinance provides in relevant part as follows:

> (a) In addition to the remedies provided in section 19-91 of this Code, whenever the city engineer finds that there are grounds for revocation of a permit, he shall give written notice to the permittee by personal service or by certified mail, return receipt requested, addressed to the applicant at the address set forth in the permit application.  That notice shall set forth:
>
> > (1)    The specific grounds upon which the permit in question may be revoked;
> >
> > (2)    The fact that there will be a hearing before the board in  which the city will seek the revocation of the permit;
> >
> > (3)    The date, time and place of such hearing; and
> >
> > (4)    The fact that the permittee may appear in person or be represented by an attorney.[1]

24.    To be sure, Arbor Court *never* received the process provided for in this section. Instead, the City unilaterally, arbitrarily, and capriciously revoked Arbor Court's permits, leaving it unable to at least begin repairing some of its buildings.  The City then completely disregarded the representation it made in its May 1, 2018 email and claimed that certain Arbor Court buildings were in fact "substantially damaged", knowing that was not true.  But the City was fully aware that it had improperly reversed course.  In fact, on June 15, 2018, the City's Kim Mickelson sent

---

[1]  This language comes from the ordinance in place at the time Arbor Court applied for its permits.  This ordinance was revised on September 1, 2018.

an email commenting on the May 1, 2018 email acknowledging that the buildings were not substantially damaged.  Specifically, Ms. Mickelson commented that the May 1, 2018 email was "the one that was later, '*oops, I shouldn't have sent this*'?"  (Emphasis added).

25.     The City's disregard for its procedures did not stop there.  Indeed, just weeks ago, on October 9, 2018, the City called Arbor Court stating that it had eight approved permits that Arbor Court needed to pick up or the City would cancel them out of the system.  On October 16, 2018, Arbor Court went to retrieve those permits.  Once Arbor Court arrived at the City's permitting office, the City stated that the permits would not be released with supervisor approval— a process not provided for in Chapter 19.  Arbor Court returned the next day to seek such supervisor approval, and it was denied, as the supervisor confirmed the City would never release any permits to Arbor Court.  Thus again, the City revoked Arbor Court's permits without following the required procedures.  When the City supervisor told Arbor Court that there is nothing it can do to cause the revoked permits to be released, Arbor Court understood that to be a final decision beyond the prior final decisions described above.

26.     While the City revoked and refuses to provide Arbor Court with its approved permits, the City has provided permits to similarly situated apartment complexes that allowed them to rebuild.  Specifically, both Imperial Oaks Apartments, located at 625 Seminar Dr., Houston, TX 77060, and Biscayne at Cityview, located at 17050 Imperial Valley Dr., Houston, TX, 77060, which are two-story multi-family residential complexes, sustained flooding to their first-floor units during Harvey that required significant repairs.  Although the damage these complexes sustained was comparable, if not greater, than the damage Arbor Court incurred, the City approved, and did not revoke, permits for those complexes to rebuild.  The only material difference between those complexes and Arbor Court is that Arbor Court is a Section 8 property, and those complexes are

not.  Hence, Arbor Court is being treated differently than those similarly situated properties based on its status as a Section 8 property.

### D.    Arbor Court is in danger of losing its contract with HUD.

27.    To date, Arbor Court's property remains damaged.  Arbor Court has not been able to start repairs due to the improper revocation of certain permits and improper denial of others. This has caused HUD to formally notify Arbor Court that it is in default under its Housing Assistance Payment ("HAP") contract with HUD because the first-floor units at Arbor Court remain damaged and uninhabitable.  HUD has demanded that Arbor Court take corrective action which includes obtaining permits and proceeding to repair the still damaged units.  But Arbor Court, which has the necessary funds for the repairs and the ability to commence and complete the repairs promptly, has no apparent ability without judicial intervention, to satisfy HUD's demand for corrective action, most importantly rebuilding the damaged units, due to the City's improper revocation and continuing denial of the permits, both of which (the revocation and denial) are final actions by the City.

