United States District Court
Southern District of Texas
**ENTERED**
October 21, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DM ARBOR COURT, LTD., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-18-1884 |
| | § | |
| THE CITY OF HOUSTON | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM & ORDER**

Pending before the court is the City of Houston's ("the City") motion to dismiss plaintiff DM Arbor Court's ("DMAC") third amended complaint.  Dkt. 108.  Having considered the motion, response, reply, and applicable law, the court is of the opinion that the City's motion should be GRANTED in part and DENIED in part.

**BACKGROUND**

**A.  Houston's Floodplain Ordinance**

Over four years ago, DMAC sought a permit to repair its property under Chapter 19 of the Houston Code of Ordinances (the "Ordinance").  *See* Dkt. 108, Ex. 1; Hous., Tex., Rev. Ordinances ch. 19 (2018 and 2006).  That Ordinance governs property development in Houston's floodplain and floodway.  *See* Dkt. 108, Ex. 1.  After the instant litigation commenced, the City amended the Ordinance, with the new permitting rules taking effect on September 1, 2018.  *See id.*  The following is a summary of the relevant provisions in effect at the time.

Since 1985, the Ordinance has helped ensure that development within Houston complies with the development standards the Federal Emergency Management Agency ("FEMA") mandates for property owners to participate in the National Flood Insurance Program ("NFIP").

*Id.* at 3; Ch. 19, art. I, § 1(b). The Ordinance also seeks "to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas by provisions designed to…[among other things] [p]rotect human life and health." *Id.* at 2; Ch. 19, art. I, § 1(a).

Article II of the Ordinance sets forth the regulatory framework for floodplain development permits. *See id.* at 10; Ch. 19, art. II, §§ 11–23.  It provides that:

> No building permit, paving permit, utility construction permit or other permit required for a structure or development shall be issued, and no plat meets the applicable requirements of this chapter, or unless a variance, excepting such structure or development from the provisions of this chapter, is granted under the terms of this chapter.

*Id.* at 10–11; Ch. 19, art. II, § 11.  A development includes new construction, or improvements to existing structures, within the floodplain and floodway.  *Id.* at 6, 18; Ch. 19, arts. I–III, §§ 2 (defining "development"), 11, 16(a), 32.

The Ordinance also specifies the requirements and procedures for permit applications, as well as decisions on whether to approve or deny them by the City Engineer.  *See id.* at 10; Ch. 19, art. II, § 11.  The Ordinance charges the City Engineer with "exercising best engineer judgment in the administration and implementation" of the permitting chapter's provisions.  *Id.* at 11; Ch. 19, art. II, § 12.  In addition, it tasks the City Engineer with "[r]eviewing, approving, or denying all applications for development permits required by the adoption of this chapter."  *Id.*; Ch. 19, art. II, § 12(2).  The Ordinance further authorizes the City Engineer to "deny a permit application if the issuance of the permit could result in … [among other things] [d]anger to life or property due to flooding or erosion damage in the vicinity of the site."  *Id.* at 14; Ch. 19, art. II, § 19(a)(1).

If the City Engineer denies an applicant's permit request, the Ordinance provides a variance and appeal process.  *Id.* at 15; Ch. 19, art. II, § 22(a)(5).  An applicant may first appeal the decision to the General Appeals Board.  *See id.*  If that proves unsuccessful, an applicant may further appeal

to the City Council, which serves as the final decisionmaker on any appeal. *Id.* at 18; Ch. 19, art. II, § 23(g).

### B.  DMAC's Attempt to Procure a Permit

In August 2017, Hurricane Harvey ("Harvey") tore through Houston.  Dkt. 106 at 1–2. Torrential rains brought widespread flooding, leaving unprecedented scenes of loss and damaged property.  *See id.*  Arbor Court was one such property.  *Id.*  A 15-building multi-family apartment community built in 1979, Arbor Court offered 232 affordable housing units through the Department of Housing and Urban Development's ("HUD") Section 8 program.  *Id.* at 2, 40.  Its 116 first-floor units, as well as those of neighboring apartment complexes unaffiliated with HUD, flooded during the storm.  *Id.* at 2, 5.  Unsurprisingly, Harvey's damage forced Arbor Court's tenants to leave their homes.  *Id.* at 2.  Yet, despite the damage, DMAC contends that the property was "structurally sound" and alleges it "would be fully habitable today with interior repairs."  *Id.* That is, had the City not denied it the permits necessary to restore the property.  *Id.*

This was not the first time that Arbor Court had flooded.  A little over a year before Harvey, Arbor Court's ground-floor units flooded during the 2016 Tax Day Flood, displacing tenants in the process.  *Id.* at 6.  After that flood, DMAC sought to restore Arbor Court and requested repair permits under the Ordinance.  *See id.*  The City "immediately" approved its request, and DMAC began the work necessary to rehome Arbor Court's displaced tenants.  *Id.*  Procuring these permits was unexceptional because other apartment communities also flooded, and the City likewise approved their permitting requests.  *See id.*

Later that year, however, the City received a "drainage evaluation report."  *Id.*  That report recommended that the City "treat Arbor Court…as a 'repetitively flooding property'" that the City should purchase, clear off all structures or improvements, and re-purpose as a multi-use park and

retention area. *Id.* DMAC was unaware of the drainage evaluation report when, following Harvey, it requested repair permits from the City's Floodplain Management Office to rehabilitate Arbor Court. *See id.*

This time, the City denied its request. *Id.* at 2–3. On October 10, 2017, DMAC received a letter explaining why. *Id.* at 7. The Floodplain Management Office concluded that "each of Arbor Court's fifteen buildings were 'substantially damaged'" because "each of the buildings was more than 50% damaged pursuant to FEMA cost estimation guidelines." *Id.*

DMAC "appealed" the denial of its permits "to the appropriate City staff personnel," though it does not appear that DMAC appealed the denial to the General Appeals Board, at least initially. *Id.* In support of its "appeal," DMAC hired a licensed real estate appraiser to determine the actual cash value of the buildings and a licensed architect to determine the cost of repair. *Id.* Using their findings, DMAC claims it proved to City staff that the City's calculations were incorrect. *Id.* On March 28, 2018, DMAC alleges that Choyce Morrow ("Morrow"), Supervising Engineer in the Office of the City of Engineer/Floodplain Management, sent a letter ("the Morrow Letter") stating that the City had "approved" DMAC's appeal for Buildings 7–9 and 12–15. *Id.* at 8. Those buildings accounted for seven of the fifteen requested repair permits, and the Morrow Letter stated that "the hold that had been placed in the City of Houston building permit system on your address has been removed." *Id.* In addition, the Morrow Letter notified DMAC that it could "proceed with obtaining any City of Houston permits [it] need[ed] to complete the repairs to Buildings 7–9 and 12–15." *Id.* Furthermore, the Floodplain Management Office provided notices regarding the permits related to those buildings with "approved" stamped on them. *Id.*

Meanwhile, DMAC continued to contest the City's damage calculations for the remaining, ostensibly unapproved, eight buildings. *See id.* After DMAC provided additional information,

Morrow sent DMAC an e-mail ("the Morrow E-Mail") on May 1, 2018, stating that "all buildings will be classified as non-substantial." *Id.* DMAC alleges that this notice, in turn, led it to believe that it would receive all the requested permits. *Id.* Between the Morrow Letter, the seven permit notices stamped "approved," and the Morrow E-Mail, DMAC alleges it thought it could begin the restoration work that Arbor Court needed. *See id.* at 8–9.

That assessment turned out to be misguided. When DMAC attempted "to retrieve physical permits for the seven previously approved buildings," the City refused to release them. *Id.* at 9. DMAC next alleges that it learned that "the City was requiring either the Mayor's Office or [the] Director of Public Works to approve the issuance and release of any permits," irrespective of its successful appeal of the City's "substantial damage" calculation. *Id.* According to DMAC, that is because "the Mayor and Director of Public Works intervened in the permit application process to enforce their own official policy that the holds they imposed upon [the] permits would not be lifted or released." *Id.* at 11. Under this alleged policy, "no permits would issue to allow rehabilitation of the property following Hurricane Harvey without [the] approval [of the Mayor and Director of Public Works], even if the criteria for obtaining the permits were fully satisfied." *Id.* at 14–15.

So, on June 8, 2018, DMAC sued the City. *Id.* at 9. At some point, then-City Attorney Ronald Lewis communicated "the City's interest in purchasing Arbor Court and confirmed the City was ready, willing, and able to do so." *Id.* Accordingly, shortly after DMAC initiated suit against the City, the parties met and discussed a potential sale. *Id.* DMAC maintains that the parties diligently exchanged information in hopes of striking a deal that would reflect "appraisals of Arbor Court, using the income valuation approach at then current approved rental rates, but assuming full, pre-Hurricane Harvey occupancy…and no damage to the property." *Id.*

Just over a month later, on July 17, 2018, the acting Director of Public Works sent DMAC a letter advising it that the City Engineer, under various provisions of the Ordinance concluded that there "is danger to both life and property due to flooding in the vicinity of the [Arbor Court] site." *Id.* at 11, 21. That letter referenced the 2016 drainage evaluation report that classified Arbor Court as a "repetitively flooding property," but failed to mention that the report also recommended that the City buy, clear, and repurpose the property. *Id.* at 11–12.

DMAC states that the letter was the first notice DMAC received that the City Engineer reviewed its permit applications. *Id.* at 12. The City Engineer allegedly never sought DMAC's comment or response to his proposed findings and decision during his review. *Id.* Nor did he conduct a hearing. *Id.* Indeed, DMAC claims that a report of the study the City Engineer conducted, showing what he reviewed, his findings, and how he arrived at them, "does not exist." *Id.* The absence of such a paper trail, DMAC concludes, is explained by the City Engineer's failure to "actually conduct a review or study of any kind." *Id.* at 13. DMAC thus hypothesizes that the City Engineer manufactured a reason to justify the City's desire to deny the permits. *See id.*

This time, DMAC appealed to the General Appeals Board. *Id.* at 20. The General Appeals Board held a hearing wherein the City Engineer testified that his denial decision was "a product of supplemental data" considered pursuant to the Ordinance. *Id.* DMAC alleges that the City Engineer "could not identify that supplemental data, whether it constituted supplemental as defined in [the Ordinance], or when the same was available to the City and/or considered in connection with the consideration of DMAC's permit application." *Id.* at 21. The General Appeals Board upheld the denial. *Id.* at 20–21. Eventually, DMAC appealed to City Council, which denied DMAC's petition. *Id.* at 21.

Though not spared by Harvey's flooding, Arbor Court's neighbors escaped DMAC's fate in the permitting process: the City issued them permits to repair their damaged ground-floor units. *Id.* at 10, 40.  One of those complexes, Imperial Oaks Apartments, built in 1977, is located on the same street as Arbor Court and houses 265 units, approximately the same number of units as Arbor Court.  *Id.* at 40.  A second complex, Biscayne at Cityview, is allegedly another neighboring apartment community.  *Id.*  Built in 1978, Biscayne is larger than Arbor Court, with more than 500 apartments, but is also two-stories.  *Id.*  Neither Imperial Oaks nor Biscayne are affiliated with HUD, but both offered rental rates comparable to those at Arbor Court, at between $500 and $800 per month.  *Id.*

### C.  DMAC's HUD Contract

DMAC's relationship with HUD allegedly attracted the attention of certain City officials. On September 12, 2017, the City's Director of Housing and Community Development contacted HUD "to ensure [that Arbor Court's] units are not rehabbed," because it was a "priority for both [him] and the Mayor that low-income families not be placed once again in the way of storm water given that Arbor Court is in the floodway." *Id.* at 15.  Those preferences were confirmed by the City's Chief Development Officer, who relayed to HUD that, at the Mayoral level, the City was withholding permits while it evaluated the issue of repetitively flooding properties. *Id.*  DMAC further alleges that another City official likewise confirmed that "the Mayor was aware of the hold on permits sought by DMAC." *Id.* at 15–16.  And, on October 2, 2017, a City Public Works employee sought to inform the City's Public Works Director of a study—potentially the 2016 drainage evaluation report—that recommended buying out Arbor Court, "as we have put a hold on selling any permits in the area temporarily (per her direction and the Mayor's)." *Id.* at 16, 24.

On September 1, 2018, the City amended its Floodplain Ordinance. *See* Dkt. 108.  The next month, the City pulled out of purchasing discussions with DMAC.  Dkt. 106 at 16.  Then, HUD formally notified DMAC that it was in default of its Housing Assistance Payment ("HAP") contract with the agency because Arbor Court's first-floor units remained "damaged, unrepaired, and uninhabitable."  *Id.* at 17.  HUD thus demanded that DMAC obtain repair permits and repair the units, which DMAC could not do because the City "continued its refusal to release usable permits that would allow for the repair of any of the buildings."  *Id.*  Consequently, HUD "removed" the HAP contract from Arbor Court.  *Id.*  DMAC alleges that its "loss of the HAP contract"—purportedly valued at $11 million—"is permanent."  *Id.* at 39–40.

Because Arbor Court could no longer operate as a HUD-subsidized affordable housing community, its cashflow dried up.  *Id.* at 17.  DMAC claims that the Arbor Court property can no longer be operated as a multifamily apartment complex—government subsidized or otherwise— because DMAC cannot sell the property "to a third party for a reasonable market value as if repaired, because it cannot be repaired and used."  *Id.* at 17–18, 37.  As a result, DMAC asserts that the City's withholding of permits "has virtually eliminated the economic viability and beneficial use of the property."[1]  *Id.* at 36.  Moreover, because Arbor Court generates no income, DMAC cannot pay the "substantial" sums it owes on its mortgage.  *Id.* at 18.

### D.  DMAC's Causes of Action

Based on these alleged facts, DMAC brings seven causes of action.  First, it seeks a declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02,

---

[1]      Despite "render[ing] [Arbor Court] effectively valueless," the City pursued the collection of ad valorem taxes from DMAC based on an assessment that valued the property at more than $12.2 million, though it since reduced the tax to reflect Arbor Court's unused land value of $1.4 million.  Dkt. 106 at 18, 39.

and its state equivalent, the Uniform Declaratory Judgment Act, TEX. CIV. PRAC. & REM. CODE §§37.001–37.006.   Dkt. 106 at 23.   DMAC's thirty-five declaratory judgment claims can be roughly organized into three categories: claims interpreting the Ordinance; claims that the Ordinance is unconstitutional; and claims that the City wrongfully applied the Ordinance to DMAC's permitting applications.

    Regarding its interpretation claims, DMAC requests a judgment declaring that:

1.  The Ordinance in effect at the time of the official decisions complained of, provides a regulatory system to monitor the issuance of permits to reduce the likelihood that development within the city will increase the dangers of flooding.  Dkt. 106 at 23.

2.  The Ordinance does not allow for the retroactive regulation of land use, that does not involve a material change in the structures or the development of the same.  *Id.*

3.  The Ordinance is intended to prevent only new proposed uses of property that are dangerous to health, safety or property in times of flood, at the time of initial construction.  *Id.*

4.  The Ordinance cannot be read to allow, via denial of requested permits, the prohibition of a use of the property in question that was permitted at the time of its initial construction, years after that initial construction, and in particular when the permits requested seek only to repair damage, without altering the initial construction status (*i.e.*, the restorative construction will not change or expand the building structure, footprint, size or location).  *Id.*

5.  Chapter 19 does not authorize a Mayoral or Director of Public Works mandated hold upon the release of permits.  *Id.* at 25.

