IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DM ARBOR COURT, LTD., | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 4:18-cv-01884 |
| | § | |
| THE CITY OF HOUSTON, | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

**CITY OF HOUSTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**<u>AS TO PLAINTIFF'S EQUAL PROTECTION CLAIM AND BRIEF IN SUPPORT</u>**

# TABLE OF CONTENTS

Page

TABLE OF CITATIONS ................................................................................................... iii

I.      SUMMARY OF ARGUMENT ................................................................................ 1

II.     EVIDENCE ............................................................................................................... 1

III.    ISSUE TO BE DECIDED AND STANDARD OF REVIEW ............................... 2

IV.    FACTUAL BACKGROUND .................................................................................. 3

      A.      Hurricane Harvey flooded the Apartments for the second time two years in a row ....................................................................................................... 3

      B.      Houston's Floodplain Ordinance and FEMA procedures required Houston to perform substantial damage determinations of floodplain properties that flooded and applied for repair permits after Harvey. .................................... 3

      C.      Houston and Plaintiff's adjuster both calculated that the Apartments were substantially damaged after Harvey, but Plaintiff developed a false narrative that the Apartments were not substantially damaged. ................................. 5

      D.      Biscayne at Cityview Apartments did not apply for permits after Harvey, and neither Imperial Oaks nor Biscayne at Cityview Apartments were substantially damaged by Hurricane Harvey. ........................................... 13

V.     ARGUMENT AND AUTHORITIES ................................................................... 16

      A.      Summary judgment standard ................................................................... 16

      B.      An equal protection claim does not stand when there is any reasonably conceivable state of facts that could provide a rational basis for the classification. ........................................................................................... 16

      C.      The Arbor Court Apartments were not similarly situated to the Biscayne Apartments because the owners of Biscayne never applied for permits. ............. 17

      D.      The Arbor Court Apartments were not similarly situated to Imperial Oaks and Biscayne because these last two complexes were not similarly flooded ........ 18

      E.      Houston had a legitimate state interest and a rational basis for denying Plaintiff's permits.................................................................................... 19

VI.    CONCLUSION AND PRAYER .......................................................................... 22

CERTIFICATE OF SERVICE ...................................................................................... 24

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................16

*Chambers v. Sears Roebuck & Co.*,
   428 F. App'x 400 (5th Cir. 2011) (per curiam) ..............................16, 18

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)................................................................16

*Da Vinci Inv., Ltd. P'ship v. City of Arlington, Tex.*,
   747 Fed. App'x 223 (5th Cir. 2018) .....................................16, 17, 21

*DM Arbor Court, Ltd. v. City of Houston*,
   No. H-18-1884, 2020 WL 264672 (S.D. Tex. Jan. 15, 2020)....................3

*Dolan v. City of Tigard*,
   512 U.S. 374 (1994)................................................................19

*Hamilton v. Segue Software, Inc.*,
   232 F.3d 473 (5th Cir. 2000) .....................................................16

*Harris v. Hahn*,
   827 F.3d 359 (5th Cir. 2016) ...................................................3, 17

*Heller v. Doe by Doe*,
   509 U.S. 312 (1993)............................................................16, 17

*Kariuki v. Tarango*,
   709 F.3d 495 (5th Cir. 2013) .......................................................2

*Kitty Hawk Aircargo, Inc. v. Chao*,
   418 F.3d 453 (5th Cir. 2005) .....................................................5, 8

*Reid v. Rolling Fork Pub. Util. Dist.*,
   854 F.2d 751 (5th Cir. 1988) .......................................................17

*Rossi v. West Haven Bd. of Educ.*,
   359 F. Supp. 2d 178 (D. Conn. 2005).........................................17, 21

*Village of Willowbrook v. Olech*,
   528 U.S. 562 (2000)................................................................16

*Wesley v. Gen. Drivers, Warehousemen, & Helpers Local 745*,
   660 F.3d 211 (5th Cir. 2011) ...................................................................................16

**Other Authorities**

Fed. R. Civ. P. 56(a) ...........................................................................................................16

Houston, Tex., Code of Ordinances ch. 19 ..............................................................3, 4, 12, 21

Houston, Tex., Rev. Ordinances ch. 19 (2018 and 2006) ...............................................3

*Substantial Damage Estimator (SDE) User Manual and Field Workbook*, FEMA P-784 /
   Tool Version 3.0 / August 2017...............................................................................4, 5, 15

*Substantial Improvement/Substantial Damage Desk Reference*, FEMA P-758,
   May 2010 ...............................................................................................................8, 9, 11

Defendant City of Houston ("Houston" or the "City") respectfully moves the Court to grant Houston summary judgment as to Plaintiff's DM Arbor Court, Ltd.'s ("Plaintiff") equal protection claim.

## I.   SUMMARY OF ARGUMENT

1.     Partial summary judgment for Houston is proper as to Plaintiff's equal protection claim, that Houston treated the Arbor Court Apartments at 802 Seminar Drive, Houston, Texas (the "Apartments") differently than adjoining apartment complexes, because (1) the Arbor Court Apartments were not similarly situated to these complexes, and, (2) Houston had rational bases for denying Plaintiff's repair permit applications.  Houston established that the Apartments were substantially damaged (and other apartment complexes were not), which required Plaintiff to bring the Apartments in compliance with Houston's Floodplain Ordinance and justified the denial of Plaintiff's permit applications for electrical and insulation repairs.  Even Plaintiff's own damage estimates and proofs of loss, requested over three years ago, but withheld from Houston until last month, show that Houston had a rational basis.

## II.   EVIDENCE

2.     The evidence in support of this Motion is contained in Exhibits that are attached to, and incorporated herein, this Motion, and consists of the following:

Exh. 1     Plaintiff's September 22, 2017, permit applications for electrical and insulation repair work (William Keith Cramer Deposition Exhibit 5, COH / Arbor Court 000090–137);

Exh. 2     Declaration of Choyce Morrow, Managing Engineer in the Floodplain Management Office of Houston Public Works;

Exh. 3     Houston's first substantial damage determination letter to Plaintiff (COH/Arbor Ct e-00699);

Exh. 4     Declaration of David Lopez, Senior Floodplain Inspector in the Floodplain Management Office of Houston Public Works;

Exh. 5       DMAC insurance adjuster Wayne Milam's substantial damage determination
             (proof of loss) calculations for Arbor Court after Hurricane Harvey
             (AC102767–83) (Produced by Plaintiff on February 7, 2022);

Exh. 6       Excerpts of Cramer's March 28, 2019, deposition transcript (Cramer is the
             President and owner of Group General Contracting, Inc.);

Exh. 7       Excerpts of Douglas Hickok's deposition transcript (Hickok is the President of
             Plaintiff's General Partner and testified in his personal capacity and on
             Plaintiff's behalf);

Exh. 8       Correspondence between Wayne Milam and DMAC contractor Cramer of
             Group General Contracting, Inc. (AC102787–90) (Produced by Plaintiff on
             February 7, 2022);

Exh. 9       Plaintiff's first Substantial Damage Determination Appeal form (AC000734–
             35, AC000740–42) and excerpts from Group General Contracting, Inc.'s
             Proposal # 1976 (AC000743–44);

Exh. 10      Houston's second substantial damage determination letters to Plaintiff
             (AC000746–49);

Exh. 11      Plaintiff's second Substantial Damage Determination Appeal application
             (COH/Arbor Ct e-05779–80) and excerpts from Group General Contracting,
             Inc.'s Proposal # 1976 (COH/Arbor Ct e-05781–82);

Exh. 12      Correspondence between Choyce Morrow and Morgan Cox (AC000818–20);
             and

Exh. 13      Plaintiff's Answers and Objections to Defendant's Third Set of
             Interrogatories.