28.    Further, upon information and belief, the City is attempting to depress the value of Arbor Court so that the City might purchase it at a drastically reduced price.  The City has expressed for several years its interest in purchasing the property and has conducted significant diligence on the property in furtherance of that aim.  Having considered a purchase transaction, the City is fully aware of Arbor Court's property's value.  The City also is fully aware that a large driver of value for the property is the HAP contract, and that if that contract is terminated, the property's value will decrease dramatically, and Arbor Court will suffer substantial financial harm. Moreover, the City also recognizes that so long as Arbor Court's buildings remain damaged, the value of the property will otherwise continue to decrease.  A decreased valuation for the property, even if such valuation is artificially manufactured by the City's arbitrary, capricious, and

discriminatory actions, will allow the City to purchase the property at a steep discount and to use it as the City sees fit, especially if the City exercises the power of eminent domain to condemn the damaged property, as it now appears the City may be planning to do.

29.     While the City is acting in the manner described throughout this Complaint to protect its proprietary interests, in contrast to engaging in lawful and legitimate governmental action or decision making, it is injuring and harming Arbor Court's tenants, who rely on government support for housing, but remain unable to return home.  The City is also causing Arbor Court to suffer imminent irreparable harm in addition to substantial and increasing economic loss and damage.  The City's actions should not be tolerated because they are preventing Arbor Court from fully operating its business and depriving vulnerable individuals of needed housing .

**CAUSES OF ACTION**

**A.     Violation of 42 U.S.C. § 1983.**

30.     Arbor Court re-alleges and incorporates paragraphs 1-29.

31.     Arbor Court sues the City under 42 U.S.C. § 1983 to recover all damages resulting from the deprivation of Arbor Court's procedural and substantive due process rights, its equal protection rights under the Fourteenth Amendment to the U.S. Constitution, and its rights under Article 1 Section 10 of the U.S. Constitution.

32.     Acting under color of law, the City has proximately caused the wrongful deprivation of Arbor Court's constitutional rights to procedural due process, substantive due process, equal protection under the law, and non-impairment of its contracts.

33.     Upon information and belief, the City's decision to revoke the approved permits in violation of Arbor Court's procedural and substantive due process rights, to deny the remaining or all of the permits (which denial, according to City officials, cannot and will not be reconsidered)

in violation of Arbor Court's equal protection rights, and to revoke the approved permits and deny the remaining or all of the permits in violation of Arbor Court's rights to not have its contracts impaired, were directed by one or both of the Mayor's Office and the Director of Public Works for the City.  Both the Mayor's Office and the Director of Public Works are City officials to whom the City's lawmakers have delegated policy making authority.

34.     Either or both of the Mayor's Office and the Director of Public Works for the City promulgated a policy pursuant to which Arbor Court's building repair permits have been revoked and will not reissue, in contravention of the plain terms of Chapter 19, despite Arbor Court's compliance with its plain terms, entitling Arbor Court to receive permits for the repair of all of its buildings.

35.     Additionally, or in the alternative, either or both of the Mayor's Office and the Director of Public Works for the City directly intervened in Arbor Court's permit application process to ensure that Arbor Court's permits would be denied and that any permits already approved would be revoked, even though Arbor Court has demonstrated its entitlement to receive permits for all of its buildings to be repaired, in accordance with the published requirements of Chapter 19.

36.     Upon information and belief, this official policy enacted by either or both of the Mayor's Office and the Director of Public Works for the City in the place and stead of Chapter 19, and either or both of their direct intervention in Arbor Court's permit application process, was prompted by the City's unrelenting desire to procure the Arbor Court property and/or the lucrative HUD contract at a price substantially below fair market value and, consequently, was official governmental action taken under color of law, enforced exclusively with respect to the permits Arbor Court applied for, and no other similarly situated permit applications.