6.  The continued, particular specific use of a property for its intended purposes or the demographics of its users, are not factors that can direct whether a repair permit should issue, under the Ordinance.  *Id.*

7.  Ordinance Sections 19-1 (a)-(b) do not authorize post initial construction refusals of permits to repair to their pre-damaged condition, or repair improvements upon properties that have long been located on a site prone to a risk of flooding.  *Id.*

8.  Ordinance Section 19-19 does not authorize the denial of permits to repair already developed properties and improvements, to restore them to their pre-damage condition with no other material changes.  *Id.*

9.   Neither Section 19-2, 19-17 nor 19-19 of the Ordinances authorize or require the submission of NFIP proof of loss statements as a condition to obtaining a repair permit, as the same are not relevant to a substantial damage determination.  *Id.* at 25–26.

Regarding its constitutional claims, DMAC requests a judgment declaring that:

10.  The Ordinance cannot be used to cause or effectuate a taking of property, in the form of a regulatory prohibition of its use, without corresponding just compensation being paid to the property owner who suffers such a prohibition and loss of use.  *Id.* at 24.

11.  The Ordinance cannot be used to leverage an uncompensated re-purposing of the property, as suggest by Officials in the HPC-PWE office since at least October 2, 2017, when Bob Oakes wrote an email confirming that the LAN study cited in the July 17, 2018 permit denial letter suggested "buying out 2 complexes to use as a detention for the area" (expressly identifying Arbor Court as one of those 2 complexes), and explaining that "we have put a hold on selling any permits in the area temporarily (as per her direction and the Mayor).  *Id.*

12.  The Ordinance "unconstitutionally vests in the City Engineer the discretion to prohibit permitted uses of a property without establishing a legitimate public purpose and without providing constitutional due process to the landowner in the form of just compensation.  Chapter 19 as written and applied in this manner and in this case authorizes an unconstitutional or unlawful taking of private property in violation of the Texas and United States constitutions, without just compensation."  *Id.* at 26–27 ¶ 85.

13.  The City Engineer's July 2018 denial of the permits was not the actual or reasonable implementation of a health and safety requirement dependent upon specific and necessary Chapter 19 findings; and instead it was merely the effectuation of a previously planned prohibition via official decision of the Mayor and/or Director of Public Works, of the continuation of the subject property's permissible and longtime use that targeted Arbor Court, and that was not applied to any other property in Houston, in violation of the Equal Protection Clause of the United States Constitution. *Id.* at 27–28 ¶ 88.

14.  The Board's and the City Council's refusal to reverse the alleged City Engineer permit denial decision in this case constitutes an official ratification of an unlawfully made official decision and governmental action made and undertaken pursuant to an unconstitutional ordinance as written and applied.  *Id.* at 26 ¶ 84.

Regarding its wrongful application claims, DMAC asks the court to declare that:

15.  The denial of permits that is the subject of this case is grounded in Section 19-19 but does not assert any failure of DMAC to comply with any applicable provisions of the Ordinance if the proposed repair construction occurs, as proposed, via DMAC's permit applications.  Instead, the denial of permits purportedly employs the standards of Article III which on its face, apply to new construction, and substantial improvements

10

of existing structures, and not repairs of damages to structures already located in a floodway area or special flood hazard area. *See,* §§ 19-31 and 19-32, 19-43(a) ("the general restrictions stated herein shall not apply to a repair or renovation that is not a substantial improvement"). According to § 19-2, "Substantial Improvement" shall mean any reconstruction, rehabilitation, addition or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before the start of construction of the improvement." "Cost of improvement" shall mean the cost that increases the value of the structure based on a signed architect's or engineer's estimate. *Id.* at 23–24.

16. The permits sought by DMAC to reconstruct or repair damage to the Arbor Court buildings do not involve "substantial improvements," or improvements that increase the pre-construction value. *Id.* at 24.

17. Despite the requirements of § 19-19(a), the official decision denying DMAC's requested permits fails to show, explain or establish that the issuance of the permits could result in any of the conditions or circumstances set forth in § 19-19(a)(1-5) to any extent that differs from those conditions or circumstances as they previously existed, before repairs became necessary. *Id.*

18. Nothing about the requested permits or the proposed construction to repair damage, will cause any increase in the dangers of flooding, and the City and City Engineer have failed to prove otherwise, and cannot prove otherwise. *Id.*

19. Chapter 245 of the Texas Local Government Code mandates that the City was required to consider the approval, disapproval, or conditional approval of DMAC's applications for permits solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the permit was filed for review for any purpose, including review for administrative completeness. *Id.*

20. The City cannot rely upon alleged new information, to retroactively deny a permit application, especially after the stated requirements for obtaining the permit – establishing that the damages structures are not substantially damaged, have been satisfied. *Id.* at 24–25.

21. The Mayor and Director of Public Works of the City promulgated and initiated an official policy not set forth in Houston's Ordinances, *targeting* DMAC and Arbor Court, pursuant to which building repair permits for Arbor Court will never issue, in contravention of the plain terms of Chapter 19 and despite DMAC's compliance with its plain terms, thereby entitling DMAC to receive permits for the repair of all of its buildings, regardless of whether used as a HUD subsidized or non-HUD subsidized apartment community. *Id.* at 25.

22. In contravention of the Ordinance, the Mayor and the Director of Public Works of the City directly intervened in the Arbor Court permit application process to ensure that notwithstanding DMAC's compliance with the published requirements of Chapter 19, and in contravention of those requirements, permits would never be released to DMAC so as to prevent rehabilitation of Arbor Court following Hurricane Harvey, for the purpose of preventing low income residents requiring HUD provided rental assistance to continue to live at Arbor Court. *Id.*

23. The permit denial decision has occurred in violation or contravention of DMAC's vested rights under Chapter 245 of the Texas Local Government Code as established by the issuance of prior development permits for Arbor Court, including a rehabilitation permit allowing for all buildings to be repaired in 2016, after sustaining almost identical damage. *Id.*

*24.* The City wrongfully refused to complete the Substantial Damage Determination appeal process, and to issue permits, because it knew none of the buildings at Arbor Court were substantially damaged, and that the City needed to ground its refusal to issue permits in some other stated reason. *Id.*

25. The apparent decision to deny DMAC its permits, to the extent based upon a failure to provide NFIP proof of loss statements, is impermissible, especially because the City knew no such proof of loss statements existed in the form nevertheless demanded. *Id.* at 26.

26. The July 17, 2018 permit denial decision arbitrarily and capriciously concludes that there is danger to both life and property due to flooding in the vicinity of the Arbor Court site justifying a denial of repair permits, and it is a pretext to circumvent the effects of DMAC establishing that all buildings at Arbor Court were not "Substantially Damaged." *Id.*

27. The permit denial decision fails to show that the issuance of the requested permits, or performance of the repair work that necessitates such permits, will cause any increase in the dangers of flooding. *Id.*

28. The requested permits are expressly exempt from the requirements of Article III of the Ordinance. *Id.*

29. The decision by the City Engineer to prohibit the repair and use of the subject property and all of its buildings by denying permits is the imposition of the requirements of the Ordinance that constitutes an exceptional hardship to DMAC, as there is no method whereby DMAC may obtain permits to repair and use its property, as it was required by HUD to do, and as the City historically had permitted it to. *Id.*

30. The proposed repair construction set forth in DMAC's permit requests that have been denied will have no effect whatsoever on the flood levels within the City of Houston,

and the issuance of the requested permits will not cause any increase in flood dangers at the property or elsewhere.  *Id.*

31. The decision to prohibit the use of DMAC's property was not actually made by the City Engineer in connection with the Hurricane Harvey event, or for legitimate Chapter 19 reasons.  The decision to prohibit DMAC's use of the property as an apartment complex or, more specifically, as an affordable apartment complex was made by the Mayor, the Director of Public Works, and certain senior City Officials *prior to* the Hurricane Harvey event.  *Id.* at 27 ¶ 86.

32. The stated reasons for the final permit denial decision, putatively by the City Engineer, are pretextual, and establish the City's violation of Chapter 245 of the Texas Local Government Code in failing to consider the approval, disapproval or conditioned approval of DMAC's permit applications based solely on ordinances and rules in effect at the time of the consideration and denial of the same.  *Id.* ¶ 87.

33. The imposition of the Ordinance's health and safety requirements constitute an exceptional hardship upon DMAC.  *Id.* at 28 ¶ 89.

34. The imposition of the Ordinance's health and safety requirements to the particular circumstances would be unjustified in light of a demonstrated good and sufficient cause—*i.e.*, the loss of DMAC's ability to continue providing longstanding affordable housing at the Arbor Court property via the same structures in which such housing had been provided at that location, for decades.  *Id.* ¶ 90.

35. The imposition by the City of the Ordinance's health and safety requirements necessitated a variance pursuant to Section 19–22(b)(1-3).  *Id.* ¶ 91.

In addition, DMAC brings five constitutional claims under 42 U.S.C. § 1983.  First, DMAC alleges that the City's withholding of the repair permits effected an unconstitutional taking without just compensation in violation of the Fifth Amendment.  The next three claims involve the City's conduct during the permit request process, which DMAC alleges violated its substantive due process, procedural due process, and equal protection rights under the Fourteenth Amendment of the U.S. Constitution.  DMAC's fifth and final constitutional claim invokes the Contracts Clause.  *Id.* at 35–42.  Finally, DMAC brings state law claim of unconstitutional takings, violations of due process, and tortious interference.  *Id.* at 43–44.

### STANDARD OF REVIEW

The City moves to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Rule 12(b)(1) authorizes dismissal of an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Federal courts are ones of limited jurisdiction.  *Howery v. Allstate Insurance Co.*, 243 F.3d 912, 916 (5th Cir. 2001), citing *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673 (1994).  A federal court's decision to hear a case that is beyond its subject matter jurisdiction is not a "mere technical violation," but rather "an unconstitutional usurpation" of power.  Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 3522 (West 3d ed June 2021 update).  Because it "spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception," subject matter jurisdiction is a "threshold" matter.  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95, 118 S.Ct. 1003 (1998) (internal quotations omitted).

Review of whether a complaint fails to state a claim under Rule 12(b)(6) involves a different set of considerations.  A 12(b)(6) motion to dismiss should be granted only if the complaint omits "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007).  Because this is such a low bar, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted.  *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir.  2004).  In analyzing a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). The court's review is limited to the allegations in the complaint and to those documents attached to a motion to dismiss to the extent that those documents are referred to in the complaint and are central to the claims.  *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

**DISCUSSION**

**A.      Declaratory Judgment Claims**

It is always dangerous when lawyers try to do math.  But, by the court's count, DMAC brings thirty-five declaratory judgment claims touching upon the Ordinance's interpretation, application, and constitutionality.  *See* Dkt. 106 at 23.  The City contends that DMAC's claims against it should be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6).  Dkt. 108.  When a motion to dismiss is predicated on both Rule 12(b)(1) and (6), the court first resolves jurisdictional questions before addressing the merits of the claim under Rule 12(b)(6)'s standards.  *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

**1.   Motion to Dismiss Pursuant to Rule 12(b)(1)**

Under the Declaratory Judgment Act ("DJA"), a court "may declare the rights of and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201.[2]  The DJA offers the court broad discretion to decide whether it will decline the party's request for a declaratory judgment, provided it explains its actions.  *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 (5th Cir. 1983).  However, both Article III of the Constitution and the DJA cabin this discretion to claims presenting an "actual controversy."  28 U.S.C. § 2201(a); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27, 127 S. Ct. 764 (2007).  If a case fails to present such a controversy "at the time the complaint was filed," the court must dismiss the claim.  *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009).  Controversies

---

[2]      The Texas Declaratory Judgment Act, Tex. Civ. Prac. & Rem. Code § 37.001, *et seq.*, "is a procedural, and not a substantive, provision and therefore does not apply to actions in federal court. *Vera v. Bank of America, N.A.*, 569 F. App'x 349, 352 (5th Cir. 2014) (citing *Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998)).

must be ripe, which is to say, they may not be moot.  *See Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998).  For the purposes of declaratory relief, these requirements ensure the continuation of a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc.*, 549 U.S. at 127.

Here, the parties disagree as to whether DMAC has standing to seek declaratory relief to redress past injuries, specifically those DMAC incurred under the prior permitting regime.  They likewise disagree over whether the amended ordinance that became effective on September 1, 2018 mooted DMAC's declaratory challenge.  And they both retread old ground by contesting the ripeness of DMAC's challenge.  *See DM Arbor Court, Ltd. v. City of Houston*, 988 F.3d 215 (5th Cir. 2021).

### a.  Standing

The City contends that DMAC lacks "standing for its declaratory judgment claims because they are based on past events and are not forward looking."  Dkt. 108 at 14.  The City notes that the ordinance under which DMAC was denied repair permits is no longer operational because the City Council amended Chapter 19 after this litigation commenced.  *Id.* at 14–15.  It also observes that DMAC has failed to apply for any permits under the current regime.  *See id.*  Thus, from the City's perspective, DMAC's declaratory relief claim lacks the risk of future injury necessary to merit declaratory relief.

With respect to Article III's standing doctrine, "[r]equests for injunctive and declaratory relief implicate the intersection of redressability and injury-in-fact requirements."  *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019).  For declaratory relief, injuries must be continuous or threatened because "declaratory relief 'cannot conceivably remedy any past wrong.'"  *Id.* (quoting

*Citizens for a Better Env't*, 523 U.S. at 103).  "A plaintiff can meet the standing requirements when suit is brought under the [DJA]…by establishing 'actual present harm or a significant possibility of future harm.'"  *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2004).  Because declaratory relief is, as the City notes, "forward looking," *see Kinnison v. City of San Antonio*, 699 F. Supp. 2d 881, 891 (W.D. Tex. 2010), "a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future."  *Bauer*, 341 F.3d at 358.  That future injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Stringer*, 942 F.3d at 720–21 (*citing Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334 (2014).  In short, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy…if unaccompanied by any continuing, present adverse effects."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660 (1983).

Plaintiff certainly alleges "continuing, present adverse effects."  *See Lyons*, 461 U.S. at 95.  DMAC cannot generate any rental income from Arbor Court because it is uninhabitable, it is uninhabitable because it cannot be repaired, and it cannot be repaired because the City refuses to issue restoration permits. Dkt. 106 at 17, 36–37.  Moreover, "because the property is no longer operable for the purposes for which the loan was made," DMAC cannot repay a lender "substantial additional sums" required under its mortgage.  *Id.* at 18.