3.       Pleadings already on file with this court are cited by Pacer docket number, as in

Dkt. __.

### III.       ISSUE TO BE DECIDED AND STANDARD OF REVIEW

4.       Whether to grant Houston summary judgment on Plaintiff's equal protection

claim.  The court of appeals reviews a grant of summary judgment *de novo*.[1]  In equal protection

claim cases that do not implicate suspect classes or fundamental rights, "[t]he appropriate

---

[1] *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013).

standard of review is whether the difference in treatment between [classes] rationally furthers a

legitimate state interest."[2]

## IV.    FACTUAL BACKGROUND

### A.    Hurricane Harvey flooded the Apartments for the second time two years in a row.

5.    Plaintiff owns the Apartments, a 232-unit complex located entirely in the City

floodplain and largely in the floodway.[3]  The Apartments flooded during the Tax Day Flood in

April 2016, and again flooded extensively when Hurricane Harvey struck Houston in late August

2017.[4]  Plaintiff requested Harvey repair permits that Houston denied because there was "danger

to both life and property due to flooding in the vicinity of the site."[5]

### B.    Houston's Floodplain Ordinance and FEMA procedures required Houston to perform substantial damage determinations of floodplain properties that flooded and applied for repair permits after Harvey.

6.    The City's Floodplain Ordinance, codified as Chapter 19 of the Houston Code of

Ordinances, governs property development in the City floodplain (including the floodway).[6]

Since at least 1985, the Ordinance has been designed to ensure compliance with FEMA

development requirements for participation by City property owners in the NFIP.[7]  Its purpose

"is to promote the public health, safety and general welfare and to minimize public and private

---

[2] *Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016).

[3] Dkt. 106 at ¶¶ 4, 5, 18, 19, 50, 65, 120.

[4] Dkt. 106 at ¶¶ 4, 20, 23.

[5] Dkt. 106 at ¶ 6; Dkt. 14-3 at 1 (permit application denial letter); Exh. 1 (Plaintiff's permit applications).

[6] *See* Houston, Tex., Rev. Ordinances ch. 19 (2018 and 2006) ("Ch. 19", the "Floodplain Ordinance," or the "Ordinance"); *see also* Dkt. 108-1 (Houston, Tex., Rev. Ordinances ch. 19 in effect from 2006 through September 1, 2018).  All references to Chapter 19 in this motion relate to the version (Dkt. 108-1) in effect from the time Hurricane Harvey struck the City through September 1, 2018, as confirmed by this Court.  *See DM Arbor Court, Ltd. v. City of Houston*, No. H-18-1884, 2020 WL 264672, at **1–2 (S.D. Tex. Jan. 15, 2020).  Houston amended its Floodplain Ordinance, effective September 1, 2018, a year after Harvey.

[7] *See* Dkt. 108-2 (Ordinance No. 85-1705 passed in 1985 amending then-current version of Chapter 19), p. 1 (reciting that amendments it enacted to Chapter 19 were made to ensure continued compliance with FEMA/NFIP requirements).

losses due to flood conditions in specific areas by provisions designed to … [among other things] [p]rotect human life and health."[8]

7.      Article II of the Ordinance sets forth the regulatory framework for floodplain development permits.[9]  It prohibits ***any*** "development" (new construction or improvement to existing structures) within the floodplain (and floodway) without first obtaining a Chapter 19 permit.[10]  Article III of the Ordinance sets forth the technical requirements and standards for construction and improvements designed to reduce flooding hazards.[11]  Overall, the Ordinance imposes standards for both new construction and substantial improvements of structures.[12]

8.      The Floodplain Ordinance defines a substantial improvement to

mean any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before the start of construction of the improvement.  This term shall include structures that have incurred repetitive loss or substantial damage, regardless of the repair work performed.[13]

Therefore, a structure that is damaged by 50% or more during a flood is, by definition, substantially damaged and its repairs must comply with the Ordinance's requirements for new construction.  Note that a structure's market or actual cash value excludes the value of land.

9.      Because the Floodplain Ordinance prohibits ***any*** development within the floodplain (and floodway) without first obtaining a Chapter 19 permit, and because the Ordinance imposes standards for substantial improvements of structures, Houston assessed

---

[8] Dkt. 108-1, Ch. 19, art. I, § 1(a) (p. 1343).

[9] *Id.*, art. II, §§ 11–23 (pp. 1350–58).

[10] *Id.*, arts. I–III, §§ 2 (defining "development," p. 1346), 11 (permit required, pp. 1350–51), 16(a) (permit required, p. 1352), 32 (flood zone standards, pp. 1358–59).

[11] *Id.*, art. III, §§ 31 to 52 (flood zone standards, pp. 1358–63).

[12] *Id.*, arts. I–III, §§ 2, 32, 33 (elevation required, pp. 1359–60), 43 (floodways, pp. 1360–62).

[13] *Id.*, art. I, § 19-2 (defining "substantial improvement," p. 1349).

whether the Apartments were substantially damaged after Harvey.[14]  Houston performed

substantial damage determination ("SDD") calculations on the basis of Houston's own

inspection of the buildings and also, later, information provided by the buildings' owner (in this

case, Plaintiff).[15]  Houston used FEMA's Substantial Damage Estimator ("SDE") software tool

to perform SDD calculations.[16]  As stated in the SDE Manual,[17]

structures. Communities that participate in the National Flood Insurance Program (NFIP) are required to determine whether damage, of any origin, to structures within a mapped Special Flood Hazard Area (SFHA) meets the criteria for Substantial Damage. The SDE tool allows community officials with limited appraisal or construction backgrounds to develop reasonable estimates of structure values and structure-specific damages in accordance with the NFIP requirements.

**Substantial Damage**

Substantial Damage is defined in the NFIP regulations as "Damage of any origin sustained by a structure whereby the cost of restoring the structure to its before-damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred."

## C.  Houston and Plaintiff's adjuster both calculated that the Apartments were substantially damaged after Harvey, but Plaintiff developed a false narrative that the Apartments were not substantially damaged.