37.     The official policy enacted by either or both of the Mayor's Office and the Director of Public Works for the City, and either or both of their direct intervention in Arbor Court's permit application process, which policy and conduct was implemented for the purpose of impeding and frustrating Arbor Court's reasonable investment backed expectations with respect to the Arbor Court property, was the moving force behind the City's violation of Arbor Court's procedural and substantive due process rights, rights to equal protection under the law, and rights to non-impaired contracts.

38.     Pursuant to, and in accordance with, this deliberately inhibitory official policy and direct intervention by its policymaking officials, the City revoked Arbor Court's approved permits without first providing Arbor Court the requisite hearing under Chapter 19, arbitrarily and capriciously revoked Arbor Court's approved permits for illegitimate purposes or for reasons not reasonably related to a legitimate government interest, irrationally and discriminatorily denied Arbor Court's permit applications on grounds not used to evaluate permit applications submitted with respect to similarly situated properties, and substantially impaired Arbor Court's contractual relationships with HUD and certain of its tenants without significant or legitimate public purpose.

### B.     Violation of Procedural Due Process.

39.     Arbor Court re-alleges and incorporates paragraphs 1-38.

40.     When the City approved and issued the permits for seven of Arbor Court's buildings in March 2018, Arbor Court had a statutory and common law property interest in those permits under Texas law.  Moreover, the permits approved and issued by the City relate directly to the maintenance of Arbor Court's livelihood and its ability to continue its business of providing affordable housing, pursuant to contractual obligations owed to HUD and residents who are entitled to receive affordable housing at Arbor Court.  Arbor Court's livelihood depends entirely

on its ability to perform its obligations under the HUD contract and its lease agreements with tenants at the Arbor Court property.

41.     The permits from the City are essential to Arbor Court's pursuit of a livelihood because Arbor Court can satisfy its contractual obligations to HUD and its tenants only by making the necessary property repairs contemplated by those permits.  And the same holds true for the eight permits issued by the City in October 2018, but administratively held indefinitely, and thus revoked for all intents and purposes.  The City could only revoke the permits if it provided Arbor Court with due process.  In other words, Arbor Court was entitled to pre-deprivation process before the City revoked its permits.  But that did not occur, and the City revoked the permits without providing any notice or hearing.

42.     Further, it would not have been overly burdensome on the City to provide pre-deprivation process to Arbor Court.  As noted, section 19-23 of the City's floodplain ordinance spells out the procedure that the City must follow before revoking permits.  Thus, the City simply needed to follow its own policies and procedures.  But the fact that it did not resulted in a failure of process for Arbor Court in violation of the Fourteenth Amendment to the U.S. Constitution.

### C.     Violation of Substantive Due Process.

43.     Arbor Court re-alleges and incorporates paragraphs 1-42.

44.     Arbor Court possesses legally cognizable property rights and interests in the permits expressly approved by the City.  The City has acknowledged these rights and interests by informing Arbor Court on multiple occasions that the permits were available for Arbor Court to pick up from the relevant City department, so that repairs could commence.

45.     By arbitrarily and capriciously revoking the approved permits, the City has unfairly deprived Arbor Court of its substantial and protectable interest therein.

15

46.     Moreover, the City's arbitrary and capricious actions with respect to the approved permits bear no rational relation to a legitimate government interest.

47.     The City's revocation of the approved permits was not a zoning decision, be it the establishment of a zoning law or a decision whether to permit a variance from a zoning law.  Rather, the revocation of the approved permits was a decision by appointed officials specifically targeting Arbor Court and its property.

48.     The actual motivation for the City's adjudicative decision to revoke the approved permits has nothing to do with any interest in protecting the safety of Houstonians or their property, but instead has everything to do with the City's longstanding proprietary desire to acquire either or both of the Arbor Court property and Arbor Court's extremely lucrative HUD contract, in each case, at a price substantially below fair market value.

49.     The deleterious purpose underlying the City's unreasonable revocation of the approved permits, *i.e.*, undeserved, purely self-interested economic gain at the expense of a specific property owner, is not a legitimate government interest.  The City has violated Arbor Court's substantive due process rights by revoking the approved permits in furtherance of its illicit, non-legitimate proprietary purpose.