Standing is also judged "[at] the time [the] suit is filed."  *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 n.3 (5th Cir. 2005); *see also Reagan Nat'l Advert. of Austin, Inc. v. City of Cedar Park*, No. 20-50125, 2021 WL 3484698, at *5 (5th Cir. Aug. 6, 2021).  That DMAC's past injuries have resulted in such enduring effects is sufficient for the purposes of Article III standing.  However, were there any doubt, DMAC alleged future injuries at the time of suit that were neither "conjectural [n]or hypothetical."  *See Stringer*, 942 F.3d at 720–21.  When

DMAC initiated suit on June 8, 2018—several months before the new floodplain ordinance would go into effect—it sought injunctive relief against the City that would permit it to repair Arbor Court.  Dkt. 1 at 7–8.  In support of its claim, DMAC alleged that the City would continue to hinder its ability to restore Arbor Court to suppress its value in the event it later sought to purchase it.  *Id.* at 4.  In addition, DMAC alleged that the City would continue to frustrate its contractual obligations to HUD, thereby prolonging its purported contractual injury, with the same goal of suppressing Arbor Court's value.  *See id.* at 8.  These allegations of a future injury satisfy the jurisdictional standards for Article III standing.

### b.  Mootness

However, the question remains whether the City Council's enactment of an amended floodplain ordinance after the commencement of suit mooted the controversy.  Whereas "standing is to be determined as of the commencement of the suit," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571–72, 112 S. Ct. 2130 (1992), mootness "accounts for such events that occur during the litigation."  *Pool v. City of Houston*, 978 F.3d 307, 313 (5th Cir. 2020).  "A controversy becomes moot [when], as a result of intervening circumstances, there are no longer adverse parties with sufficient legal interests to maintain the litigation."  *Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1048 (5th Cir. 1993) (citing *Mills v. Green*, 159 U.S. 651, 653, 16 S. Ct. 132 (1859).  A controversy is moot "when the issues presented are no longer 'live' [or when] the parties lack a legally cognizable interest in the outcome."  *Id.* (citing *Powell v. McCormack*, 395 U.S. 486, 496, 89 S. Ct. 1944 (1969)).  Generally, "[t]here is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred." 10B Fed. Prac. & Proc. Civ. § 2757 (4th ed.).

A question of mootness arises where, as here, a challenged ordinance is repealed or modified after the initiation of litigation. *See McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004) ("Suits regarding the constitutionality of statutes become moot once the statute is repealed.").  In the event of the former, "repeal of a challenged statute is one of those events that makes it 'absolutely clear that the allegedly wrongful behavior…could not reasonably be expected to recur.'" *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000); *see also Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Ga.*, 868 F.3d 1248 (11th Cir. 2017) (city's repeal of an unenforced, disavowed ordinance banning the sale of sex devices mooted controversy).  But, for mootness purposes, the justiciability analysis turns not on whether an ordinance is still in effect but "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127.

The Fifth Circuit's recent decision in *Reagan National Advertising of Austin, Inc. v. City of Austin* illustrates these principles.  *See* 972 F.3d 696 (5th Cir. 2020).  There, the City of Austin enacted an ordinance regulating the use of signs.  *Id.* at 699.  The plaintiffs were denied a permit and subsequently sued the city seeking a declaratory judgment that its sign code was unconstitutional.  *Id.* at 699–701.  Soon thereafter, the city amended the sign code, changing some of the challenged provisions but retaining others.  *Id.* at 700.  Plaintiffs argued that their claims were not moot because Texas law, specifically, Section 245002(a)(1) of the Texas Local Government Code, "require[d] [its] permits applications be evaluated under the law as it existed at the time they were submitted." *Id.* at 701 (quoting *Reagan Nat. Advert. of Austin, Inc. v. City of Cedar Park*, 387 F. Supp. 3d 703, 706 n. 3 (W.D. Tex. 2019)).  The Fifth Circuit agreed and, noting

that plaintiffs sought permits under the prior ordinance, "evaluate[d] the constitutionality of the previous version." *Id.* at 701.

*Reagan National* instructs just the opposite of what the City maintains—that DMAC's claims "are moot because they are based on past conduct and because the City later amended Chapter 19." Dkt. 108 at 24. Like *Reagan National*, some of DMAC's declaratory claims touch upon the constitutionality of a previously enacted ordinance. *See supra* at 10. Both ordinances were amended after the initiation of suit, and both sets of plaintiffs invoked Section 245002(a)(1) of the Texas Local Government Code for the proposition that their permit applications had to be evaluated under the "rules in effect at the time." *Compare Reagan National*, 972 F.3d at 701, *with* Dkt. 106 at 27. Accordingly, "the rule of orderliness resolves this jurisdictional issue." *Reagan Nat'l Advert. of Austin, Inc. v. City of Cedar Park*, No. 20-50125, 2021 WL 3484698, at *2, n. 3 (5th Cir. Aug. 6, 2021).

### c. Ripeness

The City also argues that DMAC's claims are unripe "to the extent [it] may purport to somehow seek declaratory relief with respect to the now-current amended version of Chapter 19," under which DMAC has not sought any permits. Dkt. 108 at 24. The City declined to locate this concern in any specific provision of DMAC's third amended complaint. *See id.* The court has thoroughly reviewed the third amended complaint and is satisfied that DMAC is not seeking a declaratory judgment as to the current ordinance. *See* Dkt. 106 at 22 ¶ 81, 23 ¶ 83, 26 ¶ 84, 27 ¶ 85, 32 ¶ 102. Accordingly, the City's motion to dismiss pursuant to Rule 12(b)(1) is **DENIED**.

### 2. Motion to Dismiss Pursuant to Rule 12(b)(6)

The City also moves to dismiss DMAC's declaratory relief claims pursuant to Rule 12(b)(6). The court has broad discretion in determining whether to entertain a declaratory

judgment action under 28 U.S.C. § 2201.  *Winton v. Seven Falls Co.*, 515 U.S. 277, 287, 115 S.

Ct. 2137 (1995) (noting that the Declaratory Judgment Act is "an enabling Act, which confers

discretion on the courts rather than an absolute right upon the litigant.").  Although a court may

not dismiss a request for declaratory relief "on the basis of whim or personal disinclination...the

court may consider a variety of factors in determining whether to decide a declaratory judgment

suit."  *Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28–29 (5th Cir. 1989).

> DMAC's declaratory judgment claims can be broadly organized as follows:
>
> 1.  Claims interpreting the Ordinance;
> 2.  Claims that the Ordinance is unconstitutional; and
> 3.  Claims that the City and its various components wrongfully applied the Ordinance.

In its motion to dismiss, the City argued that the constitutional claims DMAC housed in its

declaratory action were duplicative of those found elsewhere in the third amended complaint.  *See*

Dkt. 108 at 13–16.  The court ordered supplemental briefing to address whether some of DMAC's

claims counseled in favor of abstention.  Dkt. 126.  After, the City argued that DMAC's

interpretation and application claims merit abstention.  Dkt. 128 at 2 ¶ 3, 3–4 ¶ 2.  The court thus

considers whether DMAC's declaratory claims should be dismissed because they are duplicative

of its constitutional claims and if abstention doctrines apply to DMAC's interpretation and

application claims.

### a.  Duplicative Claims

The Fifth Circuit has cautioned that courts "should avoid duplicative...litigation where

possible."  *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 391 (5th Cir. 2003).  If a request

for a declaratory judgment adds nothing to an existing lawsuit, it need not be permitted.  *See Pan-*

*Islamic Corp. v. Exxon Corp.*, 632 F.2d 539, 546 (5th Cir. 1980) (affirming refusal to allow leave

to add claims that were adequately raised in the original complaint); *Mandry v. Fina Oil & Chem.*

*Co.*, 44 F.3d 1004, 1994 WL 733494 at *2 (5th Cir. 1994) (unpublished) (reversing award of

declaratory relief where "[t]he declaratory judgment does not declare any significant rights not already at issue in the contract dispute.").

In this circuit, "district courts...regularly reject declaratory judgment claims seeking the resolution of issues that are the mirror image of other claims in a lawsuit." *Great Am. Ins. Co. v. Goin*, No. 3:15-cv-75-L, 2017 WL 4238698, at *4 (N.D. Tex. Sept. 25, 2017); *see also Xtria LLC v. Tracking Sys., Inc.*, No. 3:07-CV-0160, 2007 WL 1791252, at *3 (N.D. Tex. Jun. 21, 2007) (dismissing declaratory judgment action under Rule 12(b)(6) where it duplicated an existing breach of contract claim); *Assistmed, Inc. v. Conceptual Health Sols., Inc.*, No. 3:05-CV-0880, 2006 WL 3691003, at *17 (N.D. Tex. Dec. 14, 2006) (same); *Hanson Aggregates, Inc. v. Roberts & Schaefer Co.*, No., 2006 WL 2285575, at *3 (N.D. Tex. Aug. 9, 2006) (dismissing counterclaim for declaratory judgment while noting that "a motion for declaratory judgment that merely restates a party's defenses is insufficient"); *Albritton Props. v. Am. Empire Surplus Lines*, No. 3:04-CV-2531, 2005 WL 975423, at *2 (N.D. Tex. Apr. 25, 2005) (granting Rule 12(b)(6) motion dismissing counterclaim for declaratory judgment where the disputed issues were already pending before the court); *Kogul v. Xspediou Mgmt. Co*., No. 3:04-CV-2518, 2005 WL 1421446, at * 4 (N.D. Tex. Jun. 1, 2005) (dismissing declaratory actions that sought resolution of matters already to be resolved in the ongoing lawsuit).

This practice accords with the "[t]wo principal criteria" that guide the court's decision of whether to issue a declaratory judgment: whether (1) "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" and (2) whether "it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 523 (5th Cir. 2016). Simply put, declaratory actions serve no "useful purpose" when they duplicate other legal claims. *See id.*

DMAC asserts five constitutional claims—violations of the Takings Clause, substantive due process, procedural due process, the Equal Protection Clause, and the Contract Clause—and its declaratory judgment claims duplicate most.  Consider first that DMAC seeks a declaration that the Ordinance "cannot be used to cause or effectuate a taking of property."  Dkt. 106 at 24; *see id.* at 24, 26–27 ¶¶ 84–85.  This declaratory claim does little more than mirror the gravamen of DMAC's Takings claim: "the City's regulatory actions...have absolutely interfered with Plaintiff's right to use and enjoy its property, and constitute regulatory action gone too far" because "the requirements of Chapter 19 that facially would justify the denial of repair permits were not satisfied by the City."  *Id.* at 36 ¶ 115.

Or consider that DMAC seeks a declaration that the Ordinance "unconstitutionally vests in the City Engineer the discretion to prohibit permitted uses of a property without establishing a legitimate public purpose and *without providing constitutional due process* to the landowner in the form of just compensation."  *Id.* at 27 (emphasis added).  This, too, merely simplifies and restates DMAC's substantive due process and procedural due process claims, namely that:

> [t]he City, initially through official action of its Mayor and Director of Public Works and subsequently through official action of its City Engineer, has proximately caused the wrongful deprivation of DMAC's constitutional rights to procedural due process, substantive due process, and equal protection, to wrongfully deny DMAC permits and to deprive DMAC of its establish right to repair its property.

*Id.* at 29–30 ¶ 96.

The same is true with respect to DMAC's equal protection claim.  In that claim's declaratory counterpart, DMAC asks the court to declare that:

> [t]he City Engineer's July 2018 denial of the permits was not the actual or reasonable implementation of a health and safety requirement dependent upon specific and necessary Chapter 19 findings; and instead it was merely the effectuation of a previously planned prohibition via official decision of the Mayor and/or Director of Public Works, of the continuation of the subject property's permissible and longtime use that targeted Arbor Court, and that was not applied to

any other property in Houston, *in violation of the Equal Protection Clause* of the
United States Constitution.

*Id.* at 27–28 ¶ 88 (emphasis added).  The declaration DMAC seeks does little more than repeat its
equal protection claim, which rests on the allegation that "the City intentionally treated DMAC
differently than other similarly situated property owners."  *Id.* at 40 ¶ 133.

Because DMAC's claims regarding the constitutionality of the Ordinance and the
permitting process it endured repeat the same constitutional claims located elsewhere in the third
amended complaint, the City's motion to dismiss DMAC's declaratory judgment claims pursuant
to Rule 12(b)(6) is **GRANTED** with respect to these claims.

### b.  Remaining Claims

The remainder of DMAC's declaratory judgment claims, by and large, do not duplicate the
claims found elsewhere in its third amended complaint.  Rather, they ask the court for various
declarations interpreting the Ordinance and determinations that the City improperly applied it to
DMAC's permitting request.  *See* Dkt. 106 at 23–28.  These interpretive and application-based
requests represent the vast majority of DMAC's thirty-five declaratory claims.  *See id.*  But in
asking the court to declare, for example, "that the imposition by the City of [the Ordinance's]
health and safety requirements necessitated a variance," (Dkt. 106 at 28 ¶ 91), DMAC enlists the
federal judiciary to sit "as a zoning board of appeals."  *See Koerner v. Garden Dist. Ass'n*, 78 F.
App'x 960, 964 (5th Cir. 2003).  The Fifth Circuit has "long insisted that review of municipal
zoning is within the domain of the states, the business of their own legislatures, agencies, and
judiciaries, and should seldom be the concern of federal courts."  *See Shelton v. City of Coll.
Station*, 780 F.2d 475, 477 (5th Cir. 1986).  Wary of aggrandizing its authority through the DJA,
the court ordered supplemental briefing from the parties to address whether abstention was

appropriate in this case. The issue being fully briefed, the court concludes that abstention is appropriate for the remainder of DMAC's non-duplicative declaratory relief claims.

Federal courts have a "virtually unflagging obligation...to exercise the jurisdiction given them" by Congress. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236 (1976). But abstention is sometimes appropriate where cases feature either "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or if "adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial policy concern." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728, 116 S.Ct. 1712 (1996) (internal quotations omitted). Named after the Supreme Court's decision in *Burford v. Sun Oil Company*, the *Burford* abstention doctrine relaxes the court's otherwise unremitting duty to hear cases that satisfy these narrow criteria. 319 U.S. 315, 333–34 63 S.Ct. 1098 (1943).

Because abstention is "the exception, not the rule," the court pauses to note the doctrine's origins and justifications. *See Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321 (1984) (internal quotations omitted). In *Burford*, Sun Oil Company challenged the validity of a Texas Railroad Commission order granting Burford a permit to drill several oil wells on land in east Texas. 319 U.S. at 317. Noting that the case was arguably an "'appeal' from the Commission," the Supreme Court observed that Sun Oil's challenge implicated "part of the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of 'as thorny a problem as has challenged the ingenuity and wisdom of legislatures.'" *Id.* at 317–18 (citation omitted).

Part and parcel with other land use regulations, Texas' administrative processes involved "novel" and "complex[]" legal issues that often intersected with the state's localized geology. *See*

id. at 320, 323.   And given the sophisticated system of judicial review the state legislature established, the Supreme Court determined: "Insofar as we have discretion to do so, we should leave these problems of Texas law to the State court where each may be handled as 'one more item in a continuous series of adjustments.'"   *Id.* at 332. It concluded that "sound respect for the independence of state action requires the federal equity court to stay its hand" where "the state provides a unified method for the formation of policy and determination" and offers "expeditions and adequate" judicial review of its regulators' decisions. *Id.* at 333–34.