10.  Following Harvey, Plaintiff applied for permits to make repairs.[18]  The scope of

the proposed work totaled to $1,217,500.[19]  Plaintiff's permit applications were for insulation

and electrical outlet repairs, only—a fraction of the total repairs necessitated by Harvey.[20]

11.  Houston's first SDD determined that Harvey had substantially damaged the

---

[14] *See* the citations in ¶¶ 7–8 above; *Substantial Damage Estimator (SDE) User Manual and Field Workbook* (hereinafter "*SDE Manual*"), FEMA P-784 / Tool Version 3.0 / August 2017, at p. 1-1, available at: https://www.fema.gov/sites/default/files/2020-07/sde_3.0_user_manual_field_workbook_0.pdf (communities required to perform substantial damage determination calculations); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (court may take judicial notice of information posted on a government website).

[15] Exh. 2 at ¶ 4.

[16] *SDE Manual* at p. 1-1; Exh. 2 at ¶ 3; Exh. 4 at ¶ 3.

[17] *SDE Manual* at p. 1-1.

[18] Exh. 1.

[19] *Id*. at COH/Arbor Court 000092, 095, 098, 101, 104, 107, 110, 113, 116, 119, 122, 125, 128, 131, 134, and 137.

[20] *Id*.

Apartments.  Using FEMA's SDE tool and based on his personal inspection, Houston's David

Lopez, Senior Floodplain Inspector in the Floodplain Management Office of Houston Public

Works, found that the cash value of the Apartments' structures was $7,974,805, Harvey damages

amounted to $5,816,195, and the buildings were 72.9% damaged overall, as summarized in

Table 1.[21]  Lopez calculated the structures' market values (second column in the table in Exhibit

4 and in Table 1) based on the square footage of the buildings and the International Code

Council's (ICC) published Building Valuation Data Sheet, which Houston's Regulatory Affairs,

Building Code Enforcement Branch uses to calculate market values.[22]  Lopez's damage

inspection determined the structures' repair costs using the SDE tool (third column in the table in

Exhibit 4 and in Table 1).[23]  Note that Lopez did not perform a SDD for the Arbor Court

Apartments' office building because this building could be made flood proof with water barriers

under FEMA regulations.  These regulations do not apply to residential structures.[24]

| Building no. | Pre-Flood computed actual cash value ($) | Total estimated damages ($) | Total estimated damages (%) | Document Bates numbers |
|---|---|---|---|---|
| **Table 1.  COH-estimated Arbor Court Apts. Harvey Flood damages summary (estimated as of 2017-Oct-06) (based on Exh. 3 - FRE 1006)** | | | | |
| Office building | | | | |
| Building 1 | 417,568 | 303,807 | 72.8% | COH / Arbor Ct e-00699 |
| Building 2 | 417,568 | 309,607 | 74.1% | COH / Arbor Ct e-00699 |
| Building 3 | 591,397 | 438,493 | 74.1% | COH / Arbor Ct e-00699 |
| Building 4 | 591,397 | 430,279 | 72.8% | COH / Arbor Ct e-00699 |
| Building 5 | 339,077 | 246,700 | 72.8% | COH / Arbor Ct e-00699 |
| Building 6 | 532,352 | 387,320 | 72.8% | COH / Arbor Ct e-00699 |
| Building 7 | 532,352 | 387,320 | 72.8% | COH / Arbor Ct e-00699 |
| Building 8 | 632,650 | 460,293 | 72.8% | COH / Arbor Ct e-00699 |
| Building 9 | 632,650 | 460,293 | 72.8% | COH / Arbor Ct e-00699 |
| Building 10 | 632,650 | 460,293 | 72.8% | COH / Arbor Ct e-00699 |
| Building 11 | 447,956 | 325,917 | 72.8% | COH / Arbor Ct e-00699 |
| Building 12 | 447,956 | 325,917 | 72.8% | COH / Arbor Ct e-00699 |
| Building 13 | 580,375 | 422,260 | 72.8% | COH / Arbor Ct e-00699 |
| Building 14 | 580,375 | 422,260 | 72.8% | COH / Arbor Ct e-00699 |
| Building 15 | 598,482 | 435,434 | 72.8% | COH / Arbor Ct e-00699 |
| Total | 7,974,805 | 5,816,195 | 72.9% | |

---

[21] Exh. 3 and Table 1; Exh. 4 at ¶¶ 3–6.

[22] *Id.* at ¶ 6.

[23] *Id.*

[24] *Id.* at ¶ 8.

12.     Lopez completed his first SDD on September 23, 2017.[25]  By letter dated October 7, 2017, Houston informed Plaintiff of its finding and of the need to bring the Apartments in compliance with the Floodplain Ordinance.[26]

13.     Wayne Milam, Plaintiff's insurance adjuster, subsequently performed damage calculations for DMAC's proofs of loss and provided the results to Plaintiff's contractor, William Keith "Keith" Cramer,[27] on November 21, 2017, on forms labeled FEMA NFIP PROOF OF LOSS.[28]  Cramer, through his company Group General Contracting, Inc., was DMAC's designated project manager and agent on the Arbor Court Apartments permit applications.[29]  He offices with and "90 to 95%" of his work is for DMAC and its principals.[30]  Milam's proof of loss calculations in Exhibit 5 are summarized in Table 2.  In this table, the market or actual cash value of the Building 1 structure is copied from the value in row 2 of page AC10768 in Exhibit 5, and the loss value (or damages) is copied from row 7, and so on for the other structures.

14.     Importantly, Milam determined that all but two of the Arbor Court structures were substantially damaged by Harvey (Nos. 12 and 13), *i.e.*, damaged by 50% or more, and that, overall, the structures were damaged by 59.7%.[31]  Moreover, Milam told Cramer that his estimate did not include all the damages, such as upper cabinet replacement for mold damage.[32]

---

[25] *Id*. at ¶ 6.

[26] Exh. 3.

[27] Exh. 6 at 169:20–21.

[28] Exh. 5 (adjuster's proofs of loss following Harvey); *id*. at AC102767 (signature block showing Milam is an insurance adjuster).

[29] Exh. 1 (also Exh. 5 to Cramer's deposition); Exh. 6 at 170:21–25.

[30] Exh. 6 at 171:11–24, 175:6–10, 205:17–206:18; *see also* Exh. 7 at 5:3–20, 6:16–18, 6:23–7:9 and 7:16–25 (Hickok is the President of Plaintiff's General Partner, he testified in his personal capacity and on Plaintiff's behalf, and Plaintiff is part of the Marquis Group family).

[31] Exh. 5 and Table 2.

[32] Exh. 8 at AC102787.