50.     Beyond the City's plainly improper motive for revoking the approved permits, there also was no conceivable factual basis for the City to revoke the approved permits based on its blatantly incorrect determination that *any* of the buildings on the Arbor Court property, including those subject to the approved permits, were "substantially damaged."  The City's own engineer, Choyce Morrow, recognized that based on the materials Arbor Court submitted in connection with its substantial damage determination appeal, *none* of the buildings on the Arbor Court property could appropriately be classified as "substantially damaged" within the meaning of Chapter 19.

The favorable March 28, 2018 substantial damage determination appeal regarding the approved permits further demonstrates that the City had actual knowledge of, and agreed with, the fact that not all of the buildings on the Arbor Court property were "substantially damaged."  Consequently, the City's decision to revoke the approved permits on the grounds that those buildings are "substantially damaged"—grounds the City actually knows to be false—was and remains arbitrary, capricious, and in no way related to any legitimate government interest the City may belatedly attempt to invoke well after the fact.  Indeed, the decision appears to be retaliatory, in response to Arbor Court's decision to challenge the City's decisions judicially, and Arbor Court's insistence that if it was to sell the property to the City, such sale would have to occur at a fair market valuation price.

51.     Similarly, there was no conceivable factual basis for the City to revoke the approved permits on the basis that repairing the buildings on the Arbor Court property poses a danger to life and property.  According to a July 17, 2018 letter sent by the City to Arbor Court, which was sent well after the City revoked the approved permits and yet remarkably makes no mention of the Arbor Court permits the City approved and issued, the City has been in possession of a report since *November 29, 2016* that purportedly supported its conclusion to deny Arbor Court any permits on safety grounds.  Yet, in the sixteen months between receiving the report and approving permits for certain buildings on the Arbor Court property, and permits for surrounding properties, the City never expressed any health or safety concerns about the Arbor Court property. The City even failed to express any such concern in the immediate aftermath of Hurricane Harvey. This just demonstrates that the City never actually believed, and does not believe, that repairing the Arbor Court property poses a safety risk to life or property, and that any contention to the contrary is pretextual, to cover up its true motivations.

52.     Indeed, the City's July 17, 2018 letter evidences an astonishingly transparent attempt by the City to cover up its plainly arbitrary and capricious revocation of the approved permits on "substantial damage" grounds—grounds it had actual knowledge were false—with *ex post* rationales that obviously played no role in the revocation decision and which the City also knew would not provide a factual basis to revoke the approved permits.  The fact that the City called Arbor Court on October 9, 2018, without any material change in the Arbor Court property's circumstances, to inform Arbor Court that eight approved permits were awaiting retrieval further undermines the City's specious claim that health and safety played any role in its self-interested, arbitrary, and capricious decision to revoke the approved permits.

53.     The City's election to revoke Arbor Court's approved permits is a final decision by the City.  Evidence of the revocation's finality includes, but is not limited to, the City's consistent refusal to release the issued and approved permits over the past seven months, the City's attempt to impose additional requirements on Arbor Court to obtain the permits that are beyond the scope of, and not authorized by, Chapter 19, the refusal by the Mayor's Office or the Director of Public Works for the City to release or re-issue the approved permits under these newly implemented requirements, and the City's constant effort to find new, yet entirely unsubstantiated, grounds for revoking the permits, which have ranged from knowingly incorrect substantial damage determinations to belated, non-credible invocations of safety and FEMA requirements.  These actions violated Arbor Court's Fourteenth Amendment rights under the U.S. Constitution.