The *Burford* doctrine matured some years later in *Alabama Public Service Commission v. Southern Ry. Co.*, 341 U.S. 341, 71 S. Ct. 762 (1951).  There, "[i]nstead of pursuing its right of appeal to the state courts," a railroad operator appealed a permit denial from the Alabama Public Service Commission (the "Commission") directly to the federal court, where it alleged the denial constituted an uncompensated taking under the Fourteenth Amendment.  *Id.* at 343.  The district court proceeded to make its own factual findings, voided the Commission's order, and entered injunctive relief.  *Id.* at 333–34.  On appeal, the railroad operator defended the district court's judgment, arguing that any "administrative order ripe for judicial review in the state courts" that confers federal jurisdiction through "the presence of diversity of citizenship or a federal question opens the federal courts to litigation as to the validity of that order," provided "no action involving the same subject matter" was pending in the state courts.  *Id.* at 345.  But, relevant here, the Supreme Court narrowed the scope of the question: "Assuming that the federal district court had jurisdiction, should it, as a matter of sound equitable discretion, have declined to exercise that jurisdiction here?" *Id.*

In keeping with *Burford*, the Court answered that the district court improperly exercised its jurisdiction by conducting what it characterized as a "de novo" review of the Commission.  *See*

*id*. at 347–48.  Alabama, the Court observed, "provided for appeal from any final order of the Commission to the [state] circuit court...as a matter of right."  *Id.* at 348.  The operator did not challenge the constitutional adequacy of the state's judicial review.  *Id.*  But even if it had, the Court noted that it was well "settled that a utility has no right to relitigate factual questions on the ground that constitutional rights are involved." *Id.* at 349.  The takeaway?  The lower court had no need to make factual findings in a regulated area of local concern.  *See id.*  Equally importantly, the Court underscored the federal judiciary's duty to exercise its equitable discretion with "'scrupulous regard for the rightful independence of state governments.'"  *Id.*

Subsequent developments to the *Burford* doctrine are similarly instructive.  Just as the presence of a federal question does not categorically demand a court sitting in equity to exercise its jurisdiction, the presence of a "complex state administrative process" does not require abstention.  *See New Orleans Pub. Servs., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 362, 109 S. Ct. 2506 (1989) ("NOPSI").  In *NOPSI*, an electricity utility sought declaratory and injunctive relief in federal court after litigating a utility claim before municipal bodies.  *Id.* at 357.  Specifically, it sought a judgment that federal law pre-empted the New Orleans City Council's rate order.  *Id.*  Despite the federal nature of the utility's claim, the district court abstained from hearing the case pursuant to *Burford*.  *Id.* at 355–56, 357.  That was a mistake.  After the Fifth Circuit affirmed, the Supreme Court reversed because the utility's claims did not "demand significant familiarity with, and [would] not disrupt state resolution of, distinctively local regulatory facts or policies."  *Id.* at 358.  The Court further explained that *Burford* abstention is not necessarily warranted "even in all cases where there is a 'potential for conflict' with state regulatory law or policy."  *Id.* (citation omitted).  In that vein, *NOPSI* also afforded the Supreme Court opportunity to clarify when *Burford* abstention applies:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Id.* at 361.

All told, the decision to abstain under *Burford*, must be "based on a careful consideration of the federal interests in retaining jurisdiction over the dispute" and ultimately represents a determination "that the State's interest are paramount and that [the] dispute would best be adjudicated in a state forum." 319 U.S. at 327. And, although there is no "formulaic test" for deciding whether a case comes within *Burford*'s narrow jurisdictional exception, the Fifth Circuit has identified five factors that should be considered: (1) "whether the cause of action arises under federal or state law;" (2) "whether the case requires inquiry into unsettled issues of state law;" (3) "the importance of the state interest involved;" (4) "the state's need for a coherent policy in that area;" and (5) "the presence of a special state forum for judicial review." *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993). Finally, courts may abstain "only where the relief being sought is equitable or otherwise discretionary," such as a request for declaratory judgment. *Quackenbush*, 517 U.S. at 731.

Returning to this case, DMAC requests, in relevant part, several declarations interpreting the Ordinance. *See supra* at 9–13; Dkt. 106 at 23–28. Among these, DMAC notably asks the court to declare that the Ordinance "cannot be read to allow, via denial of requested permits, the prohibition of a use of the property in question that was permitted at the time of its initial construction" and that the Ordinance "does not authorize[] a Mayoral or Director of Public Works mandated hold upon the release of permits." Dkt. 106 at 23, 25. It similarly asks the court to

declare that specific subsections of the Ordinance "do not authorize post initial construction refusals of permits to repair to their pre-damaged condition" or "require the submission of NFIP proof of loss statements as a condition to obtaining a repair permit." *Id.* at 25–26.

Among its many application-based declarations, DMAC asks the court to declare that the "permits it sought…do not involve 'substantial improvements' or improvements that increase the pre-construction value" of the Arbor Court property; that "[n]othing about the requested permits or the proposed construction to repair damage, will cause any increase in the dangers of flooding;" and that the Mayor's alleged targeting of DMAC in the permitting process contravened the Ordinance. *Id.* at 24.

These are but a few amongst a litany of claims that ask the court to make factual findings about the proposed construction in the floodplain and whether the City was wrong under the Ordinance to deny DMAC a permit to rehabilitate Arbor Court.  In effect, DMAC requests this court to serve as an appellate body to the City's permitting adjudication process, conduct a *de novo* review of the proceedings below, and make factual findings superseding those of the City's own bodies.

For abstention, the issue is whether these claims present "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar" or the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *See NOPSI*, 491 U.S. at 361.  Considering the Fifth Circuit's *Wilson* factors, the court concludes that they do.

First, DMAC's claims arise from questions of state law.  Texas both "permit[s] and provide[s] incentives for local governments to take measures to mitigate the potential for loss of

life and property from future flood events." *City of Friendswood v. Horn*, 489 S.W.3d 515, 523–24 (Tex. App.—Houston [1st Dist.] 2016, no pet.).  The Texas Water Code articulates the state's more general flood-management scheme and

> authorizes political subdivisions to adopt more comprehensive floodplain management rules that the political subdivision determines are necessary for planning and appropriate to protect public health and safety, participate in floodplain management and mitigation initiatives such as the program's community rating system, Project Impact, or other initiatives developed by federal, state, or local government, collect reasonable fees to cover the cost of administering a local floodplain management program, and take steps, using regional, watershed, and multi-objective approaches, to improve the long-range management and use of flood-prone areas  (Sec. 16.315).

 House Comm. On Land & Res. Mgmt, Bill Analysis, Tex. S.B. 936, 77th Leg., R.S. (2001).  To accomplish these goals, Texas mandates that certain political subdivisions "adopt ordinances, as appropriate, necessary for the city…to be eligible to participate in the [NFIP]." Tex. Water Code § 16.3145.  Since 1985, the Ordinance at issue here furthered this interest by promulgating local standards for property owners to comply with FEMA's national program.[3]  *See* Dkt. 108, Ex. 1 at 3; Ch. 19, art. I, § 1(b).  Despite this federal tie-in, the Water Code delegates "the responsibility for qualifying for the [NFIP]" to the relevant "interested political subdivision."  Tex. Water Code § 16.314.  As a home-rule city, "Houston derives its authority from the Texas Constitution and the City Charter adopted by its voters," and qualifies as a relevant political subdivision for the purposes of the Water Code.  *See Powell v. City of Houston*, No. 19-0689, 2021 WL 2273976, at *2 (Tex. June 4, 2021), *reh'g denied* (Oct. 8, 2021).  The Water Code authorizes all of Texas' relevant

---

[3]     Congress established the NFIP in 1968 after private insurance companies declined to offer flood insurance on flood-prone property.  *See* 42 U.S.C. § 4001(a)).  NFIP (1) makes federally subsidized flood insurance available in flood-prone areas and (2) encourages states and localities to adopt land use policies and regulations that reduce the risk of flood damage. § 4001(a)-(e)). For communities to be eligible for federal flood insurance under the NFIA, they are required to adopt community floodplain ordinances in accordance with flood hazard maps promulgated by FEMA. § 4012(c).

political subdivisions, including Houston, "to take all necessary and reasonable actions that are not less stringent than the requirements of the [NFIP]." Tex. Water Code § 16.315. This includes, but is not limited to, (1) making appropriate land use adjustments to constrict the development of land which is exposed to flood damage and minimize damage caused by flood losses and (2) guiding the development of proposed construction. *Id.* §§ 16.315(1)–(2).

DMAC makes much ado about the Ordinance's federal relations, arguing that the interpretation and application claims it brings here cannot be local or state-based in nature if the Ordinance is designed to secure Houston's participation in the NFIP. Dkt. 133 at 9. But as Texas' Water Code indicates, and as other courts have recognized, "[c]ommunity participation in the NFIP is voluntary, and FEMA does not have any direct involvement in the administration of local floodplain management ordinances." *See, e.g.*, *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1156 (W.D. Wash. 2004). In any case, a state law or local ordinance does not adopt a federal profile merely because it is enacted to secure a political subdivision's participation in a national benefits scheme, especially where, as here, that ordinance is an outgrowth of the polity's pre-existing "authority to regulate land use."[4]  *See Powell*, 2021 WL 2273976, at *2.

---

[4]     In addition, the Supreme Court has held that the balance of federal and state judicial responsibilities would be disturbed by the exercise of federal jurisdiction where such exercise would "herald [] a potentially enormous shift of traditionally state cases into federal courts." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 319, 125 S.Ct. 2363 (2005). Where "the scope and limitations of a complex federal regulatory framework are at stake," the implications for the federal docket are "less severe." *Bd. of Comm'rs of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 725 (5th Cir. 2017). Here, NFIP—which DMAC does not expressly challenge—does not "interfere[] with the power of state authorities to regulate" land use in the floodplain so much as it incentivizes certain regulation. *See Singh v. Duane Morris LLP*, 538 F.3d 334, 339 (5th Cir. 2008). That the Ordinance at issue is the product of that incentive does not make DMAC's declaratory challenges sound fundamentally in federal law.

With this understanding in mind, DMAC seeks interpretation and application of "purely state law issues." *See Koerner*, 78 F. App'x at 963. As previously noted, such issues "should seldom be the concern of federal courts," *Shelton*, 780 F.2d at 477, unless the "challenges to…land-use decisions aspire to constitutional stature." *See FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996). That exception does not apply here: DMAC's interpretation and application challenges are distinct from its constitutional claims because they do not challenge the rational basis of the permitting denial. Rather, they contest the denial's validity vis-a-vis the ordinance itself, properly construed. *See* Dkt. 106. The *Alabama* Court made clear that a declaratory claim revolving around "an allegedly invalid state administrative order" does not command the court to exercise its jurisdiction. *See* 341 U.S. at 345, 349–50. That lesson remains true here. Accordingly, the first *Wilson* factor favors abstention.

The other *Wilson* factors do, too. DMAC asks the court to inquire "into unsettled issues of state law," like whether the Ordinance "authorize[s] a Mayoral or Director of Public Works mandated hold upon the release of permits." *See Wilson*, 8 F.3d at 314; Dkt. 106 at 25. Likewise, DMAC solicits judicial inquiry "into local facts" in asking the court to declare that "[n]othing about the requested permits or the proposed construction to repair damage will cause any increase in the dangers of flooding." *See Wilson*, 8 F.3d at 314; Dkt. 106 at 25. These claims are but two examples of "difficult state questions" littered throughout DMAC's declaratory action. *See Burford*, 319 U.S. at 331. The second *Wilson* factor thus favors abstention.

Regarding *Wilson*'s third factor, there is no doubt that "the state interests involved"—land-use in flood prone areas— are important. *See* 8 F.3d at 314; *see also Harper v. Pub. Serv. Comm'n of W. Va.*, 396 F.3d 348, 352 (4th Cir. 2005) ("[P]roperty law concerns, such as land use and zoning questions, are frequently 'important' state interests justifying…abstention."); *Carroll v. City of*

*Mt. Clemens*, 139 F.3d 1072, 1075 (6th Cir. 1998) (recognizing that state has an "important interest in enforcing its state and local housing codes"); *Duty Free Shop, Inc. v. Administracion De Terrenos De Puerto Rico*, 889 F.2d 1181, 1182 (1st Cir. 1989) (recognizing that state's ability to conduct "eminent domain proceedings" is an important interest); *World Famous Drinking Emporium, Inc. v. City of Tempe*, 820 F.2d 1079, 1083 (9th Cir. 1987) (recognizing that nuisance ordinance "in aid of and closely related to Tempe's zoning ordinance" represents an important state interest).

These core state interests are managed in a more decentralized manner than those at issue in *Burford*, which featured challenges to a specialized state tribunal tasked with shaping regulatory policy for the entire state. *See* 319 U.S. at 326–28; *see also Sierra Club v. City of San Antonio*, 112 F.3d 789, 794 (5th Cir. 1997) (concerning whether abstention was appropriate where federal court ruling on an Endangered Species Act claim would interfere in "comprehensive regulatory scheme" used to govern an aquifer). In that sense, DMAC's challenge to the Ordinance does not entail the Jenga-like risk of "a federal court[] tapping on one block…[and] caus[ing] the whole thing to crumble." *Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 319 (5th Cir. 2021), *as revised* (Feb. 26, 2021). Yet, the diffuse nature of Texas' regulatory scheme does not undermine the need for coherent policy, namely one that vests power in local bodies to determine local needs. So, while exercising jurisdiction here would not sound the death knell for a state-wide regulatory scheme, it would invite the brick-by-brick dismantling of state-authorized local governance over floodplain management. Accordingly, *Wilson*'s fourth factor also favors abstention.

Only the last factor—the presence of a *special* state forum for judicial review—cuts in DMAC's favor. Texas provides no *special* forum for judicial review of floodplain permitting denials, unlike the regime in *Burford* which empowered a single state court to hear all appeals of

the Railroad Commission's orders.  319 U.S. at 326.  Rather, Texas affords plaintiffs like DMAC a right to appeal permit denials to general state courts.  *See, e.g.*, *Dos Republicas Coal P'ship v. Saucedo*, 477 S.W.3d 828, 841 (Tex.App.—Corpus Christi–Edinburg 2015, no pet.) (reviewing whether municipal administrator abused discretion when applying certain provisions of a floodplain ordinance).  In that respect, the kind of state-level judicial review offered to DMAC is more in line with that offered to the parties in *Grace Ranch*, where "regular litigation" venues served state judicial interests.  *See* 989 F.3d at 318.

Though the fifth *Wilson* factor favors the exercise of jurisdiction, that DMAC enlists the federal court's intervention through the DJA in resolving an essentially local problem despite the availability of a general state judicial forum mitigates its persuasiveness.  The DJA provides that a court "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added).  Again, the Supreme Court has "repeatedly characterized the [DJA] as enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."  *Wilton*, 515 U.S. at 287 (internal quotations omitted). Considering the fundamentally discretionary jurisdiction that DMAC seeks, and that four of the five *Wilson* factors favor abstention, the court abstains.

To summarize, the City's motion to dismiss DMAC's declaratory judgment claims pursuant to Rule 12(b)(6) is **GRANTED** because some of the claims are duplicative of the constitutional claims located elsewhere in the suit and the remainder merit abstention.