FEMA's *Desk Reference* notes that: "an adjuster's … estimates of damage that determine the amount of a claim payment may not include all of the costs to repair the building to its pre-damage condition."[33]  It is possible, therefore, that had Milam included the additional damages he noted, his calculation would have shown that *all* the structures were substantially damaged.

| Table 2.  DMAC adjuster Arbor Court Apts. Harvey Flood proofs of loss summary (as of 2017-Nov-21) (based on Exh. 5 - FRE 1006) | | | | |
|---|---|---|---|---|
| Building no. | Actual cash value ($)[1] | Actual cash value loss ($)[2] | Actual cash value loss (%) | Document Bates numbers |
| Office building | 104,670 | 94,231 | 90.0% | AC102783 |
| Building 1 | 687,324 | 377,053 | 54.9% | AC102768 |
| Building 2 | 984,303 | 524,558 | 53.3% | AC102775 |
| Building 3 | 510,241 | 324,465 | 63.6% | AC102776 |
| Building 4 | 510,241 | 456,539 | 89.5% | AC102777 |
| Building 5 | 886,616 | 556,263 | 62.7% | AC102778 |
| Building 6 | 886,616 | 553,942 | 62.5% | AC102779 |
| Building 7 | 886,616 | 533,028 | 60.1% | AC102780 |
| Building 8 | 510,241 | 446,698 | 87.5% | AC102781 |
| Building 9 | 984,303 | 516,501 | 52.5% | AC102782 |
| Building 10 | 884,605 | 646,277 | 73.1% | AC102769 |
| Building 11 | 987,168 | 519,822 | 52.7% | AC102770 |
| Building 12 | 759,411 | 356,741 | 47.0% | AC102771 |
| Building 13 | 759,411 | 359,502 | 47.3% | AC102772 |
| Building 14 | 687,324 | 372,113 | 54.1% | AC102773 |
| Building 15 | 987,168 | 531,022 | 53.8% | AC102774 |
| Total | 12,016,257 | 7,168,756 | 59.7% | |
| 1.  Line 2 in the Proofs of Loss, *e.g.*, AC102768 for Building 1. | | | | |
| 2.  Line 7 in the Proofs of Loss, *e.g.*, AC102768 for Building 1. | | | | |

15.      Of course, Milam's results presented Plaintiff with a problem because they supported Houston's conclusion stated in its October 7 letter that the buildings were substantially damaged.  Cramer, Plaintiff's contractor and agent, quickly told Milam that he was "[c]oncerned about being more than 50% rebuild [sic]."[34]  In response, Milam wrote "sorry but I have rules to follow and I did what I could," and "I'm sorry Keith [*i.e.*, Cramer] I tried to help and will help you if you need me but you know I don't have the final say...."[35]  Cramer insisted that "I was

---

[33] *See* Substantial Improvement/Substantial Damage Desk Reference ("*Desk Reference*"), FEMA P-758, May 2010, at 4-2, ¶ 4.3, available at: https://www.fema.gov/sites/default/files/documents/fema_nfip_substantial-improvement-substantial-damage-desk-reference.pdf; *Kitty Hawk*, 418 F.3d at 457 (allowing judicial notice).

[34] Exh. 8 at AC102789.

[35] *Id*. at AC102788.

counting on your proof of losses to show building values far exceed the rebuild value."[36]  Indeed, Cramer was worried that "Houston will take into account your [*i.e.*, Milam's] proof of losses. They will 100% use those to determine if they can issue building permits."[37]  Milam further explained his methodology:

> I used the exact interior water height for each building that my tape measure showed....the difference is the pricing we used, BUT even with lower pricing when you include the electrical, OSB [oriented strand board, a type of wood board] and the exterior sheathing on this much SF [square feet] it's going to be more....Like we discussed I didn't include these on the 2016 flood and I could of [sic] actually replaced the upper cabinets, ceilings and ceiling insulation in most of the buildings because mold had started growing and I didn't....[38]

Milam, therefore, opted to not replace "cabinets, ceilings and ceiling insulation in most of the buildings" after Harvey even though "mold had started growing" in order to "help" keep rebuild costs below 50%, *i.e.*, below the substantial damage threshold.[39]  Again, FEMA's *Desk Reference* cautions that adjusters underestimate the extent of damages.[40]

16.     In short, Cramer knew exactly what he and his client needed from Milam to counter Houston's October 7 letter, and was not shy asking for it.  From this point on, Plaintiff's primary goal was to give Houston different numbers to calculate the SDDs without disclosing Milam's proof of loss calculations—calculations that proved Houston right.  For example, Plaintiff alleged in its live complaint,

> The City initially denied DMAC's requests for permits by claiming (incorrectly) that all of the buildings were "substantially damaged" because the repairs would cost more than 50% of the buildings' values.[41]

---

[36] *Id.* at AC102787.

[37] *Id.*

[38] *Id.* at AC102787.

[39] *Id.* at AC102787–88.

[40] *Desk Reference* at 4-2, ¶ 4.3.

[41] Dkt. 106 at ¶ 7; *see also id.* at ¶¶ 7, 43, 52, 53, and 135; Dkt. 119 at pp. 10, 18, 19, 22, 25, 27, 28, and 29 (Pacer page numbers) (repeatedly alleging that the Apartments were not substantially damaged).

Milam's proofs of loss show that Plaintiff ignored inconvenient facts when it challenged Houston's SDD and when it later filed suit.[42]

17.     On January 10, 2018, Plaintiff appealed Houston's SDD to Houston's Floodplain Management Office ("FMO"), alleging that the buildings were only 20.46% damaged.[43]  An appeal to the FMO is a request that the FMO review and reassess a SDD, and is not to be confused with an appeal to the General Appeals Board to reconsider a permit denial.[44]  In supporting its FMO appeal, Plaintiff submitted a construction proposal from Cramer's Group General Contracting, Inc., the same contractor who had submitted the original lowball permit application[45] and then cajoled Milam to lower his damages estimate.[46]  Plaintiff did not submit Milam's market values and damage estimates (Table 2) to Houston's FMO.  Instead, Plaintiff submitted its own market value for the structures ($16,633,222) and Cramer's new estimate for the repairs ($3,402,586).[47]  Plaintiff used these two numbers to claim that the structures were only 20.46% damaged.[48]  It is worth noting that Cramer's estimate for the repairs ($3,402,586) is less than half Milam's estimate of the damages to the structures ($7,168,756), and that Plaintiff's market value for the structures ($16,633,222) is almost $5 million more than what Plaintiff paid for the property (including land) *before* the property flooded twice in less than 18 months.[49]

18.     Meanwhile, Lopez collected more information about the structures' damages

---

[42] Dkt. 106 at ¶ 7.

[43] Exh. 9 at AC000734.

[44] Exh. 2 at ¶ 6.

[45] Exh. 1.

[46] Exh. 9 at AC000743–44.

[47] *Id*. at AC000742–43.

[48] *Id*. at AC000734.

[49] Exh. 9 at AC000743 and Table 2.  For the Arbor Court Apartments' purchase price, *see* Appraisal Report on Real Property by Cushman & Wakefield, Inc. at 6, Oct. 18, 2018, in Plaintiff's Designation of Expert Witnesses ("Reportedly, the purchase price was $11,850,000 or $51,078 per unit.").