### D.     Violation of Equal Protection.

54.     Arbor Court re-alleges and incorporates paragraphs 1-53.

55.     The City's actions have denied Arbor Court equal protection under both the state and federal constitutions.

56.     Specifically, the City intentionally treated Arbor Court differently than other similarly situated property owners.  Arbor Court was built in 1979.  Upon information and belief, Imperial Oaks Apartments, located at 625 Seminar Dr., Houston, TX 77060, on the same street as Arbor Court, was built in 1977 and is also a 2-story apartment.  It also has approximately the same number of apartments as Arbor Court at 265.  Upon information and belief, Biscayne at Cityview, located at 17050 Imperial Valley Drive, Houston, TX 77060, was similarly built in 1978.  Though larger than Arbor Court, with more than 500 apartments, it is also 2-stories.  Further, while both properties offer apartments with comparable prices to Arbor Court at between $500 and $800 per month, upon information and belief, neither Imperial Oaks, nor Biscayne at Cityview is a Section 8 property.  Both properties—Imperial Oaks and Biscayne at Cityview—received damage from Hurricane Harvey flooding that was at least comparable, if not greater, than the damage Arbor Court's property received.  They also received permits from the City to rebuild.  Yet, unlike Arbor Court, the City did not revoke those permits.

57.     The City had no rational basis for this difference in treatment.  The City unreasonably and unconstitutionally applied Houston's municipal ordinances and forced Arbor Court to endure extraordinary processes, as well as selective and improper enforcement of the City's repair permit approval process under Chapter 19 of the City's floodplain ordinance.  The City wrongfully, arbitrarily, and capriciously denied Arbor Court's appeal related to Buildings 1-6 and 10-11, and wrongfully, arbitrarily, and capriciously imposed an onerous and irregular approval process related to Buildings 7-9 and 12-15.

58.     Further, despite the fact that Arbor Court's SDDA appeal demonstrated that none of its 15 Buildings were "substantially damaged," Arbor Court's appeal was arbitrarily and capriciously denied as to Buildings 1-6 and 10-11.  Further, while Arbor Court's appeal was

granted as to Buildings 7-9 and 12-15, this approval was later arbitrarily and capriciously revoked, and the City now requires the Mayor's Office or the Director of Public Works for the City's consent for the revoked permits to be approved although City officials have confirmed that such consent to release the permits will never occur.  The neighboring apartment complexes, which are not Section 8 properties, had their comparable permits approved without this consent process, which does not appear anywhere within the City's Chapter 19 ordinance.

59.    The City's intentional and arbitrarily different treatment of Arbor Court has denied Arbor Court's entitlement to equal protection under the law under the Fourteenth Amendment to the U.S. Constitution.

### E.    Contracts Clause of the U.S. Constitution

60.    Arbor Court re-alleges and incorporates paragraphs 1-59.

61.    Arbor Court has contractual relationship with HUD via the HAP Agreement.  Arbor Court also has a contractual relationship with the tenants who lease properties on the Arbor Court property.  The City has actual knowledge of these contractual relationships.

62.    The City's arbitrary, capricious, and discriminatory revocation and denial of Plaintiff's permits has substantially impaired Arbor Court's contractual relationships with HUD and the residents who lease now damaged apartments at the Arbor Court property.  Because of the City's unlawful actions, Arbor Court is unable to perform repairs that are essential to its ability to perform properly under its contract with HUD and leases with tenants.

63.    The City's actions have totally and indefinitely destroyed Arbor Court's ability to perform its most critical and fundamental obligations under both the HUD contract and its lease agreements with first-story tenants, namely Arbor Court's responsibility to provide safe and adequate housing to low-income individuals and families.  Moreover, Arbor Court had no

reasonable expectation that the City would severely impair its contracts with HUD and its tenants by singling out and specifically targeting the Arbor Court property.

64.     There is no significant or legitimate public purpose underlying the City's revocation and denial of the permits to which Arbor Court is entitled.  The City's actions also are not reasonably necessary to achieve any legitimate public purpose.  Indeed, the City's actions are targeted directly and exclusively at Plaintiff for the sole, illegitimate purpose of driving down the value of the Arbor Court property in furtherance of the City's efforts to obtain the property and/or the HAP contract at an artificially depressed valuation.  And such actions by the City have been intentionally targeted and designed to interfere with Arbor Court's contract with HUD, to deprive Arbor Court of the benefits of the same along with causing Arbor Court to be unable to fulfill it obligations thereunder.