### B.    Section 1983 Claims

DMAC asserts that the City violated its constitutional rights by taking its property without just compensation, denying substantive and procedural due process, violating its right to equal protection, and substantially impairing its ability to contract in contravention of the Contracts

Clause.  *See generally* Dkt. 106.  It brings these claims pursuant to 42 U.S.C. § 1983.  The City

moves to dismiss each pursuant to Rule 12(b)(6).

> Section 1983 of Title 42 in relevant part provides:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

To state a claim under § 1983, a plaintiff must assert facts to support that a person acting under

color of state law denied the plaintiff a right under the Constitution or federal law.  *Martin v*

*Thomas*, 973 F2d 449, 452–53 (5th Cir 1992). A person for these purposes includes a local

governing body if the action claimed to be unconstitutional implemented a "decision officially

adopted and promulgated by that body's officers."  *Monell v Dep't of Soc. Servs. of City of New*

*York*, 436 US 658, 690, 98 S. Ct. 2018 (1978).   Any such claim against a municipality must

establish "a policymaker; an official policy; and a violation of constitutional rights whose 'moving

force' is the policy or custom."  *Piotrowski v City of Houston*, 237 F3d 567, 578 (5th Cir 2001),

quoting *Monell*, 436 US at 694.

"[T]he unconstitutional conduct must be directly attributable to the municipality through

some sort of official action or imprimatur; isolated unconstitutional actions by municipal

employees will almost never trigger liability."  *Piotrowski*, 237 F.3d at 578.  For that reason,

municipal liability cannot be predicated on the doctrine of *respondeat superior*.  *Id*.  Instead,

"[o]nly the actions of district officials with final policy-making authority subject the district to

such liability." *Eugene v. Alief Indp. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995).

In practice, the Supreme Court and Fifth Circuit have recognized three different kinds of

"policy."  The first encompasses "formal rules and understandings… that…establish fixed plans

35

of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986).   Policy may also include "conduct that has become a traditional way of carrying out policy and has acquired the force of law." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984); *see also* 42 U.S.C. § 1983 (making liable "[e]very person who, under color of any statute, ordinance, regulation, *custom*, or usage" deprives a citizen "or other person" within the jurisdiction her rights) (emphasis added).   Discriminatory acts "performed pursuant to a 'custom'" need not have "been formally approved by an appropriate decisionmaker" to "subject a municipality to liability," provided "that the relevant practice is so widespread as to have the force of law." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382 (1997).   A third formulation—ratification—posits that a plaintiff satisfies the policy standard where she shows that "a final decisionmaker[]" adopted "a course of action 'tailored to a particular situation and not intended to control decisions in later situations.'" *Bryan Cty.*, 520 U.S. at 410 (quoting *Pembaur*, 475 U.S. at 481).   Under this category, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which the county may be liable." *Brown v. Bryan Cty., Okla.*, 219 F.3d 450, 462 (5th Cir. 2000).   In those cases, a municipality can be liable only if the decision to adopt action resulting in the constitutional deprivation is properly made by that government's authorized decisionmakers. *See id.*   Such "authorized decisionmakers" are defined to be officials "'whose acts or edicts may fairly be said to represent official policy'" and whose decisions may therefore result in municipal liability under § 1983. *Id.* at 480 (quoting *Monell*, 436 U.S. at 694).

Finally, a plaintiff must also establish that the municipality's wrongful actions were causally connected to the deprivation. *See James v. Tex. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008).   Satisfaction of this element requires Plaintiff to "show that the municipal action was taken

with the requisite degree of culpability" and is causally related to "the deprivation of federal rights." *Id.* The court considers each of DMAC's constitutional claims against these well-settled standards.

### 1. Takings Claims

DMAC alleges that the City's refusal to issue it a repair permit effected a categorical regulatory taking and a non-categorical regulatory taking without just compensation in violation of the Fifth Amendment of the U.S. Constitution. Dkt. 106 at 36 ¶ 114. DMAC separately claims that the City has inversely condemned its property. *Id.* The court finds that DMAC has adequately alleged that the City effected a regulatory taking without providing just compensation. However, the court finds that DMAC cannot bring a state-level inverse condemnation claim through its § 1983 action.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Fourteenth Amendment made the Takings Clause applicable to the States. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536, 125 S. Ct. 2074 (2005). By definition, ripe takings claims also comply with the doctrinal requisites of § 1983. *See Pakdel v. City & Cty. of San Francisco, Cal.*, —— U.S. ——, 141 S. Ct. 2226, 2230 (2021) (noting that the ripeness doctrine's finality requirement requires that a plaintiff "show that there is no question about how the regulations at issue apply to the particular land in question") (internal quotations and alterations omitted).

As its texts makes plain, the Takings Clause "requires the payment of compensation whenever the government acquires private property for a public purpose." *See Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321, 122 S.Ct. 1465 (2002). In conditioning the exercise of the Government's power on just compensation, the Takings Clause

bars it "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563 (1960).

But while the Takings Clause requires "just compensation" when there is a "taking," it neither defines a taking nor "address[es] in specific terms the imposition of regulatory burdens on private property." *See Murr v. Wisconsin*, ⸺ U.S. ⸺, 137 S. Ct. 1933, 1942 (2017). That task is left to the courts. In that vein, the Supreme Court has advised that the "paradigmatic taking" involves the "direct appropriation of property." *Lingle*, 544 U.S. at 537–38; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014, 112 S.Ct. 2886 (1992) (citing *Legal Tender Cases*, 12 Wall. 457, 551 (1871)). Such was the only category of takings prior to Justice Holmes's famous mediation on the effects of the government's regulatory power in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158 (1922).

Charting a new course in takings jurisprudence, *Mahon* recognized that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415. Though the Court has not defined what constitutes a regulation gone "too far," it has acknowledged that this class of regulations "may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537. Therefore, in reviewing a regulatory takings claim, the court keeps in mind the doctrine's "aim to identify regulatory actions that are functionally equivalent" to those classic takings. *Id.* at 529.

Three species of regulatory takings identified by the Supreme Court inform this court's analysis. *See Lingle*, 544 U.S. at 538–39. First, the government causes a taking when it "requires an owner to suffer a permanent physical invasion of her property." *Id.* at 538; *see also Cedar Point Nursery v. Hassid*, ⸺ U.S. ⸺, 141 S. Ct. 2063, 2072 (2021) ("Government action that

physically appropriates property is no less a physical taking because it arises from a regulation."). Second, "regulations that completely deprive an owner of all economically beneficial use of her property" likewise constitute a "categorical" taking, except where principles of nuisance and property law "independently restrict" the owner's use. *Lingle*, 544 U.S. at 538.

A third category applies to regulations that do not effect a physical taking and fall short of completely eliminating a property's value. This catchall category asks courts to apply the factors outlined in *Penn Central Transportation Co. v. New York City* to determine whether a regulation effects a taking. *See* 438 U.S. 104, 124, 98 S. Ct. 98 (1978). Those factors test the "magnitude of a regulation's economic impact" and "the extent to which the regulation has interfered with distinct investment-backed expectations." *Lingle*, 544 U.S. at 540, 125 S. Ct. at 2082. The court may also consider the "character of the governmental action. *Penn Central*, 348 U.S. at 124, 98 S. Ct. at 2646. Importantly, even regulatory restrictions reviewed under the *Penn Central* framework must "entirely deprive an owner of property rights" to qualify as a taking. *Horne v. Dep't of Agric.*, 576 U.S. 350, 364, 135 S. Ct. 2419 (2015).

However, regardless of how a regulation might be classified, the key inquiry is "whether the government has physically taken property for itself or someone else —by whatever means— or has instead restricted a property owner's ability to use his own property." *Cedar Point Nursery*, 141 S. Ct. at 2072.

### a. Categorical Regulatory Taking

DMAC claims that the denial inflicted "a severe, negative impact" upon it, "permanently depriv[ing] Plaintiff of all economically viable or beneficial use of the Arbor Court property." Dkt. 106 at 36 ¶¶ 116, 119. That is so because "the City itself has taken the position that the Arbor Court property cannot safely be used by people in occupied structures on the property, due to its

existence in a floodplain and/or floodway." *Id.* at 37 ¶ 120.  In DMAC's telling, the City's position was informed, in part, on the recommendation of the 2016 drainage evaluation report that proposed clearing the property and converting it to a public park or retention area, *see id.*, neither of which constitute "beneficial use[s]…from the landowner's point of view." *Lucas*, 505 U.S. at 1017. Though not currently a public park or retention area, the Arbor Court property allegedly "sits vacant and produces no income."  Dkt. 106 at 38 ¶ 123.  Indeed, DMAC alleges that even the Harris County Appraisal District recognizes that the Arbor Court property is economically idle insofar as it based its *ad valorem* tax valuation on the "value of the raw land."  Dkt. 106 at 38 ¶ 123.  Finally, DMAC alleges that "there is no known economically viable or beneficial use of the property to which the property can be put."  *Id.*  In other words, DMAC has alleged facts that the City's permitting denial amounts to "regulation[] that completely deprive [it] of all economically beneficial use of [its] property."  *See Lingle*, 544 U.S. at 538.

Resisting this conclusion, the City argues that the Fifth Circuit's decision in *Adolph v. Fed. Emergency Mgmt. Agency*, 854 F.2d 732 (5th Cir. 1988), "confirm[s]" that local floodplain regulations cannot "result in any taking."  Dkt. 108 at 17.  *Adolph* supports no such conclusion. In that case, a group of plaintiffs sued their local parish council and FEMA alleging both that a local floodplain ordinance *and* the National Flood Insurance Program resulted in an unconstitutional taking without just compensation.  854 F.2d at 734.  The local ordinance required "new or additional structures" to meet certain elevation requirements per the national, congressionally mandated regulations.  *Id.*  The *Adolph* plaintiffs argued that the ordinances made the development of their properties "prohibitively expensive" and "unmarketable."  *Id.*  Rejecting their claims, the Fifth Circuit concluded that, irrespective of the prohibitive cost of compliance, the challenged

ordinances did not effect a taking "[s]o long as [they] d[id] not directly affect the then-current use of plaintiffs' property." *Id.* at 739.

This case differs in several important respects. First, DMAC does not challenge the entirety of a "carefully-crafted nationwide scheme" and an ordinance exclusive to new or additional development but, instead, the local denial of a permit to rebuild existing structures. *See id.* at 737. Second, DMAC claims that there are no conditions—prohibitively expensive or otherwise—that it can comply with to secure the permit necessary to restore Arbor Court's economic viability. *See* Dkt. 106 at 39 ¶ 126. Third, the *Adolph* Court explicitly narrowed its holding to regulations that did not "directly affect the then-current use" of a property. 854 F.2d at 739. But that's exactly what DMAC alleges the City did by denying it a repair permit to rebuild Arbor Court's *existing* structures, which functioned as an apartment complex just before Hurricane Harvey's flooding and indeed appear to entirely predate the floodplain ordinance. *See generally* Dkts. 106, 108.

The Ninth Circuit's decision in *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422 (9th Cir. 1996), *aff'd*, 526 U.S. 687, 119 S. Ct. 1624 (1999), is more relevant, though DMAC's claim is arguably stronger. There, a developer purchased dozens of acres of beachfront property zoned for multi-unit residential use. *See id.* at 1425, 1434. The prior owner had unsuccessfully applied for a development permit but re-applied. *Id.* That second application for development permits was pending with the City of Monterey when plaintiff Del Monte purchased the property. *Id.* After the City of Monterey again denied the development permits, citing environmental impact, Del Monte sold the property to the State of California for an $800,000 profit. *See id.* at 1432. Despite its profit, Del Monte sued, alleging a categorical regulatory taking because the City of Monterey effectively required it to leave the property in its natural state, despite

41

its zoning for residential use.  *Id.* at 1433.  Unable to be developed, Del Monte argued that the property was only valuable to the city or state, which later converted the property into a public park.  *Id.*  The Ninth Circuit agreed because the jury heard evidence that the extensive list of development conditions the City of Monterey placed on the property "made any development…impossible."  *See id.* at 1434.

Though not binding, this case is persuasive.  Of course, DMAC, unlike Del Monte, is not seeking to break new ground and develop otherwise virgin waterfront property: it is merely trying to rehabilitate what already exists.  This difference aside, the claims are similar.  DMAC, like Del Monte, owns residential property.  It alleges that the City of Houston, like the City of Monterey, denied it a permit to use the property for residential purposes due to the environmental character of the land—here, because it lies in a floodplain, there because development would hurt native flora and fauna.  *See Del Monte*, 95 F.3d at 1431.  In both cases, the plaintiffs alleged that the permit denials abrogated any economically viable use of the property because it cannot be used for any other purpose.  Thus, at bottom, both rested on claims that the government's "regulatory actions" were the "functional[] equivalent" to the more paradigmatic takings that deprived owners of any beneficial use of their property.  *See Lingle*, 544 U.S. at 529.  Accordingly, the court finds that DMAC has sufficiently stated a categorical regulatory taking claim.

### b.  *Penn Central* Regulatory Taking

DMAC also alleges that the City effected a non-categorical taking under the three-factor *Penn Central* test.  *See* Dkts. 106 at 36 ¶ 116, 119 at 14.  The *Penn Central* analysis of a non-categorical taking requires an "ad hoc, factual inquir[y]" into the factual circumstances of each case.  *See Lucas*, 505 U.S. at 1015.  Courts must "weigh three factors to determine whether the interference with property rises to the level of a taking: (1) the economic impact of the regulation

on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Degan v. Bd. of Trs. of Dallas Police & Fire Pension Sys.*, 956 F.3d 813, 815 (5th Cir.), *cert. denied*, ––– U.S. ––, 141 S. Ct. 375 (2020).   Though these factors "provide[] important guideposts," they are not "mathematically precise variables." *Palazzolo v. Rhode Island*, 533 U.S. 606, 634, 121 S.Ct. 2448 (2001) (O'Connor, J., concurring).   For that reason, courts "must consider all of the surrounding circumstances and employ a fact-sensitive test of reasonableness" when considering non-categorical regulatory takings claims. *Da Vinci Inv., Ltd. P'ship v. City of Arlington, Tex.*, 747 F. App'x 223, 228 (5th Cir. 2018) (internal quotations omitted).   DMAC alleges facts that satisfy each of the *Penn Central* factors.

First, DMAC has alleged that the City's denial of the repair permit significantly reduced the value of the Arbor Court property.   In assessing a regulation's economic impact, the Fifth Circuit "compare[s] the value that has been taken from the property with the value that remains in the property." *Hackbelt 27 Partners, L.P. v. City of Coppell*, 661 F. App'x 843, 850 (5th Cir. 2016). According to DMAC, the Arbor Court property enjoyed a "fair market value of at least $24,500,000.00." Dkt. 106 at 39 ¶ 127.   Now, it claims, "that fair market valuation [has been] reduced to $1,400,000.00"—a $23,100,000.00 loss. *Id.* The Fifth Circuit has recognized that the denial of permits can "undoubtedly" reduce the value of a property. *See Da Vinci*, 747 F. App'x at 228.   Thus, *Penn Central*'s economic impact factor cuts in DMAC's favor.