(because he had more time after the Harvey rush) and used Plaintiff's market values for the structures for his second SDDs.[50]  Using FEMA's SDE tool, Lopez then determined that the damages amounted to $8,273,160 (Table 3).[51]  This second set of SDDs determined that eight of the buildings were substantially damaged and seven were not, as summarized in Table 3.[52]  Overall, the buildings were 50.1% damaged (Table 3).  Houston's total damage estimate of $8,273,160 was 13.3% greater than Milam's value of $7,168,756 (see the last two rows in Table 3).  Again, this difference is consistent with the *Desk Reference*'s caution that insurance adjusters underestimate the extent of damages.[53]

| Table 3.  COH-estimated Arbor Court Apts. Harvey Flood damages summary (estimated as of 2018-March-28) (based on Exh. 6 - FRE 1006) | | | | |
|---|---|---|---|---|
| Building no. | Actual cash value ($) | Actual cash value loss ($) | Actual cash value loss (%) | Document Bates numbers |
| Office building | | | | Calculation not available |
| Building 1 | 836,589 | 460,729 | 55.1% | AC000746 |
| Building 2 | 1,119,677 | 708,084 | 63.2% | AC000746 |
| Building 3 | 542,813 | 302,674 | 55.8% | AC000746 |
| Building 4 | 1,077,913 | 605,348 | 56.2% | AC000746 |
| Building 5 | 1,400,653 | 788,861 | 56.3% | AC000746 |
| Building 6 | 1,400,653 | 788,861 | 56.3% | AC000746 |
| Building 7 | 1,400,653 | 582,543 | 41.6% | AC000748 |
| Building 8 | 1,077,913 | 454,011 | 42.1% | AC000748 |
| Building 9 | 1,119,677 | 531,063 | 47.4% | AC000748 |
| Building 10 | 1,255,696 | 691,488 | 55.1% | AC000747 |
| Building 11 | 1,232,295 | 691,488 | 56.1% | AC000747 |
| Building 12 | 972,771 | 376,367 | 38.7% | AC000748 |
| Building 13 | 972,771 | 448,056 | 46.1% | AC000748 |
| Building 14 | 809,125 | 337,319 | 41.7% | AC000748 |
| Building 15 | 1,297,136 | 506,268 | 39.0% | AC000748 |
| Total | 16,516,335 | 8,273,160 | 50.1% | |
| Milam values | 12,016,257 | 7,168,756 | | From Table 2 |
| Difference (%) | 27.2% | 13.3% | | |

19.     Moreover, Houston's second SDDs almost certainly underestimated the *percent* damages because Lopez used Plaintiff's alleged market values of the structures (Column 2 in Table 3).[54]  Plaintiff alleged that these values totaled $16,633,222, or $4,616,965 (27.2%) more

[50] Exh. 4 at ¶ 7; Exh. 9 at AC000734, 742.

[51] Exh. 4 at ¶ 7; Exh. 10.

[52] Exh. 4 at ¶ 7; Exh. 10.

[53] *Desk Reference* at 4-2, ¶ 4.3.

[54] Exh. 9 at AC000742 (actual cash values ("ACV") on this page same as those in Table 3, Column 2).

than Milam's estimate of $12,016,257 and, as noted, almost $5 million more than the Apartments' purchase price—which included the land.  As Cramer explained in his email to Milam, it was important that the buildings' market values "far exceed the rebuild value."[55]  All things being equal, inflating the market value of the structures decreases the percent damages and the likelihood that the structures will be found to be substantially damaged.

20.     Not satisfied with Houston's results, however, Plaintiff appealed Houston's SDD to the FMO a second time on April 10, 2018, this time insisting via Plaintiff principal Morgan Cox that the Apartments' "damages are in the 2% range, nowhere near the 50% [substantial damage] threshold."[56]  Property owners can appeal Houston's SDD calculations to the FMO as many times as they want.[57]  The Floodplain Ordinance places no limit on the number of appeals, and Houston will repeat a SDD whenever an owner requests it and submits new or updated information.[58]  Each time, Houston repeats the SDDs with FEMA's SDE tool.[59]

21.     Wanting to resolve the second appeal and obtain complete information from Plaintiff, Houston's Choyce Morrow asked Cox on May 3, 2018, to provide, inter alia, "any other cost estimates that you have received as well as your NFIP Proof of Loss Statement."[60]  The Floodplain Ordinance empowers Houston to request "[a]ny other relevant documentation" to supplement a flood zone permit application.[61]  Houston needed this information to try to understand why Houston calculated SDDs in the 39% to 63% percent range (Table 3) when

---

[55] Exh. 8 at AC102787.

[56] Exh. 11 at e-05779–80.  Cox's signature block shows that he is Vice President of Plaintiff's general partner, DM Arbor Court G.P., Inc.

[57] Exh. 2 at ¶ 6.

[58] *Id.*

[59] *Id.*

[60] Exh. 12 at AC000820; Exh. 2 at ¶ 7.

[61] Dkt. 108-1, Ch. 19, art. II, § 18(7) (p. 1354).

Plaintiff insisted that the SDDs were 20.46% in its first appeal, and then 2% in its second appeal.[62]   Ignoring Ms. Morrow's request for damage estimates and proofs of loss, Cox insisted in bold, italicized, underlined, and partly capitalized language that "[a]gain, as we have always known, ***Arbor Court is NOT substantially damaged.***"[63]   But Milam's proofs of loss showed otherwise,[64] which is why Plaintiff spared no effort to hide them from Houston.[65]   Ms. Morrow stated she could not complete the SDDs after the second appeal because Plaintiff did not provide all the requested information.[66]   Plaintiff filed suit against Houston on June 8, 2018, and Ms. Morrow stopped working on the second appeal SDDs.[67]

**D.     Biscayne at Cityview Apartments did not apply for permits after Harvey, and neither Imperial Oaks nor Biscayne at Cityview Apartments were substantially damaged by Hurricane Harvey.**

22.     Separately, Imperial Oaks Apartments ("Imperial Oaks"), located at 625 Seminar Drive, Houston, Texas 77060, also sought repair permits immediately following Harvey. Biscayne at Cityview Apartments ("Biscayne"), located at 17050 Imperial Valley Drive, Houston, Texas 77060, did not.[68]   These are the two apartment complexes, both located near the Arbor Court Apartments, that Plaintiff invoked in its complaint in support of its equal protection claim.[69]

23.     Using FEMA's SDE tool, Lopez completed Houston's SDDs for Imperial Oaks on Sept. 30, 2017, and determined that the structures were at most 35% damaged (Table 4), *i.e.*,

---

[62] Exh. 2 at ¶ 7; Exh. 9 at AC000734; Exh. 11 at e-05780.
[63] Exh. 12 at AC000818 (emphasis in original).
[64] Exh. 5 and Table 2.
[65] Plaintiff did not produce Milam's proofs of loss to Houston until Feb. 7, 2022.  *See* Dkt. 163.
[66] Exh. 2 at ¶ 8.
[67] *Id.*
[68] Exh. 4 at ¶¶ 3, 10.
[69] Dkt. 106 at ¶¶ 34, 133.