65.     In addition to there being no significant or legitimate purpose underlying the City's revocation and denial of the permits to which Arbor Court is entitled, the City's adjustment of the parties' rights and obligations under the HAP contract and Arbor Court tenant leases are not based on reasonable conditions and are not of a character appropriate to the public purpose purportedly justifying the City's unlawful actions.  It is plainly unreasonable for the City to specifically target the Arbor Court property and adjust Plaintiff's, HUD's, and the tenants' contractual rights and obligations by imposing conditions on permit releases and approvals that are not required of any similarly situated property.  The City's deliberately disparate treatment of Arbor Court and conscious efforts to single out Arbor Court are flatly inconsistent with the false and pretextual "public purpose" the City has offered in justification of its discriminatory, arbitrary, and capricious actions.

**F.      Violation of State Due Process and Equal Protection.**

66.      Arbor Court re-alleges and incorporates paragraphs 1-65.

67.      For the reasons set out above, the City's revocation and denial of the permits Arbor Court applied for regarding the Arbor Court property constitute violations of Arbor Court's rights under the due process and equal protection provisions of the Texas Constitution.

**G.      Tortious Interference.**

68.      Arbor Court re-alleges and incorporates paragraphs 1-67.

69.      For several years, the City has both known about, and highly coveted, Arbor Court's valuable contract with HUD.

70.      Prior to Hurricane Harvey, the City had contacted HUD on numerous occasions, unrelated to any governmental function such as zoning or community development, and willfully and intentionally interfered with Arbor Court's contractual relationship with HUD by encouraging HUD to terminate its contract with Arbor Court and agree to a comparable contract with the City.

71.      Following Hurricane Harvey and the resulting damage to the Arbor Court property, the City has accelerated its efforts to encourage and induce HUD to terminate its valuable contract with Arbor Court.   On information and belief, these efforts include numerous phone calls, communications, and meetings with HUD officials, all of which are intended to interfere with Arbor Court's contractual relationship with HUD.

72.      The City's repeated and ongoing willful and intentional interference with Arbor Court's contractual relationship with HUD is purely proprietary in nature.  The City's campaign of interference cannot fairly be characterized as a function enjoined on the City by law and given to the City by the state of Texas as part of the state's sovereignty.  To the contrary, the City has

undertaken a course of conduct to interfere with Arbor Court's contract with HUD in its discretion for its own benefit and ostensibly the benefit of the City's inhabitants.

73.     The City's tortious communications with HUD already have resulted in damage to Arbor Court's contractual relationship with HUD as demonstrated by, *inter alia*, the notice of default that Arbor Court recently received from HUD.  Upon information and belief, in its communications with HUD, the City repeatedly has encouraged HUD to terminate its contract with Arbor Court.

74.     If allowed to continue unchecked, the City's willful and deliberate efforts to interfere with Arbor Court's contractual relationship with HUD will proximately result in additional damages, including the termination of the HUD contract.

**H.     Violation of Vested Rights.**

75.     Arbor Court re-alleges and incorporates paragraphs 1-74.

76.     Chapter 245 of the Texas Local Government Code mandates that the City was required to consider the approval, disapproval, or conditional approval of Arbor Court's applications for permits solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the permit was filed for review for any purpose, including review for administrative completeness.

77.     Arbor Court obtained a vested right under Chapter 245 in the approved permits once granted by the City.  The City revoked Arbor Court's approved permits on the basis of rules and requirements that were promulgated after Arbor Court submitted its original permit application to the City (and imposed uniquely on Arbor Court), in clear violation of Chapter 245 of the Texas Local Government Code.

78.    With respect to the permits the City simply denied, rather than revoked, the City denied those permits on the basis of rules and requirements that were promulgated after Arbor Court submitted its original permit application to the City (and imposed uniquely on Arbor Court) in clear violation of Chapter 245 of the Texas Local Government Code.