The next factor, investment-backed expectations, also adds a point in DMAC's column. Investment-backed expectations must be "reasonable." *Hackbelt*, F. App'x at 850. *Mahon* illustrates what "reasonable" investment-backed expectations look like.   There, the claimant sold the surface rights to parcels of property but reserved the right to mine the below-surface coal.

*Mahon*, 260 U.S. at 414.  A Pennsylvania statute, enacted after the transactions, prohibited any coal mining that unsettled housing foundations unless certain conditions were met.  *Id.*  The statute effectively made it commercially impracticable to mine the coal.  *Id.* at 414.  Because it effectively destroyed the very rights that the plaintiff reserved from the owners of the surface land, the Supreme Court held that the statute effected a taking without just compensation.  *See id.* at 414–415.

The facts alleged by DMAC suggest comparably reasonable investment-backed expectations.  Arbor Court was built in 1979.  Dkt. 106 at 40 ¶ 133.  The contested ordinance went into effect in 2006, long after DMAC was built.  *See* Dkt. 108 at 11.  Despite this, Arbor Court flooded in 2016, and the City issued a repair permit.  Dkt. 106 at 6 ¶ 20.  Both flooding incidents yielded comparable levels of damage.  *See id.*  Yet, after Harvey, the City reversed its past practice of allowing DMAC to rebuild and repair Arbor Court after storm damage, preventing DMAC from using Arbor Court the way it had been used for the preceding thirty-eight years.  *See* Dkt. 106 at 7 ¶ 24.  These factual allegations support the inference that DMAC reasonably expected the City to issue a second repair permit after Hurricane Harvey's flooding and thus are sufficient to survive a motion to dismiss under Rule 12(b)(6).  *See Sansotta v. Town of Nags Head*, 97 F.Supp.3d 713, 733–34 (E.D.N.C. 2014) (finding Town interfered with beachfront cottage owners' investment-backed expectations after denying rebuild permits following storm damage when it previously granted the permits following prior storms).

Finally, "government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have often been held to constitute 'takings.'"  *Penn Central*, 438 U.S. at 128.  Because the City has "restricted" DMAC's ability to use the property for the existing residential purposes it is zoned for—and because DMAC arguably states a claim

under the categorical takings doctrine—this factor also weighs in its favor.  *See Hackbelt*, 661 F.

App'x at 850.[5]

### c. Inverse Condemnation

DMAC also "sues the City under the theor[y] of inverse condemnation," seemingly

bringing the claim under § 1983.[6]  Dkt. 106 at 3 ¶ 10, 35–36 ¶ 114.  "Inverse condemnation is a

cause of action against a governmental defendant to recover the value of property that has been

taken in fact by the governmental defendant."  *Knick v. Twp. of Scott, Pa.*, ⸺ U.S. ⸺, 139 S.

Ct. 2162, 2168 (2019) (internal quotations omitted).  Thus, where there is a regulatory taking that

deprives landowners of all beneficial uses of the property, landowners can bring an action in state

court for inverse condemnation and seek damages for that temporary taking. *See First English*

*Evangelical Lutheran Church v. Cnty. of L.A.*, 482 U.S. 304, 321, 107 S. Ct. 2378 (1987).

At the outset, the court notes that "inverse condemnation" claims are state creations.  *Knick*,

139 S. Ct. at 2182 (Breyer, J., dissenting).  With the notable exception of Ohio, every state provides

an inverse condemnation action. *Id.* at 2168.  Under Texas law, to establish its claim for inverse

condemnation against the City, DMAC must show that "(1) the state intentionally performed

---

[5]      DMAC also brings the same regulatory takings claims under the Texas Constitution.  Dkt. 106 at 38 ¶ 124. Texas courts permit both categorical and non-categorical regulatory takings claims; analysis of such claims under the state constitution is coextensive with federal claims.  *See City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 644 (Tex. 2013) (noting that in determining whether the government's actions have unreasonable interfered with a claimant's property interests, Texas courts follow the U.S. Supreme Court's "Penn Central inquiry, which requires [a court] to consider all of the circumstances surrounding the alleged taking."); *Hallco Texas, Inc. v. McMullen Cty.*, 221 S.W.3d 50, 56 (Tex. 2006) ("A regulation that deprives a property owner of all economically beneficial or productive use of the property makes the regulation categorically a taking.") (internal quotations omitted).  Because the court finds that DMAC stated both categorical and non-categorical regulatory takings claim under the federal constitution, it likewise concludes that DMAC has stated a regulatory takings claim under Texas' constitution.

[6]      While courts liberally construe *pro se* filings, more stringent standards apply to parties represented by counsel.  *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995) (per curiam).

certain acts, (2) that resulted in a 'taking' of property, (3) for public use." *Gen. Servs. Comm'n v. Little-Tex. Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).

However, DMAC bring appears to brings its inverse condemnation claim under § 1983, not Texas state law. *See* Dkt. 106 at 3 ¶ 10. Because § 1983 is reserved for "vindicating federal rights," it cannot function as a vehicle for state-level causes of action. *Baker v. McCollan*, 443 U.S. 137, 144, 99 S. Ct. 2689, 2694 n. 3 (1979). This distinction between federal and state causes of action occupied the *Knick* Court's attention, and its analysis is relevant here. *See* 139 S. Ct at 2171, 2174 n. 5. There, plaintiff Rose Mary Knick brought a Fifth Amendment takings claim under § 1983 in federal court, expressly foregoing an inverse condemnation action under state law. *Id.* at 2168. The Township of Scott argued that plaintiff Knick had to first raise her inverse condemnation action in state court prior to bringing a federal takings claim under § 1983. *See id.* The Court recognized that a "state action for battery" is separate from a "Fourth Amendment claim of excessive force" and that the availability of the former does not preclude the invocation of the latter. *Id.* at 2171. Because the two causes of action originate from a different legal genus, § 1983 cannot carry both. That is, in part, why the *Knick* Court declined to adopt the Solicitor General's argument that "state inverse condemnation claims arise under federal law." *See id.* at 2174 n. 5.

That logic applies with equal force here. Inverse condemnation is a state cause of action that mimics, in some respects, a federal takings claim but enjoys no independent footing in federal law. Accordingly, it cannot be brought under § 1983.

In sum, the City's motion to dismiss pursuant to Rule 12(b)(6) is **DENIED** as to DMAC's categorical and non-categorical takings claims and **GRANTED** as to DMAC's inverse condemnation claim.

### 2.   Violations of Substantive Due Process

"Not everything that stinks violates the Constitution." *Hillcrest Prop., LLP v. Pasco Cty.*, 915 F.3d 1292, 1303 (11th Cir. 2019) (Newsom, J., concurring) (cleaned up).   That maxim holds true here.   Some of DMAC's allegations are certainly odious.   *See generally* Dkt. 106 at 29 ¶ 95. But they nonetheless fail to articulate a constitutionally protected property interest or a violation of DMAC's rights for the purposes of substantive due process.

"If there is no protected property interest, there is no process due." *Spuler v. Pickar*, 958 F.2d 103, 106 (5th Cir. 1992).   Thus, "[t]o prevail on a substantive due process claim, [a plaintiff] must first establish that it held a constitutionally protected property right to which the Fourteenth Amendment's due process protection applies." *Simi Inv. Co., v. Harris Cnty.*, 236 F.3d 240, 249–50 (5th Cir. 2000).   "To have a property interest in a benefit," a plaintiff must "have a legitimate claim of entitlement to it;" relevant entitlements are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756, 125 S.Ct. 2796 (2005) (citation and quotation marks omitted).   But even where state law creates an underlying substantive interest, "federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9, 98 S. Ct. 1554 (1978) (internal quotations omitted).   If a plaintiff shows that it has been deprived of a property interest, it must further show that the deprivation was not "rationally related to a legitimate government interest." *Simi*, 236 F.3d at 249.

DMAC appears to locate its property interest in two sets of allegations.   First, DMAC asserts that it:

> owned an apartment complex that, prior to Hurricane Harvey, had been fully
> constructed and occasionally repaired, with permits issued by the City under its

> floodplain ordinance, following a prior flooding event.  DMAC had a vested
> property interest in the permits it had received, and in the right to repair they
> afforded, and it has such a vested right in the identical permits it sought in order to
> make repairs to damage caused by Hurricane Harvey.

Dkt. 106 at 29 ¶ 94.  DMAC additionally asserts that it has a "legally cognizable property interest

under Texas law in the permits that were wrongfully held by the City when they should have been

released."  Dkt. 119 at 26–27; *see also* Dkt. 106 at 29 ¶ 94.  The City responds that "[a] plaintiff

has a protected property interest in a permit only *after* it is issued."  Dkt. 108 at 30 ¶ 40 (emphasis

original).  Under this theory, DMAC had an enduring protected property interest in the permits

necessary to repair its property after Hurricane Harvey because it had previously received repair

permits.

DMAC's second theory is a bit different.  In its response to the City's motion to dismiss,

DMAC appears to contend that its constitutionally protected property interest rests in the permits

that were "revoked…by appointed officials specifically targeting the Arbor Court property and its

operations."  Dkt. 119 at 27.  This theory is presumably connected to the correspondence DMAC

had with city personnel and, specifically, the Morrow Letter approving permits for some buildings,

the subsequent Morrow e-mail indicating that the damage calculations to the buildings would be

changed, and the Flood Management Office notices with the approval stamps.  Dkt. 106 at 8–9.

This argument turns on the inference that DMAC received the permits and the City revoked what

DMAC effectively had in hand.

DMAC correctly states that "business permits," as well as "[p]rivileges, licenses,

certificates, and franchises…qualify as property interests" for the purposes of due process.  *See*

*Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 220–21 (5th Cir. 2012).  In *Bowlby*, the Aberdeen

Planning and Zoning Board issued permits authorizing plaintiff to operate a "Sno Cone" hut inside

the city limits.  *Id.* at 218.  After receiving the permits, the plaintiff opened her business.  *Id.*  Then,

nearly two months later, the Board revoked the permits without previously notifying the plaintiff that it would be reviewing the permits. *Id.* The Fifth Circuit found that the plaintiff possessed a "property interest in her business permits" because, "once issued" the permit became "essential in the pursuit of a livelihood." *Id.* at 220 (quoting *Bell v. Burson*, 402 U.S. 535, 539, 91 S. Ct. 1586, 1589 (1971)). Likewise, in *Jabary v. City of Allen*, the Fifth Circuit concluded that the plaintiff had a protected property interest in his hookah bar's Certificate of Occupancy once it was issued. 547 F. App'x 600, 606–07 (5th Cir. 2013). In that case, the plaintiff operated his hookah bar without interruption for approximately one year before the City of Allen revoked the Certificate without predeprivation notice. *Id.*

*Bowlby* and its progeny spell doom for DMAC's first theory. For starters, DMAC fails to cite any authority, let alone state law, to support its assertion that the City's issuance of a permit one year created an enduring property interest.[7] *See Town of Castle Rock*, 545 U.S. at 756. But development or repair permits that have yet to issue fit awkwardly within the *Bowlby* framework. On one hand, a development permit might be necessary to use the land "in pursuit of a livelihood." *See Bell*, 402 U.S. at 539, 91 S.Ct. at 1589. On the other, unlike licenses authorizing the continuous operation of a business, these land-use analogs more often allow singular, time-limited instances of capital improvement. At least that is the case with the Ordinance, which provides that a "development permit will expire if development has not commenced within 18 months of issuance, and upon completion of the project for which it is granted, or after five years has elapsed from the date of permit issuance, whichever occurs first." Dkt. 108, Ex. 1 at 12. Because they tend to

---

[7] The court notes that the Ordinance prescribes a revocation for when a permit is issued and then needs to be revoked. Dkt. 108, Ex. 1 at 17.

expire, it is counter-intuitive, as both a matter of logic and law, that the issuance of one repair permit would generate an enduring, constitutionally protected property interest.

Yet, DMAC relies exactly on this counter-intuitive premise when it contends that "it has…a vested right in the identical permits it sought in order to make repairs to damage caused by Hurricane Harvey." Dkt. 106 at 29 ¶ 94.  DMAC does not allege that the repair permit it received after the Tax Day Flood continued in perpetuity.  And while it may be that the City's issuance of a repair permit after the Tax Day Flood gave DMAC the expectation that it would issue another after Hurricane Harvey, DMAC must establish "more than a unilateral expectation" that it would receive the benefit for the purposes of alleging a viable substantive due process claim. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701 (1972).

In any case, DMAC's reliance on *Bowlby* is inapposite because courts ask whether the statute or regulation that allegedly creates the protected property interest places "substantive limitations on official discretion." *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 735 (5th Cir. 2008).   Regulations cannot create a property interest prior to issuance, as "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *See Town of Castle Rock*, 545 U.S. at 756.

DMAC ignores this established caselaw entirely.  DMAC acknowledges that the Ordinance empowered the City Engineer with discretion to issue permits—it just disagrees that he appropriately exercised that discretion. *See* Dkt. 106 at 12–13 ¶ 41, 21 ¶ 74, 26 ¶ 85, 31 ¶ 101.  The Ordinance provides that "the city engineer may deny a permit application if the issuance of the permit could result in…[d]anger to life or property due to flooding or erosion damage in the vicinity of the site" or "[s]usceptibility of the development and the contents of any structure to flood damage and the effect of such damage on the individual owner." *Id.*  "Though an automatic

or non-discretionary…policy may give rise to a protected property interest," the Ordinance's own "guidelines clearly indicat[e] that [DMAC] was not guaranteed" a permit. *See Wigginton v. Jones*, 964 F.3d 329, 336 (5th Cir. 2020) (considering whether a discretionary tenure policy created a protected property interest for the purposes of substantive due process protection).

So, DMAC's first formulation of a constitutionally protected property interest cannot get off the ground. Its second fares a little better but falters in flight. That is because, even assuming that the Morrow Letter, Morrow E-mail, and Floodplain Management Office notices actually resulted in DMAC having the permits that the City then revoked, the City had a rational basis for its actions. "Rational-basis review is guided by the principle that [courts] do not have a license…to judge the wisdom, fairness, or logic of legislative choices." *Hines v. Quilliivan*, 982 F.3d 266, 274 (5th Cir. 2020) (internal quotations omitted). It is not, therefore, a "searching standard of scrutiny." *Brackeen v. Haaland*, 994 F.3d 249, 342 (5th Cir. 2021). Thus, unless a decision to revoke (or deny) a permit is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare," it will escape stiffer scrutiny from the federal courts. *See Shelton*, 780 F.2d at 280. And, while "[a] rationality analysis…cannot be conducted in a vacuum," DMAC's own allegations underscore that the court need not look far to find reason in the City's denial. Accepting, as DMAC alleges, that the City classified Arbor Court as a "repetitively flooding" property, it had a reasonable basis to withhold the repair permits. *See* Dkt. 106 at 33¶105, 34 ¶ 109. Afterall, the City could easily find that permitting tenants to live in a floodway would fail to advance "public health, safety…or general welfare" goals of protecting residents during storms. *See Shelton*, 780 F.2d at 280. DMAC does not allege otherwise. *See* Dkt. 106 at 29–35.