none were substantially damaged.[70]  Some buildings had no flood damages and required no repair permits, and all buildings were otherwise eligible for permits to repair as they were before Harvey.[71]

| Table 4.  Imperial Oaks Hurricane Harvey SDD (625 Seminar Drive, Houston, TX 77060) (based on Exh. 4 - FRE 1006) | | | | |
|---|---|---|---|---|
| Building | Appraised value ($) | Damages ($) | Improvem't (%) | Document Bates numbers |
| Office building | No flood damage and no repair permit required | | | |
| Building 1 | Suffered fire damage prior to Harvey; building now demolished. | | | |
| Building 2 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160019 to 034 |
| Building 3 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160035 to 058 |
| Building 4 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160075 to 092 |
| Building 5 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160059 to 074 |
| Building 6 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160093 to 108 |
| Building 7 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160109 to 124 |
| Building 8 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160125 to 140 |
| Building 9 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160141 to 156 |
| Building 10 | No flood damage and no repair permit required | | | |
| Building 11 | No flood damage and no repair permit required | | | |
| Building 12 | No flood damage and no repair permit required | | | |
| Building 13 | No flood damage and no repair permit required | | | |
| Building 14 | 652,609 | 189,857 | 29.1% | COH Arbor Ct e-160171 to 194 |
| Building 15 | 498,830 | 174,351 | 35.0% | COH Arbor Ct e-160157 to 170 |
| Building 16 | 652,609 | 189,857 | 29.1% | COH Arbor Ct e-160195 to 216 |
| Building 17 | 652,609 | 189,857 | 29.1% | COH Arbor Ct e-159692 to 696 |
| Building 18 | 652,609 | 189,857 | 29.1% | COH Arbor Ct e-159698 to 702 |
| Building 19 | 652,609 | 189,857 | 29.1% | COH Arbor Ct e-1159715 to 719 |
| Building 20 | 968,457 | 321,684 | 33.2% | COH Arbor Ct e-1159704 to 713 |
| Building 21 | 968,457 | 321,684 | 33.2% | COH Arbor Ct e-1159721 to 730 |
| Total | 9,689,428 | 3,161,811 | 32.6% | |

24.    Biscayne's owner did not apply for repair permits after Harvey.[72]  As a result, Houston did not send an inspector to the property and did not perform SDDs at that time.[73] Later, in 2020, Houston brought into compliance all apartment complexes that had been flooded by Harvey and repaired without permits.[74]  Biscayne was one of these complexes.[75]  Houston performed SDDs for the non-permitted complexes, after the fact, using still-visible waterlines.[76]

---

[70] Exh. 4 at ¶¶ 9–10.

[71] *Id.* at ¶ 9.

[72] *Id.* at ¶ 10.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

Lopez completed the SDDs for Biscayne on July 25, 2020.[77]  He calculated that the structures were only 20.8% damaged and, therefore, none was substantially damaged (Table 5).[78]  As with Imperial Oaks, some structures had no flood damages and required no repair permits, and all buildings were otherwise eligible for repair permits.[79]

| Table 5.  Biscayne at Cityview Hurricane Harvey SDD (17050 Imperial Valley Dr., Houston, TX 77060) (based on Exh. 4 – FRE 1006) | | | | |
|---|---|---|---|---|
| Building | Appraised value ($) | Damages ($) | Improvem't (%) | Document Bates numbers |
| Office building | 238,094 | 38,969 | | COH Arbor Ct e-160366 to 370 |
| Building 1 | No flood damage and no repair permit required | | | |
| Building 2 | No flood damage and no repair permit required | | | |
| Building 3 | 322,222 | 66,958 | 20.8% | COH Arbor Ct e-160336 to 340 |
| Building 4 | No flood damage and no repair permit required | | | |
| Building 5 | 322,222 | 66,958 | 20.8% | COH Arbor Ct e-160341 to 345 |
| Building 6 | 428,448 | 89,032 | 20.8% | COH Arbor Ct e-160346 to 350 |
| Building 7 | 616,116 | 128,029 | 20.8% | COH Arbor Ct e-160351 to 355 |
| Building 8 | 963,124 | 200,138 | 20.8% | COH Arbor Ct e-160356 to 360 |
| Building 9 | 424,908 | 88,296 | 20.8% | COH Arbor Ct e-160361 to 365 |
| Building 10 | 354,090 | 73,580 | 20.8% | COH Arbor Ct e-160256 to 260 |
| Building 11 | 276,190 | 57,392 | 20.8% | COH Arbor Ct e-160261 to 265 |
| Building 12 | 424,908 | 88,296 | 20.8% | COH Arbor Ct e-160266 to 270 |
| Building 13 | 297,435 | 61,807 | 20.8% | COH Arbor Ct e-160271 to 275 |
| Building 14 | 297,435 | 61,807 | 20.8% | COH Arbor Ct e-160276 to 280 |
| Building 15 | 309,828 | 64,383 | 20.8% | COH Arbor Ct e-160281 to 285 |
| Building 16 | 309,828 | 64,383 | 20.8% | COH Arbor Ct e-160286 to 290 |
| Building 17 | 322,222 | 66,958 | 20.8% | COH Arbor Ct e-160291 to 295 |
| Building 18 | 424,908 | 88,296 | 20.8% | COH Arbor Ct e-160296 to 300 |
| Building 19 | 309,828 | 64,383 | 20.8% | COH Arbor Ct e-160301 to 305 |
| Building 20 | 460,316 | 95,654 | 20.8% | COH Arbor Ct e-160306 to 310 |
| Building 21 | 334,615 | 69,533 | 20.8% | COH Arbor Ct e-160311 to 315 |
| Building 22 | 486,873 | 101,173 | 20.8% | COH Arbor Ct e-160316 to 320 |
| Building 23 | 486,873 | 101,173 | 20.8% | COH Arbor Ct e-160321 to 325 |
| Building 24 | 198,290 | 41,205 | 20.8% | COH Arbor Ct e-160326 to 330 |
| Building 25 | 309,828 | 64,383 | 20.8% | COH Arbor Ct e-160331 to 335 |
| Building 26 | No flood damage and no repair permit required | | | |
| Total | 8,918,600 | 1,842,783 | 20.7% | |

25.    As Lopez noted, a key required measurement for FEMA's SDE tool is the peak water height during the flood event.[80]  For example, the extent of damage to a structure's electrical and plumbing systems depends on whether flood water height was less or greater than 18 inches.[81]  A broad indication that the Arbor Court Apartments were more damaged than the

---

[77] *Id.*

[78] *Id.* at ¶ 9.

[79] *Id.*

[80] *Id.* at ¶ 5.