79.    The additional hurdles the City has imposed uniquely on Arbor Court were not intended to prevent the imminent destruction of property or injury to any person and were not enacted to prevent the flooding of any building.  At the time the additional obstacles were imposed, there was no imminent or likely flood risk to the Arbor Court property.  In addition, these obstacles are purely political in nature and bear no reasonable relation to mitigating flood loss, which already was addressed more than adequately in Chapter 19's engineering-based approach to permitting.

### I.    Request for Injunctive Relief.

80.    Arbor Court re-alleges and incorporates paragraphs 1-79.

81.    Due to the City's repeated and ongoing disregard for Arbor Court's rights under the U.S. Constitution and the Texas Constitution, and the City's repeated and ongoing interference in and with Arbor Court's contractual relationship with HUD, Arbor Court is entitled to both preliminary and permanent injunctive relief.

82.    Arbor Court requests preliminary relief in the form of a preliminary injunction compelling the City to immediately discontinue its arbitrary, capricious, and discriminatory practices of refusing to release or issue, as applicable, Arbor Court the permits necessary to begin repairing each of the 15 buildings on the Arbor Court property.

83.    In the alternative, Arbor Court requests preliminary relief in the form of a preliminary injunction enjoining the City from taking any further action precluding Arbor Court from repairing the damage to the Arbor Court property, including interrupting or interfering with

Arbor Court's efforts and actions to repair its property in the manner contemplated by Arbor Court's permit applications, when Arbor Court commences the work, with or without issued permits, but in accordance with all applicable code requirements.

84.     Arbor Court seeks a permanent injunction enjoining the City from taking action against Arbor Court for repairing or rebuilding the Property, in accordance with any order of the Court allowing it to do so, alleging a failure to perform repair and restoration work with permits.

85.     Arbor Court faces imminent and irreparable harm if the requested injunctive relief is not granted.  Arbor Court's livelihood and continued existence depends on its ability to perform its obligations under the HUD agreement and receive rents from its tenants.  The City's arbitrary, capricious, and discriminatory conduct towards Arbor Court with respect to its permit applications has, and continues, to make Arbor Court's performance of its critical legal and contractual obligations to HUD and tenants who have leased damaged units impossible.

86.     The urgency of judicial intervention and the granting of equitable injunctive relief has been heightened in the last several days.  Not only has the City revoked its willingness to resolve the issues presented via a purchase and sale transaction, but in response to that HUD has sent Arbor Court formal notice that it considers Arbor Court to be in default of its contractual obligations, and subject to remedial enforcement action unless Arbor Court engages in immediate corrective action, including obtaining permits to repair the ongoing damage at Arbor Court, or otherwise causing the repair of the damaged buildings.  Accordingly, Arbor Court faces imminent, non-compensable liability risks and irreparable injury with respect to its inability to fulfill its obligations to HUD and its tenants.

87.     The real threat of imminent and irreparable harm to Arbor Court as a result of the City's actions is not limited to its potential liability to HUD and its tenants.  Upon information and

25

belief, Arbor Court's inability to perform its obligations under the HUD Contract and its lease agreements with tenants is not only likely to result in the termination of those agreements, but also may result in the termination of Arbor Court's other agreements with HUD, and will cause substantial damage to Arbor Court's image and reputation, making it prohibitively difficult for Arbor Court to secure future contracts with HUD, attract new tenants, or obtain future approvals from the City with respect to the Arbor Court property or any other properties Arbor Court may acquire.

88.     No adequate remedy at law is available to prevent the occurrence of these imminent and irreparable injuries or make Arbor Court whole once these injuries are realized.  Arbor Court is substantially likely to prevail on the merits of its claims.