Accordingly, the City's motion to dismiss pursuant to Rule 12(b)(6) is **GRANTED** as to DMAC's substantive due process claim.

### 3.   Violations of Procedural Due Process

DMAC's procedural due process claim is born from the same set of facts as its substantive due process claim. *See* Dkt. 106 at 31 ¶ 101.   DMAC's formulation of its claim is also related.   As the court just discussed, DMAC's substantive due process argument waffled between assertions that the City refused to issue permits it had a property interest in receiving and implications that the City had issued the permits but then arbitrarily revoked them. *See* Dkts. 106 at 29–35, 119 at 26–29.   Here DMAC merges the two together: "the City provided no process prior [to] depriving DMAC of permits that had been wrongfully subject to a hold."   Dkt. 119 at 25.   The court's conclusion is the same.

Procedural due process under the Fourteenth Amendment of the United States Constitution is implicated where an individual is deprived of life, liberty, or property, without due process of law. U.S. CONST. amend. XIV, § 1, cl. 3.   Claims under procedural and substantive due process both require the plaintiff to identify a protected property interest. *See Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010).   But whereas substantive due process protects plaintiffs from the arbitrary deprivation of protected interests, *see Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998), procedural due process guarantees "an opportunity to be heard" before the deprivation. *Mathews v Eldridge*, 424 US 319, 332–33 (1976) (citations and internal quotations omitted).   In the zoning and permitting context, the Fifth Circuit considers procedural due process claims through one of two frameworks.   "[W]here a zoning decision has been made by an elected body…[the Fifth Circuit] ha[s] characterized the action as legislative or 'quasi-legislative,'" thereby "negating procedural due process claims." *Jackson Court Condos., Inc. v. City of New Orleans*, 874 F.2d

1070, 1074 (5th Cir. 1989).  But "a municipal body's action may be more likely termed adjudicative if an appointed group, such as a zoning board, makes a specific decision regarding a specific piece of property."  *Cnty. Line Joint Venture v. City of Grand Prairie*, 839 F.2d 1142, 1144 (5th Cir. 1988).  Procedural due process rights attach to this latter category.  *See id.  But see Shelton*, 780 F.2d at 482 ("[A] state's use of an adjudication-like mechanism for zoning decisions does not by itself trigger [a procedural due process] inquiry or create [protected] property rights.").

If a zoning or permitting decision was "adjudicative" in nature, the courts apply the three-factor test articulated *Mathews* to determine if a plaintiff was denied its procedural due process rights.  First, courts evaluate "the private interest that will be affected by the official action;" second, "the risk of an erroneous deprivation of such interest through the procedures used and [the] probable value, if any, of additional procedural safeguards;" and third, "the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail."  *Mathews*, 424 U.S. at 321, 96 S. Ct. 893.

DMAC asserts that it had a constitutionally protected property interest in receiving the permits that the City simultaneously withheld and revoked from its possession.  *See* Dkt. 119 at 25.  Content with ignoring the epistemological difficulties this entails, DMAC further complains that City provided no pre-deprivation process and argues that "it would not have been overly burdensome for the City to provide a pre-deprivation procedure."  *Id.*

Even assuming there was a property interest, and that the City's decision to deny the permits was adjudicative, rather than legislative or quasi-legislative, DMAC was not denied its right to procedural due process.[8]  Whether subject to a denial or a revocation, DMAC does not

---

[8]     While the court assumes for the purposes of argument that DMAC had a property interest, it struggles to reconcile DMAC's argument that the City revoked the permits—which implies that the permits had issued—with the many allegations that belie this premise.  For instance, DMAC

sufficiently allege a procedural due process claim.  While DMAC's private interest in receiving

the permits was considerable, DMAC's allegations paint the picture of constitutional adequate

process.  The City Engineer reviewed DMAC's permitting application and denied it.  Dkt. 106 at

20.  The City of Houston's General Appeals Board "heard [DMAC's] appeal from the denial…and

DMAC's variance seeking relief from the application of the requirements of Chapter 19."  *Id.* at

20–21 ¶ 72.  The General Appeals Board subsequently rejected DMAC's appeal.  *Id.* at 21 ¶ 73.

Finally, albeit without a hearing, the City Council "rejected [DMAC's] appeal from the General

Appeals Board's decision…thus upholding the City's permit denial decision."  *Id.*  This process

involved sufficient safeguards to guard against an erroneous deprivation, and it requires little

imagination to see how adding or modifying layers of process—ideas that DMAC declines to

propose—would burden the City's interest in regulating development in the floodplain.

"The *Mathews* balancing test 'permits varied types of hearings, from informal to more

formal evidentiary hearings.'"  *G & H Dev., L.L.C. v. Benton-Par. Metro. Plan. Comm'n*, 641 F.

App'x 354, 357 (5th Cir. 2016) (quoting *Bowlby*, 681 F.3d at 221).  The third amended complaint

does not indicate—and DMAC's response to the City's motion to dismiss does not argue— how

the permitting application and appellate procedures were, themselves, constitutionally insufficient.

Instead, it repeatedly claims that the City incorrectly applied those procedures.  Dkt. 106 at 2 ¶ 7,

13 ¶ 41, 16 ¶ 53, 21 ¶ 73, 36 ¶ 114.   But "the due process clause does not require a [municipality]

to implement its own law correctly," so "a violation of [municipal] law alone is insufficient to state

---

alleges that the City "put a hold on selling any permits in the area temporarily" pursuant to the
Mayor's direction, Dkt. 106 at 35, and that the City "refuse[d] to lift [the] hold…that would have
allowed [it] to repair the damage to its buildings."  Id. at 3 ¶ 7.  DMAC acknowledges that, even
when it first applied for the permits, its request was "initially denied."  Id. at 2 ¶ 7.  Thus, under
its own allegations, the City did not "deprive" DMAC what it already possessed but, rather, denied
it from obtaining what it sought.

a constitutional claim." *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996) (citation and internal quotation marks omitted).   In short, the permitting application and appellate process supplied to DMAC afforded it all the constitutional due process it was due.   *See G & H Dev., L.L.C.*, 641 F. App'x at 357; *Welders Mart, Inc v City of Greenville*, 2000 WL 246607, *2 (N.D. Tex.); *Cleburne's Grass Roots, LLC v City of Cleburne*, 2001 WL 238132, *1 (N.D. Tex.).

Accordingly, the City's motion to dismiss pursuant to Rule 12(b)(6) is **GRANTED** with respect to DMAC's procedural due process claim.[9]

### 4.  Violations of the Equal Protection Clause

DMAC also alleges that the City violated its right to equal protection.  The Equal Protection Clause serves "as a shield against arbitrary classifications."  *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598, 128 S. Ct. 2146 (2008).  But not all classifications are subject to the same degree of judicial scrutiny.  In the absence of a "classification affecting fundamental personal rights or based upon inherently suspect distinctions such as race, religion, or alienage," classifications or unequal treatment are "subject to the same rational basis analysis utilized in due process claims." *Jackson Ct. Condos., Inc. v. City of New Orleans*, 874 F.2d 1070, 1079 (5th Cir. 1989).

Despite the Supreme Court's emphasis on "classifications," the Equal Protection Clause "protects persons, not groups."  *Engquist*, 553 U.S. at 597 (alteration deleted).  For that reason, "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that [it] has been irrationally singled out as

---

[9]      In passing, DMAC alleged identical substantive and procedural due process claims under the Texas Constitution.  The state constitution "due process of law provision provides the same protections as the federal Due Process Clause," so these claims fail as well.  *See Lucky Tunes #3, L.L.C. v. Smith*, 812 F. App'x 176, 184 (5th Cir. 2020) (quoting *Fleming v. State*, 376 S.W.3d 854, 857 (Tex. App.—Fort Worth 2012), *aff'd*, 455 S.W.3d 577 (Tex. Crim. App. 2014)).

a so-called 'class of one.'" *Id.* at 601.  In other words, "when it appears that the government is singling out an individual, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a rational basis for the difference in treatment." *Id.* at 602.

Thus, to adequately state its "class of one claim," DMAC must prove that (1) it "has been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000).  To show differential treatment, a plaintiff must identify a comparator group. *See Integrity Collision Ctr. v. City of Flusher*, 837 F.3d 581, 586 (5th Cir. 2016).  "[T]here is no precise formula to determine whether an individual is similarly situated to comparators." *Lindquist v. City of Pasadena, Tex.*, 656 F. Supp. 2d 662, 687 (S.D. Tex. 2009), *aff'd sub nom. Lindquist v. City of Pasadena Tex.*, 669 F.3d 225 (5th Cir. 2012).  Rather, this court "consider[s] the full variety of factors that an objectively reasonable…decisionmaker would have found relevant in making the challenged decision." *Id.* at 234 (citation and internal quotation marks omitted).

DMAC adequately alleges a "class of one" claim.  DMAC alleged that Arbor Court is "similarly situated" to other properties that received repair permits following Hurricane Harvey's floods: Imperial Oaks Apartments is another two-story apartment complex located on the same street as Arbor Court, was built in 1977—two years before Arbor Court—and sustained "substantial damage from Hurricane Harvey['s] flooding." Dkt. 106 at 40–41 ¶ 133.  At 265 units, Imperial Oaks Apartments is home to "approximately the same number of apartments as Arbor Court," which contains 232 total units. *Id.* at 5 ¶ 18, 40–41 ¶ 133.  A second neighboring, two-story apartment complex, Biscayne at Cityview, was built in 1978, is the site of over 500 apartments.  Biscayne also weathered flood damage from Hurricane Harvey. *Id.* at 5 ¶ 18.  To be sure, neither apartment complex is a Section 8 property. *Id.*  But DMAC alleges that "both

properties offer apartments with comparable prices to Arbor Court at between $500 and $800 per month." *Id.* Nevertheless, unlike Arbor Court, these properties received repair permits.

Second, DMAC has adequately alleged that the City lacked a rational basis for the difference in treatment. The Supreme Court's decision in *Olech* is instructive. In that case, plaintiffs alleged that the Village of Willowbrook conditioned connecting plaintiffs' property to the municipal water supply on a 33-foot easement, even though it required only a 15-foot easement from other property owners. *Olech*, 528 U.S. at 563. The plaintiffs claimed that the Village's demand for an additional 18-foot easement was "irrational and wholly arbitrary" in violation of the Equal Protection Clause. *Id.* The district court dismissed a plaintiffs' equal protection claim pursuant to Rule 12(b)(6). *Id.* The Seventh Circuit reversed, holding that a plaintiff could state an equal protection claim by asserting that the state's differential treatment was motivated by spite. *Id.* at 564. Though the Supreme Court affirmed the Seventh Circuit's decision, it held that the plaintiffs' factual allegations of differential treatment, including claims that the Village's demand for an enlarged easement was "irrational and wholly arbitrary," was "sufficient to state a claim for relief under traditional equal protection analysis." *Id.* at 565.

In view of *Olech*, this court is hard-pressed to dismiss DMAC's equal protection claim, which is more factually developed than that upheld by the Supreme Court. The City responds that it "denied the permits because of flood-related danger to health and safety, which qualifies as a rational basis." Dkt. 108 at 36 ¶ 60. But this is no answer to the court's query. The relevant inquiry is not whether the City had a rational basis for denying the permits, but whether it had a "rational basis for the differential treatment." *See Da Vinci*, 747 F. App'x at 227.

The City thus asks the court to find some "conceivable rational basis" for its "official action." *See* Dkt. 108 at 36 ¶ 60. The court declines that invitation. While the court may

"hypothesize a legitimate purpose to support the action," the rational basis "still must be *actually* rational, not a matter of fiction." *Hines*, 982 F.3d at 273. "A hypothetical rationale…cannot be fantasy." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). On the alleged facts, a rational basis for the differential treatment of comparably expensive, neighboring apartment complexes of comparable size situated along the Bayou that endured similar levels of damage from Hurricane Harvey's floodwaters is not within ready reach.

Accordingly, the City's motion to dismiss pursuant to Rule 12(b)(6) is **DENIED** as to DMAC's equal protection claim.

### 5. Violations of the Contract Clause

The last of DMAC's constitutional claims concerns the Contract Clause. Dkt. 106 at 41–43. The Contract Clause prohibits states from passing any "law" that "impair [s] the Obligations of Contracts." U.S. Const. art. I, § 10. When considering claims arising from the Contracts Clause, "[t]he threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697 (1983) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716 (1978)); *Powers v. United States*, 783 F.3d 570, 578 (5th Cir. 2015). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial*." Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105 (1992).

If the regulation constitutes a substantial impairment, the court then determines whether there is a "significant and legitimate public purpose behind the regulation." *Energy Rsrvs.*, 459 U.S. at 411, 103 S.Ct. 697 (citation omitted). Generally, remedying a broad and general social or economic problem will constitute a significant and legitimate public purpose, but providing a

benefit to a narrow group of people will not.  *See Allied Structural Steel*, 438 U.S. at 247, 249; *see also Lipscomb*, 269 F.3d at 504–05.  This requirement helps ensure "that the State is exercising its police power, rather than providing a benefit to special interests."  *Energy Rsrvs.*, 459 U.S. at 412.  If there is a significant and legitimate public purpose behind the regulation, "the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'"  *Id*.  Where, as here, the municipality is not a contracting party, "[a]s is customary in reviewing economic and social regulation…courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."  *Id.* at 412–13.

DMAC asserts that the City's "arbitrary, capricious, and discriminatory revocation and denial of DMAC's permits has substantially impaired DMAC's contractual relationships with HUD and the residents who leased the damaged apartments at the Arbor Court property."  Dkt. 106 at 42 ¶ 139.  It further repeats that it was the City's "unlawful actions" that resulted in HUD terminating its contract with DMAC.  *Id.* Due to these allegations, the City frames DMAC's complaint as one against "Houston's *conduct*," as opposed to its laws, and argues that its Contract Claim must therefore be dismissed.  Dkt. 108 at 36 ¶ 61 (emphasis original).  So, the "law" that DMAC challenges is the allegedly improper administration of the Ordinance itself.  Specifically, DMAC argues that the conduct of which it principally complains—namely, the unofficial policy of requiring the Mayor's Office or Director of Public Works' approval of any permits or the issuance—has "the effect of law."  Dkt. 119 at 31.  But it points to no caselaw—authoritative or otherwise—that supports the premise that the Contract Clause extends to administrative conduct.

Because of the Contracts Clause's plain language, claims arising under it are generally facial in nature, looking to the law, itself, as opposed to its administration.  *See, e.g.*, *Keystone*

*Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504, 107 S. Ct. 1232 (1987) (finding that a Pennsylvania law that removed surface owners' contractual obligations to waive damages substantially impaired preexisting contractual obligations); *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 17, 97 S. Ct. 1505 (1977) (finding that New Jersey law repealing New Jersey's previously-legislated contractual obligations substantially impaired contract); *El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577 (1965) (finding that a Texas statute that limited reinstatement rights of interest-defaulting purchases of land from the state to a 5-year period where defaulting purchasers previously could have reinstated claims through written request interfered with preexisting contractual relations); *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231 (1934) (finding that a Minnesota law permitting judicial extension of the time for redemption interfered with preexisting contractual obligations).