[81] *Id.*; *see also Substantial Damage Estimator (SDE) User Manual and Field Workbook* (hereinafter "*SDE Manual*"), FEMA P-784 / Tool Version 3.0 / August 2017, at Appendix E, pp. 9–10, available at: https://www.fema.gov/sites/default/files/2020-07/sde_3.0_user_manual_field_workbook_0.pdf.

Imperial Oaks and Biscayne apartments is that the measured water heights were above 18 inches for all Arbor Court buildings, and below 18 inches for all Imperial Oaks and Biscayne buildings.[82]   Indeed, some of the Arbor Court buildings had water lines as high as three feet.[83]

## V.      ARGUMENT AND AUTHORITIES

### A.      Summary judgment standard

26.      Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[84]  An issue is genuine if "the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."[85]  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."[86]

27.      A movant that does not bear the burden of proof "may meet its burden by pointing out the absence of evidence supporting the nonmoving party's case."[87]  Once the movant satisfies its burden, the nonmovant must "produce evidence of the existence of a material issue of fact requiring a trial."[88]

### B.      An equal protection claim does not stand when there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

28.      An equal protection claim requires a plaintiff to show that it was not treated the same as others similarly situated.[89]  An equal protection claim that is not based on membership

---

[82] Exh. 4 at ¶ 5.

[83] *Id.*; *see also* Exh. 6 at 206:15–18 (reporting water heights "over cabinets . . . [s]o less than 4 feet.").

[84] Fed. R. Civ. P. 56(a).

[85] *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[86] *Id.*

[87] *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 407 (5th Cir. 2011) (per curiam).

[88] *Wesley v. Gen. Drivers, Warehousemen, & Helpers Local 745*, 660 F.3d 211, 213 (5th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[89] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

in a suspect class or the infringement of a fundamental right may be cognizable as a so-called
"class of one."[90]  But, "[u]nder a rational basis review, a court affords governmental decisions a
'strong presumption of validity,' and will uphold a governmental decision 'if there is any
reasonably conceivable state of facts that could provide a rational basis for the classification.'"[91]
"Moreover, 'the range of rational grounds is not restricted to those articulated at the time the
[government] made its decision,' but encompasses all conceivable bases, actual or
hypothesized."[92]  "As long as there is *a* conceivable rational basis for the official action, it is
immaterial that it was not *the* or *a* primary factor in reaching a decision or that it was not actually
relied upon by the decision-makers or that some other nonsuspect irrational factors may have
been considered."[93]  "Classifications survive rational basis review 'even when there is an
imperfect fit between means and ends.'"[94]  Even "decisions that are imprudent, ill-advised, or
even incorrect may still be rational."[95]

## C.  The Arbor Court Apartments were not similarly situated to the Biscayne Apartments because the owners of Biscayne never applied for permits.

29.     Plaintiff alleges that the Arbor Court Apartments were similarly situated to
Imperial Oaks and Biscayne apartments.[96]  Plaintiff is wrong.  Plaintiff applied for permits for
the Arbor Court Apartments shortly after Harvey.[97]  The owner of Biscayne Apartments did

---

[90] *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

[91] *Da Vinci Inv., Ltd. P'ship v. City of Arlington, Tex*., 747 Fed. App'x 223, 227 (5th Cir. 2018) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 319–20 (1993)).

[92] *Id*. (citing *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir. 1988)).

[93] *Id*. (citing *Reid*, 854 F.2d at 754 (emphases in original)).

[94] *Harris*, 827 F.3d at 365 (citing *Heller*, 509 U.S. at 321).

[95] *Da Vinci*, 747 Fed. App'x at 227 (citing *Rossi v. West Haven Bd. of Educ.*, 359 F. Supp. 2d 178, 183 (D. Conn. 2005)).

[96] Dkt. 106 at ¶¶ 133, 143.

[97] Exh. 1.

not.[98]  The Arbor Court and Biscayne apartments were not similarly situated for this reason.

Houston cannot be expected to treat equally a property owner that applies for permits and one

that does not.

**D.      The Arbor Court Apartments were not similarly situated to Imperial Oaks and Biscayne because these last two complexes were not similarly flooded.**

30.     Although these three complexes are in close proximity,[99] the extent of flood

damage was demonstrably different.  Plaintiff's own insurance adjuster established that 14 of the

16 Arbor Court structures were substantially damaged, and that overall, the complex was 59.7%

damaged.[100]  This result was consistent with Houston's SDDs, which determined that the Arbor

Court structures were at least 50.1% damaged overall.[101]  Houston separately determined that

neither the Imperial Oaks nor Biscayne apartments were substantially damaged.[102]  Overall, the

structures in those two complexes were 32.6% and 20.7% damaged, respectively (Tables 4 and

5).[103]  The three apartment complexes were not similarly situated because Arbor Court was

substantially damaged and the other two complexes were not.

31.     Plaintiff has no evidence to support its contention that the Arbor Court

Apartments were similarly situated to the Imperial Oaks and Biscayne apartments.  In response

to Houston's interrogatories regarding how the three apartment complexes "were comparable in

all relevant material respects," Plaintiff merely asserted its conclusion that "[a]ll three [apartment

complexes] similarly suffered damage of a like damage extent and pattern in the Hurricane

---

[98] Exh. 4 at ¶ 10.

[99] Dkt. 106 at ¶ 34 (describing Imperial Oaks and Biscayne as "neighboring apartment complexes" to Arbor Court).

[100] Exh. 5 and Table 2.

[101] Exh. 4 at ¶¶ 6, 7 and Tables 1, 3.

[102] Exh. 4 at ¶¶ 9, 10 and Tables 4, 5.

[103] Exh. 4 at ¶ 9 and Tables 4, 5.

Harvey flooding event."[104]  Plaintiff refused to provide any specifics other that its conclusory say-so.[105]  Houston has met "its burden by pointing out the absence of evidence supporting the nonmoving party's case," namely Plaintiff's claim that the apartment complexes were similarly situated.[106]  Plaintiff's equal protection claim fails for this reason.

**E.      Houston had a legitimate state interest and a rational basis for denying Plaintiff's permits.**

32.      Houston had a legitimate state interest in denying DMAC's permit applications because the prevention of flooding is a "legitimate public purpose."[107]  And in this case, there is a perfect fit between the means (flood zone repair permit denial) and the end (prevention of danger to both life and property).

33.      *Even if* there are any facts to demonstrate that Biscayne is similarly situated to Arbor Court, which Houston denies, nonetheless, Houston had a rational basis for treating Arbor Court and Biscayne differently because the first applied for repair permits and the latter did not. Houston neither approved nor denied inexistent permit applications for Biscayne in the aftermath of Harvey.[108]

34.      *Even if* there are any facts to demonstrate that Imperial Oaks is similarly situated to Arbor Court, which Houston denies, nonetheless, Houston had a rational basis for treating Arbor Court and Imperial Oaks differently.  Houston performed SDDs for Arbor Court and Imperial Oaks shortly after Hurricane Harvey, *i.e.*, two flooded apartment complexes that applied

---

[104] Exh. 13 at 2.