89.     The balancing of the equities and hardships strongly favors issuance of the requested injunctive relief.  Arbor Court possesses the funds necessary to commence repairs on its property immediately, and is ready, willing, and able to do so as soon as it is permitted to do so by this Court.  Moreover, the injuries faced by Arbor Court as a result of the City's unconstitutional conduct poses an existential threat.  In contrast, the City faces no injury at this time, or at best, only faces injury that is purely speculative, if it is merely required to permit Arbor Court to perform the necessary repairs on its property.

90.     The public interest would be served by the entry of the requested injunctive relief. Affordable housing is a critical issue for municipalities across the country, including the City.  The injunctive relief sought will help ensure the City's already inadequate supply of affordable housing is not further diminished as a result of the City's arbitrary, capricious, and discriminatory conduct.

91.     Arbor Court is prepared to post bond in an amount this Court deems appropriate.

## REMEDIES

92.     Arbor Court re-alleges and incorporates paragraphs 1-91 .

93.     Arbor Court has suffered substantial damages as the proximate result of the City's violation of Arbor Court's rights to procedural and substantive due process, equal protection, and contracts free of substantial impairment and the City's tortious interference with its contractual relationship with HUD.  These damages include lost rental income from tenants, lost earnings under the HUD contract, and diminution in the value of the Arbor Court property.

94.     By virtue of the City's violations of Arbor Court's rights secured by the United States Constitution, Plaintiff is entitled to, under 42 U.S.C. § 1983, the foregoing damages and injunctive relief along with its attorneys' fees pursuant to 42 U.S.C. § 1988.  Plaintiff also is entitled to damages and injunctive relief by virtue of Defendant's violation of Article 1 Section 10 of the U.S. Constitution.

95.     By virtue of its statutory vested rights, as well as the City's violation of substantive state law due process and equal protection guarantees, Plaintiff is entitled to mandamus, declaratory and/or injunctive relief to set aside the City's revocation of the approved permits and denial of or failure to approve the other permits Plaintiff submitted to the City in connection with its efforts to repair the Arbor Court property following Hurricane Harvey.

96.     Plaintiff pleads entitlement to these remedies in the alternative and reserves its right to select its preferred remedy at time of entry of judgment.

## CONDITIONS PRECEDENT

97.     All conditions precedent to bringing this suit have been duly and timely met and satisfied.

## PRAYER

98.     WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that this Court grant it the relief sought above, that it be awarded preliminary and permanent injunctive relief and where applicable, its damages within the jurisdictional limits of this Court, prejudgment and postjudgment interest, court costs, other fees, and all relief, both legal and equitable, to which it is entitled.

Respectfully submitted,

/s/ Kenneth B. Chaiken
Kenneth B. Chaiken
Attorney-in-Charge
Texas Bar No. 04057800
kchaiken@chaikenlaw.com
CHAIKEN & CHAIKEN, P.C.
Legacy Town Center III
5801 Tennyson Pkwy., Suite 440
Plano, Texas 75024
(214) 265-0250 – Telephone
(214) 265-1537 – Facsimile

Karl Stern
Texas Bar No. 19175665
S.D. Tex. Bar No. 4870
karlstern@quinnemanuel.com
Christopher D. Porter
Texas Bar No. 24070437
S.D. Tex. Bar No. 1052367
chrisporter@quinnemanuel.com
Emily M. Smith
Texas Bar No. 24083876
emilysmith@quinnemanuel.com
S.D. Tex. Bar No. 1890677
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
711 Louisiana St., Suite 500
Houston, Texas 77002
713.221.7000 – Telephone
713.221.7100 – Facsimile

**ATTORNEYS FOR PLAINTIFF**
**DM ARBOR COURT, LTD.**

## CERTIFICATE OF SERVICE

A copy of the foregoing Second Amended Complaint was served on the following counsel of record for defendant via CM/ECF on October 31, 2018:

Patricia Lynn Casey
City of Houston Legal Department
900 Bagby, 4th Floor
Houston, Texas 77002
Email: pat.casey@houstontx.gov

*/s/ Christopher D. Porter*
Christopher D. Porter