Thus, legislation that, itself, "repudiate[s] or adjust[s] existing debtor-creditor relationships that obligors [are] unable to satisfy" violates the Contract Clause. *See Keystone*, 480 U.S. at 503. Legislation that "operates collaterally or incidentally to impair or destroy the obligation of private contracts" does not. *See Cont'l Ill. Nat. Bank & Tr. Co. of Chicago v. Chicago, R.I. & P. Ry. Co.*, 294 U.S. 648, 680, 55 S. Ct. 595 (1935); *see also Nw. Nat. Life Ins. Co. v. Tahoe Regional Plan. Agency*, 632 F.2d 104 (9th Cir. 1980) (finding that a land use ordinance did not contravene Contract Clause where the ordinance affected only property and did not impair any obligations of parties to assessment bonds issued for development of the property). Here, the Ordinance does not impair the contractual relationship DMAC enjoyed with HUD and its tenants. Rather, the City's application of a facially neutral ordinance "incidentally" or "collaterally" interfered with the relationships. *See Chicago*, 294 U.S. at 680. And that, Supreme Court doctrine suggests, is insufficient to state a claim.

Picking up on this suggestion, other courts have found that administrative acts, like zoning enforcement or permitting denials, do not fall within the Contract's Clause ambit. *See Kinney v. Conn. Jud. Dep't*, 974 F.2d 313, 314 (2d Cir. 1992) (observing that the Contract Clause is "aimed at the legislative power of the State, and not at the decisions of its courts, or the acts of administrative or executive boards or officers."); *Jackson Sawmill Co., Inc. v. United States*, 580 F.2d 302, 312 (8th Cir. 1978) ("[A]ppellants have confused impairment of performance of a contract with impairment of the obligation of the contract. The Constitution does not provide a federal action for simple breach of contract."); *Carver v. Nassau Cnty. Interim Fin. Auth.*, No. 11-CV-1614(JS)(GRB), 2018 WL 1970740, at *7 (E.D.N.Y. Apr. 26, 2018), *aff'd sub nom. Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54 (2d Cir. 2020) (finding that administrative action that interfered with contract's performance did "not fall within the Contract Clause's prohibition"); *Tocci Bros., Inc. v. City of N.Y.*, No. 00-CV-0206, 2000 WL 1134367, at *9 (E.D.N.Y. Aug. 3, 2000) (administrative acts taken pursuant to legislative authority do not implicate the contracts clause or else "every administrative action would become subject to the Contracts Clause, a result clearly prohibited by controlling precedent."). Though out of circuit, this court finds these decisions persuasive. The complained-of conduct did not repudiate a contractual obligation but collaterally impaired DMAC's performance of its contract. Therefore, DMAC has failed to state a claim under the Contract Clause.

Accordingly, the City's motion to dismiss pursuant to Rule 12(b)(6) is **GRANTED** as to DMAC's Contract Clause claim.

### 6. Tortious Interference

Finally, invoking the court's supplemental jurisdiction, DMAC brings a state-law claim of tortious interference. Dkt. 106 at 4 ¶ 14, 43–44. DMAC alleges that the City tortiously interfered

with its contract with HUD by "encouraging HUD to terminate its contract with DMAC and agree to a comparable contract with the City." *Id.* at 43 ¶ 146.  The City moves to dismiss this claim on the grounds that it is shielded from suit due to sovereign immunity and that DMAC fails to state a claim. Dkt. 108 at 38.  The court finds that the City does not benefit from sovereign immunity because its actions were proprietary in nature but that DMAC nevertheless fails to state a claim for tortious interference.

### a. Sovereign Immunity

When a municipality commits a tort while engaged in governmental functions, its liability is determined by the provisions of the Texas Tort Claims Act. *See* Tex. Civ. Prac. & Rem. Code § 101.0215(a).  The doctrine of sovereign immunity, however, shields a city from suit when it commits torts in the performance of its governmental functions, except as authorized by statute. *Id.* §§ 101.0215(a), 101.023(c); *Turvey v. City of Houston*, 602 S.W.2d 517, 519 (Tex. 1980).  That said, whether a city enjoys immunity from suit turns on the function it was performing when it committed the tort.  *See Turvey*, 602 S.W.2d at 519.

"Municipal corporations exercise their broad powers through two different roles; proprietary and governmental." *Gates v. City of Dallas*, 704 S.W.2d 737, 738 (Tex. 1986).  As the Texas Supreme Court recently explained, "[t]he governmental/proprietary dichotomy recognizes that immunity protects a governmental unit from suits based on its performance of a governmental function but not a proprietary function." *Wasson Ints., Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 146 (Tex. 2018).  "Unlike governmental functions, for which municipal corporations have traditionally been afforded some degree of governmental immunity, proprietary functions have subjected municipal corporations to the same duties and liabilities as those incurred by private persons and corporations." *Gates*, 704 S.W.2d at 739.

Governmental functions generally consist of a municipality's activities "in the performance of purely governmental matters solely for the public benefit." *Tooke v. City of Mexia*, 197 S.W.3d 325, 342 (Tex. 2006) (quoting *Dilley v. City of Houston*, 222 S.W.2d 992, 993 (Tex. 1949)). The Texas Tort Claims Act enumerates a non-exhaustive list of several governmental functions including: "zoning, planning, and plat approval" and "enforcement of land use restrictions under Subchapter E, Chapter 212, Local Government Code." Tex. Civ. Prac. & Rem. Code §§ 101.0215(a)(29)–(36). Such functions are those that, as a historical matter, have "normally performed by governmental units." *Wassons*, 559 S.W.3d at 147 (quoting Joe R. Greenhill and Thomas V. Murto III, Governmental Immunity, 49 Tex. L. Rev. 462, 463 (1971)). Governmental functions likewise encompass a city's "exercise [of] powers conferred on [it] for purposes essentially public...pertaining to the administration of general laws made to enforce the general policy of the state." *City of Galveston v. Posnainsky*, 62 Tex. 118, 127 (1884).

By contrast, proprietary functions are those "performed by a city, in its discretion, primarily for the benefit of those within the corporate limits of the municipality" and "not as an arm of the government." *Gates*, 704 S.W.2d at 739; *Dilley*, 222 S.W.2d at 993. Because they "are not done as a branch of the state," proprietary acts "do not implicate the state's immunity for the simple reason that they are not performed under the authority, or for the benefit, of the sovereign." *Wasson*, 559 S.W.3d at 147 (internal quotations omitted). Just as it identifies governmental functions, the Tort Claims Act also enumerates a non-exclusive list of some proprietary functions, including "the operation and maintenance of a public utility" and "amusements owned and operated by the municipality." Tex. Civ. Prac. & Rem. Code §§ 101.0215(b)–(c).

DMAC alleges that "[o]n information and belief, these efforts included numerous phone calls, communications, and meetings with HUD officials, all of which were intended to interfere

with DMAC's contractual relationship with HUD" and prevent its performance of the HUD contract. *Id.* at 43–44 ¶ 147. Furthermore, DMAC alleges that on September 12, 2017, the City's Director of Housing and Community Development contacted HUD "to ensure the [Arbor Court] units aren't rehabbed" and confirmed that "it is a priority for both me and the Mayor that low-income families not be placed once again in the way of storm water given that Abor Court is in the floodway." *Id.* at 15 ¶ 50. These actions, DMAC argues, are proprietary in nature, and therefore sovereign immunity does not shield the City from suit. *See* Dkt. 119 at 31–32. The City counters that once situated in the appropriate "context," its actions were "clearly [of a] governmental function." *See* Dkt. 108 at 38–39 ¶ 67. For this reason, the City believes that DMAC's tortious interference claim should be dismissed on immunity grounds.

The court agrees that the City's communication with HUD to ensure that the Arbor Court units were not rehabbed is not a governmental function. As the Director of Housing and Community Development acknowledged in his communication with HUD, the City sought to prevent the rehabilitation of Arbor Court to the benefit of low-income families. Dkt. 106 at 15 ¶ 50. This was a discretionary decision, one not obligated by the City's traditional governing duties. *See Gates*, 704 S.W.2d at 739. Consideration of context supports this conclusion. The actions complained of in DMAC's tortious interference claim pertain to the City's communication with HUD—not its exercise of a plainly governmental land use authority. Moreover, the City's communication was also made to benefit a specific subset of its own residents, as opposed to the general public. *See Wasson*, 559 S.W.3d at 151 (noting that "whether a [municipality's] contract primarily benefits one or the other will often indicate whether it is proprietary or governmental"). Nor was the specific instance of communication "closely related to or necessary" for the City to perform its governmental functions, namely executing the permitting process. *See id.* at 153 ("The

64

fact that a city's proprietary action 'touches upon' a governmental function is insufficient to render the proprietary action governmental.").

Accordingly, the court finds that the City is not immune from suit as to DMAC's tortious interference claim and the City's motion to dismiss pursuant to Rule 12(b)(1) is **DENIED**.

### b.  Failure to State a Claim

However, this finding does not end the court's analysis.  The question remains whether DMAC has adequately alleged a tortious interference claim.  The court finds that it has not.  To establish a claim for tortious interference with existing contracts a plaintiff must establish that: (1) contracts existed that were subject to interference; (2) defendant willfully and intentionally committed acts of interference; (3) defendant's acts proximately caused damages; and (4) actual damages.  *Faucette v. Chantos*, 322 S.W.3d 901, 913 (Tex.App.—Houston [14th Dist.] 2010, no pet.) (citing *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex. 1993)).

Assuming that the third amended complaint contains allegations satisfying the first two elements, DMAC has not pleaded facts that show that the City's "acts"—namely, its communication with HUD—"proximately caused damages."  *See Faucette*, 322 S.W.3d at 913.

The term "proximate cause" is shorthand for a legal concept: "Injuries have countless causes, and not all should give rise to legal liability."  *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692, 131 S. Ct. 2630 (2011).  In a tortious interference claim, "[a] plaintiff must be able to show that the act of interference was the proximate cause of the damages suffered by it. This is the classic proximate cause test with the component elements of cause in fact and foreseeability."  *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 126 (Tex.App.—El Paso 1997, pet. denied).  So, in addition to foreseeability, DMAC must allege facts showing that the "cause in fact"—the City's communication with HUD—was a "substantial factor" in bringing about its injury—the lost

contract and attendant revenue.  *See Tex. Campaign for the Env't v. Partners Dewatering Int'l, LLC*, 485 S.W.3d 184, 197 (Tex.App.—Corpus Christi–Edinburg 2016, no pet.) (citing *Nixon v. Mr. Prop. Mgmt. Co, Inc.*, 690 S.W.2d 546, 549 (Tex.1985)).  "In other words, proximate cause is that cause, unbroken by any new and independent cause, that produces injury and without which the injury would not have occurred."  *Id.*

DMAC's allegations have not met that elementary burden.  The only allegations that DMAC makes that the City's communications resulted in the loss of the contract, as opposed to its denial of the permit (the basis of its Contracts Clause claim), are found in paragraphs 149 and 150 of the third amended complaint:

> The City's tortious communications with HUD resulted in damage to DMAC's contractual relationship with HUD as demonstrated by HUD's termination and transfer of the HAP contract. Upon information and belief, in its communications with HUD, the City repeatedly has encouraged HUD to terminate its contract with DMAC.

> The City's willful and deliberate efforts to interfere with DMAC's contractual relationship with HUD proximately resulted in additional damages, including the termination of the HUD contract.

Id. at 44 ¶¶ 149–50.  These "conclusory statements," which are little more than "[t]hreadbare recitals of the elements," do not suffice to allege proximate cause, and, therefore, to state a claim of tortious interference.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009).

The *Iqbal* Court understood that evaluating a claim under Rule 12(b)(6) would "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  556 U.S. at 679.  The larger context of DMAC's third amended complaint underscores why it fails to state a claim here.  To the extent that the third amended complaint includes factual allegations touching on concepts of causation, they refute the notion that the City's communication plausibly served as the proximate cause of DMAC's damage.  Consider, for

instance, DMAC's allegation that it was "the denial of [the repair] permits [that] caused the loss of the HUD subsidy"— not the City's communication with HUD.  Dkt. 106 at 18 ¶ 63.  Indeed, DMAC claims that "HUD formally notified DMAC that it was in default under its Housing Assistance Payment...contract with HUD because the first-floor units at Arbor Court remained damaged, unrepaired, and thus uninhabitable." *Id.* at 17 ¶ 55.  Consequently, DMAC asserts that "HUD demanded DMAC take correction action including obtaining permits and proceeding to repair the still damaged units." *Id.* ¶ 56.  But "DMAC could not comply with HUD's demand...because the City continued its refusal to release usable permits." *Id.*  And "[a]s a direct consequence of the City's refusal to lift the holds placed on permits," DMAC alleges that "it could not repair Arbor Court as demanded by HUD, who removed the HAP contract from Arbor Court," thereby resulting in DMAC's "cashflow" to come "to a complete halt." *Id.* ¶ 57.  In short, DMAC theorizes that this conduct "caused the independent injury of being unable to repair the [Arbor Court] property, as it was required by HUD to do to maintain the HUD HAP contract and benefits thereunder." *See id.* at 35 ¶ 112.

However, in defending its tortious interference claim, DMAC argues that this allegedly improper permitting conduct is "completely independent" from its tortious interference claim. Dkt. 119 at 34.  The court is inclined to agree.  Thus, while DMAC has shown that the City's communication with HUD constituted propriety conduct that waived immunity, it has failed to adequately allege that the challenged communications were the proximate cause of its injuries.

In sum, DMAC does not allege sufficient facts to state a claim of tortious interference. Accordingly, the City's motion to dismiss pursuant to Rule 12(b)(6) is **GRANTED** with respect to DMAC's tortious interference claim.

CONCLUSION

For the reasons outlined above, the City's motion to dismiss under Rule 12(b)(1) and Rule 12(b)(6) is **DENIED** in part and **GRANTED** in part, as follows:

1. The motion to dismiss DMAC's declaratory claims pursuant to Rule 12(b)(1) is **DENIED**;

2. The motion to dismiss DMAC's declaratory judgment claims pursuant to Rule 12(b)(6) is **GRANTED**.

3. The motion to dismiss DMAC's takings claims pursuant to Rule 12(b)(6) is **DENIED** as to DMAC's categorical and non-categorical takings claims and **GRANTED** as to DMAC's inverse condemnation claim;

4. The motion to dismiss DMAC's substantive due process claims pursuant to Rule 12(b)(6) is **GRANTED**;

5. The motion to dismiss DMAC's procedural due process claims pursuant to Rule 12(b)(6) is **GRANTED**;

6. The motion to dismiss DMAC's equal protection claim pursuant to Rule 12(b)(6) is **DENIED**;

7. The motion to dismiss DMAC's Contract Clause claim pursuant to Rule 12(b)(6) is **GRANTED**;

8. The motion to dismiss DMAC's tortious interference claim pursuant to Rule 12(b)(1) is **DENIED**; and

9. The motion to dismiss DMAC's tortious interference claim pursuant to Rule 12(b)(6) is **GRANTED**.

Signed at Houston, Texas on October 21, 2021.

                                      _____

                                              Gray H. Miller

                                  Senior United States District Judge