[105] *Id*. at 3.

[106] *Chambers*, 428 F. App'x at 407.

[107] *Dolan v. City of Tigard*, 512 U.S. 374, 387 (1994).

[108] Exh. 4 at ¶ 10.

for permits.[109]  Using the same inspector and the same SDE tool in the same timeframe

(September 2017), Houston determined that Harvey substantially damaged all the Arbor Court

Apartment structures but none of the Imperial Oaks structures.[110]  Indeed, even Plaintiff's

insurance adjuster independently reached the same conclusion as Houston for 14 of the 16 Arbor

Court Apartment structures.[111]  Houston's and DMAC's adjuster's SDD results concurred.  A

few of the Imperial Oaks structures were not even flooded by Harvey and required no permits.[112]

Thus, Plaintiff was required to appeal the SDDs to the FMO while Imperial Oaks was entitled to

permits.

     35.     In response to Plaintiff's first FMO appeal, Houston determined that eight of 16

structures were substantially damaged, and overall, the complex was substantially damaged.[113]

Houston could not conclude its third analysis, in response to Plaintiff's second appeal, because

Plaintiff withheld the adjuster's damage estimates and proofs of loss.[114]

     36.     According to Lopez, the Houston Senior Floodplain Inspector who performed all

the SDDs with FEMA's SDE tool, the key difference between these two properties was the peak

water height during the Harvey flood.[115]  In particular, the extent of damage to a structure's

electrical and plumbing systems depends on whether flood water height was less or greater than

18 inches.[116]  Lopez found that the measured water heights were above 18 inches for all Arbor

---

[109] *Id*. at ¶¶ 6, 9–10 and Tables 1 and 4.

[110] Exh. 3 and Table 1; Exh. 4 at ¶¶ 6, 9–10 and Table 4.

[111] Exh. 5 and Table 2 (Milam damage calculations).

[112] Exh. 4 at ¶ 9.

[113] Exh. 10 and Table 3 (second Houston SDD).

[114] Exh. 2 at ¶¶ 7, 8.

[115] Id. at ¶ 5.

[116] *Id*.

Court buildings, and below 18 inches for all Imperial Oaks buildings.[117]  Some of the Arbor

Court buildings had water lines as high as three feet.[118]  Even Cramer, Plaintiff's contractor and

agent, testified that one Arbor Court building had water heights "over cabinets . . . [s]o less than

4 feet."[119]

37.     Houston, therefore, had a rational basis for granting repair permits to Imperial

Oaks Apartments and for denying Plaintiff's permit applications.  Imperial Oaks Apartments

were not substantially damaged, and Arbor Court Apartments were.

38.     It does not matter that Houston's basis for denying permits to Arbor Court on

basis of substantial damages was not that articulated in Houston's July 17, 2018 letter, which

instead invoked "danger to both life and property."[120]  What matters is that Houston had *a*

conceivable rational basis, namely that the Arbor Court Apartments were substantially damaged,

a conclusion supported by Plaintiff's adjuster's damage estimates and proofs of loss.[121]  In any

event, denying the permit applications on basis of "danger to both life and property" is in and of

itself a rational basis when one property is substantially damaged by a flood and the other is not.

39.     Because by Plaintiff's own admission the Apartments were substantially damaged

by Harvey, because Houston independently reached the same conclusion, and because Houston's

contemporaneous evidence shows that Imperial Oaks Apartments were not substantially

damaged, there is no genuine dispute that Houston had a rational basis for denying Plaintiff's

permit applications, which entitles Houston to summary judgment on Plaintiff's equal protection

---

[117] *Id.*

[118] *Id.*

[119] Exh. 6 at 206:15–18.

[120] Dkt. 14-3; *Da Vinci*, 747 Fed. App'x at 227.

[121] Exh. 5.

claim.[122]

40.     Finally, even if Plaintiff alleges that Houston's decision to deny the permits was "imprudent" or "ill-advised," and even if Houston's SDD calculations were "incorrect,"—and all of which Houston denies—Houston's decision was rational because it was based on the best information that Houston had, it was consistent with Plaintiff's contemporaneous information, and Plaintiff did all it could to deny Houston access to its adjuster's concurring information to Houston when Houston expressly asked Plaintiff for it.[123]

## VI.     CONCLUSION AND PRAYER

41.     For these reasons, the City of Houston respectfully asks this Court to grant Houston summary judgment as to DM Arbor Court, Ltd.'s equal protection claim, and to grant any and all such other and further relief, whether at law or in equity, to which the City of Houston, Texas may be justly entitled.

Respectfully submitted,

**ARTURO G. MICHEL**
**City Attorney**
SUZANNE R. CHAUVIN
Chief, General Litigation Section

By:     *s/ Pierre Grosdidier*
Pierre Grosdidier
Senior Assistant City Attorney
**ATTORNEY-IN-CHARGE**
Federal Id. No.: 893533
State Bar No.: 24059866
CITY OF HOUSTON LEGAL DEPARTMENT
900 Bagby Street, 4th Floor
Houston, Texas 77002
832.393.6475 – Telephone
832.393.6259 – Facsimile

---

[122] *Da Vinci*, 747 Fed. App'x at 227.

[123] Exh. 12 at AC000820; Exh. 2 at ¶ 7–8; *Da Vinci*, 747 Fed. App'x at 227 (citing *Rossi*, 359 F. Supp. 2d at 183); Dkt. 108-1, Ch. 19, art. II, § 18(7) (allowing Houston to request and consider "[a]ny other relevant documentation" to supplement a flood zone permit application, p. 1354).

pierre.grosdidier@houstontx.gov

<u>Of Counsel:</u>

Lydia Zinkhan
Senior Assistant City Attorney
Federal Id. No.: 11882
State Bar No. 22277600
City of Houston Legal Department
900 Bagby Street, 4th Floor
Houston, Texas 77002
832.393.6467 – Telephone
832.393.6259 – Facsimile
lydia.zinkhan@houstontx.gov

**ATTORNEYS FOR DEFENDANT
THE CITY OF HOUSTON**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2022, I served all the attorneys of record with a true and correct copy of the foregoing document in accordance with *Rule 5(b) of the Federal Rules of Civil Procedure*.

Kenneth B. Chaiken
**ATTORNEY-IN-CHARGE**
Federal Id. No.: 21390
State Bar No.: 04057800
kchaiken@chaikenlaw.com
Robert L. Chaiken
Federal Id. No.: 23225
State Bar No.: 04057830
rchaiken@chaikenlaw.com
CHAIKEN & CHAIKEN, P.C.
Legacy Town Center, III
5801 Tennyson Pkwy., Suite 440
Plano, Texas 75024
214.265.0250 – Telephone
214.265.1537 – Facsimile

***Attorneys for Plaintiff,***
***DM Arbor Court, Ltd.***

<u>s/ *Pierre Grosdidier*</u>
Pierre Grosdidier