United States District Court
Southern District of Texas
**ENTERED**
August 17, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DM ARBOR COURT, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:18-CV-01884 |
| | § | |
| THE CITY OF HOUSTON, TEXAS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM & ORDER

On August 15, 2022, the Court held a hearing on six motions: Defendant's Motion for Partial Summary Judgment on Plaintiff's Equal Protection Claim (ECF No. 193); Defendant's Motion to Strike Plaintiff's Response (ECF No. 224); Defendant's Motion to Strike Mr. Marchitelli's Errata Sheet (ECF No. 241); Defendant's Motion to Exclude Mr. Marchitelli (ECF No. 200); Defendant's Motion for Partial Summary Judgment on Plaintiff's Takings Claim (ECF No. 199); and Plaintiff's Cross-Motion for Partial Summary Judgment on Plaintiff's Takings Claim (ECF No. 202). At the hearing, the Court ruled from the bench. The Court provides this Memorandum and Order to further document its rulings and reasoning.

## I.  BACKGROUND

Arbor Court was built in the late 1970s as a 15-building multi-family apartment community. ECF No. 203 at APPX0448. Plaintiff DM Arbor Court, Ltd. ("DMAC") bought Arbor Court for $13.5 million and invested another $500,000 into it. *Id.* at APPX0448–0449. DMAC operated Arbor Court under a Housing Assistance Payment Contract ("HAP Contract") from the U.S. Department of Housing and Urban Development ("HUD"). *Id.* at APPX0450. The HAP

contract subsidized the apartments and, in return, required DMAC to use the units as affordable housing for low-income residents. *Id.*

Arbor Court flooded during the Tax Day Flood of April 2016.  *Id.* at APPX0449. In response, DMAC sought and obtained repair permits from Defendant The City of Houston ("the City") under Chapter 19 of the Houston Code of Ordinances. *Id.* Subsequently, the City received a "drainage evaluation report" from Lockwood, Andrews, and Newnam, Inc. (the "LAN Report"). The LAN Report suggested that the City treat the area where Arbor Court is located as repetitively flooding. *Id.* at APPX0047; ECF No. 137 at 3–4. Thereafter, the City considered acquiring Arbor Court and repurposing the area for recreation and flood detention. ECF No. 203 at APPX0009– 0010. City officials stated: "getting Arbor Court relocated should be one [of] our highest priorities." ECF No. 203 at APPX0008.

Arbor Court flooded again during Hurricane Harvey. *Id.* The buildings were damaged and first-floor tenants had to evacuate. *Id.* Once more, DMAC sought repair permits under the Ordinance. ECF No. 137 at 1. Judge Miller's opinion on the City's Motion to Dismiss provides helpful background on the Ordinance:

> Since 1985, the Ordinance has helped ensure that development within Houston complies with the development standards the Federal Emergency Management Agency ("FEMA") mandates for property owners to participate in the National Flood Insurance Program ("NFIP"). [ECF No. 108, Ex. 1] at 3; Ch. 19, art. I, § 1(b). The Ordinance also seeks "to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas by provisions designed to . . . [among other things] [p]rotect human life and health." *Id.* at 2; Ch. 19, art. I, § 1(a).
>
> Article II of the Ordinance sets forth the regulatory framework for floodplain development permits. *See id.* at 10; Ch. 19, art. II, §§ 11–23. It provides that: "No building permit, paving permit, utility construction permit or other permit required for a structure or development shall be issued, and no plat meets the applicable requirements of this chapter, or unless a variance, excepting such structure or development from the provisions of this chapter, is granted under the terms of this chapter." *Id.* at 10–11; Ch. 19, art. II, § 11. A development includes new

construction, or improvements to existing structures, within the floodplain and floodway. *Id.* at 6, 18; Ch. 19, arts. I–III, §§ 2 (defining "development"), 11, 16(a), 32.

The Ordinance also specifies the requirements and procedures for permit applications, as well as decisions on whether to approve or deny them by the City Engineer. *See id.* at 10; Ch. 19, art. II, § 11. The Ordinance charges the City Engineer with "exercising best engineer judgment in the administration and implementation" of the permitting chapter's provisions. *Id.* at 11; Ch. 19, art. II, § 12. In addition, it tasks the City Engineer with "[r]eviewing, approving, or denying all applications for development permits required by the adoption of this chapter." *Id.*; Ch. 19, art. II, § 12(2). The Ordinance further authorizes the City Engineer to "deny a permit application if the issuance of the permit could result in . . . [among other things] [d]anger to life or property due to flooding or erosion damage in the vicinity of the site." *Id.* at 14; Ch. 19, art. II, § 19(a)(1). If the City Engineer denies an applicant's permit request, the Ordinance provides a variance and appeal process. *Id.* at 15; Ch. 19, art. II, § 22(a)(5). An applicant may first appeal the decision to the General Appeals Board. *See id.* If that proves unsuccessful, an applicant may further appeal to the City Council, which serves as the final decisionmaker on any appeal. *Id.* at 18; Ch. 19, art. II, § 23(g).

ECF No. 137 at 1–3.[1]

The requirements for obtaining a repair permit under the Ordinance turn in part on whether the permit calls for a "substantial improvement." A permit for a "substantial improvement" must comply with the Ordinance's additional requirements for new construction. *See e.g.*, ECF No. 108-1, Ch. 19, art. III, § 19-33 ("All additions to, and new construction and substantial improvement of, any residential structure within Zone AO shall have the lowest floor and all utilities elevated above [a certain level]."). A "substantial improvement" includes "any reconstruction, rehabilitation, . . . or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before the start of construction of the improvement." *Id.*, art. I, § 19-2 (defining substantial improvement). A "substantial improvement" further

---

[1] "Under the NFIP, the federal goal is providing subsidized flood insurance for existing structures in flood-prone areas, while simultaneously discouraging future unsafe construction in such areas. 42 U.S.C. §§ 4011–12." *Adolph v. Fed. Emergency Mgmt. Agency of the U.S.*, 854 F.2d 732, 734 n.2 (5th Cir. 1988).

"include[s] structures that have incurred repetitive loss or substantial damage, regardless of the repair work performed." *Id.* A structure is "substantially damaged" when "the cost of restoration of the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure." *Id.* The upshot of this series of interlocking rules is that, if a structure is damaged by 50% or more during a flood, repairs must comply with the Ordinance's heightened requirements for new construction.

After Harvey, DMAC applied for "minor repair" permits for Arbor Court. ECF No. 193-1. DMAC proposed total repairs of $1,217,500, which would have covered damage to insulation and electrical outlets. *Id.* at COH/Arbor Court 000092–137. The City then conducted an independent "Substantial Damage Determination" ("SDD"). Using FEMA's Substantial Damage Estimator tool ("SDE"), the City's Floodplain Management Office ("FMO") calculated Arbor Court's value at around $8 million, and the damage from Harvey at around $5.8 million (approximately 73% of Arbor Court's total value). ECF No. 193-3. Because the structures were more than 50% damaged, the City concluded that Arbor Court was "substantially damaged" and demanded that DMAC comply with the Ordinance's "substantial improvement" provisions (including the elevation requirement). *Id.* Since DMAC's applications only sought approval for "minor repairs," the City denied those applications. ECF No. 203 at APPX0450–0451.

In the interim, an insurance adjuster (Wayne Milam) calculated the damage to Arbor Court for DMAC. Mr. Milam determined that all but two of the buildings were more than 50% damaged, and that Arbor Court was 59.7% damaged in total ($12 million in value vs. $7.2 million in damage). ECF No. 193-5. When DMAC's contractor (William "Keith" Cramer) learned of Mr. Milam's report, he told Mr. Milam that the figures "don't really give me what I need." ECF No. 193-8 at AC102789. Mr. Milam responded: "I'm sorry but I have rules to follow and I did what I

4

could . . . I'm sorry Keith I tried to help and I will help if you need me but you know I don't have the final say[.]" *Id.* at AC102788. Mr. Cramer replied: "Well, I was counting on your proof of losses to show building values far exceed the rebuild value. . . . [the City] will take into account your proof of losses. They will 100% use those to determine if they can issue building permits." *Id.* at AC102787.

Undeterred, DMAC appealed the City's denial to the General Appeals Board ("GAB"). ECF No. 137 at 4. Before the GAB, DMAC relied on its own market value calculation ($16.6 million) and an estimate for repairs that was less than half of what Mr. Milam had relayed to Mr. Cramer ($3.4 million). ECF No. 203 at APPX045; ECF No. 193 at ¶ 17. In March 2018, the FMO used DMAC's heightened market values to redo the SDDs.[2] ECF No. 193-10. Using DMAC's market values, the City concluded that Buildings 7–9 and 12–15 were not substantially damaged. *Id.* As a result, the City removed the hold on the permits for those structures. ECF No. 193-10. The City maintained the hold on the permits for Buildings 1–6 and 10–11, however, because it determined that those structures were still "substantially damaged." *Id.* DMAC then sent additional information to the FMO.[3] DMAC's subsequent submissions went so far as to claim that Arbor Court was only 2% damaged. ECF No. 193-2 at ¶ 7. FMO Engineer Choyce Morrow states in an affidavit that she then tried to repeat the SDDs with DMAC's new data, but "could not complete them because [she] did not have all the required information." *Id.*

The permitting process took another turn in May 2018, when Ms. Morrow sent DMAC the following email:

> I have re-reviewed Chapter 19's definition of Substantial Damage and it does not specifically state that, "Repair costs should be at fair market value[.]" Arbor Court

---

[2] The City had previously used market values from the International Code Council's Building Valuation Data Sheet. ECF No. 193-4 at ¶ 7.

[3] Property owners can appeal the City's SDD as many times as they wish. ECF No. 193-2 at ¶ 6.

has provided cost estimates prepared and sealed by a state of Texas Architect that
show that repairs will cost less than 50% of building values, therefore all buildings
will be classified as non-substantial[.]

ECF No. 205 at APPX0306. DMAC was elated. But a subsequent "site visit by Houston Senior

Floodplain Inspector David Lopez led [Ms. Morrow] to believe that DMAC might not have

disclosed all the information that [she] needed to accurately perform the SDDs." *Id.* Specifically,

Mr. Lopez's inspection revealed that Arbor Court required more repair work than DMAC had

disclosed. ECF No. 193-12. As a result, Ms. Morrow asked DMAC to provide additional cost

estimates and a proof of loss statement. ECF No. 193-2 at ¶ 7. When DMAC tried to retrieve the

permits for its buildings without providing the requested information, the City refused to release

the permits. ECF No. 203 at APPX0451–0452.

DMAC contends that the City's about-face stemmed from its long-held desire to acquire

Arbor Court. ECF No. 137 at 5. DMAC believes that the City used the permitting process to

accomplish its goal at a lower cost. As a result, DMAC sued the City on June 8, 2018. *Id.*

Approximately one month later, Director of Public Works Carol Haddock notified DMAC that the

City could not finalize its SDDs with the information that DMAC had provided. ECF No. 14-3.

Ms. Haddock also told DMAC that the City was denying the applications under a separate

provision, which limited the issuance of permits where "there is danger to both life and property

due to flooding in the vicinity of the site." *Id.* (citing Ordinance Section 19-19). Ms. Haddock

noted that Arbor Court was in a floodway, and that the property had flooded several times in the

last 17 years. *Id.* Citing the LAN report, the Tax Day Flood, and Hurricane Harvey, Ms. Haddock

explained: "The depth of flood waters and the velocity vectors previously measured across this

property indicate that there is a risk of danger to anyone, resident or rescuer, caught in the waters."

*Id.* Ms. Haddock further reasoned that Arbor Court tenants were at risk of property damage from

6

flooding. *Id.* Ms. Haddock indicated that this determination did "not preclude Arbor Court from submitting the information previously requested by the City or additional information that it believes is relevant to or may impact the City Engineer's decision under section 19-19." *Id.* Ms. Haddock later testified that she knows of no other property to be denied permits on this basis. ECF No. 203 at APPX0393. DMAC appealed the denial to the GAB. ECF No. 137 at 6. The GAB upheld the denial, as did the City Council. *Id.*[4]

When DMAC failed to repair Arbor Court, HUD notified DMAC that it intended to transfer the HAP contract to a functioning property. *Id.* DMAC's umbrella parent company (Marquis) purchased Cullen Park Apartments to ensure that it did not lose the benefits of the contract. With Marquis' permission, HUD transferred the HAP contract to Cullen Park. ECF No. 200 at ¶ 11.

In a lengthy opinion in October 2021, Judge Miller held that DMAC alleged plausible takings and equal protection claims. ECF No. 137 at 68. The parties have since filed six motions related to these claims: (1) The City's Motion for Partial Summary Judgment on DMAC's Equal Protection Claim (ECF No. 193); (2) The City's Motion to Strike DMAC's Response (ECF No. 224); (3) The City's Motion to Strike Mr. Marchitelli's Errata Sheet (ECF No. 241); (4) The City's Motion to Exclude Mr. Marchitelli (ECF No. 200); (5) The City's Motion for Partial Summary Judgment on DMAC's Takings Claim (ECF No. 199); and (6) DMAC's Motion for Partial Summary Judgment on DMAC's Takings Claim (ECF No. 202).

---

[4] DMAC had not completed the appeals process when it first pursued relief. *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021). The Court therefore dismissed the case as unripe. *Id.* Because the City Council denied DMAC's applications while the case was on appeal, however, the Fifth Circuit concluded that the case could be adjudicated on remand. *Id.* at 221.

## II. ANALYSIS

### A. *The City's Motion for Partial Summary Judgment on DMAC's Equal Protection Claim*

#### 1. <u>Legal Standard</u>

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.' " *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)). "[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19.

"When deciding a motion for summary judgment prior to a bench trial," the district court has limited additional "discretion to decide that the same evidence, presented to him or her as a

trier of fact in a plenary trial, could not possibly lead to a different result." *Jones v. United States*, 936 F.3d 318, 321–22 (5th Cir. 2019).

2. <u>Analysis</u>

Judge Miller's opinion on the City's Motion to Dismiss sets out the law that governs DMAC's equal protection claim:

> The Equal Protection Clause serves "as a shield against arbitrary classifications." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008). But not all classifications are subject to the same degree of judicial scrutiny. In the absence of a "classification affecting fundamental personal rights or based upon inherently suspect distinctions such as race, religion, or alienage," classifications or unequal treatment are "subject to the same rational basis analysis utilized in due process claims." *Jackson Ct. Condos., Inc. v. City of New Orleans*, 874 F.2d 1070, 1079 (5th Cir. 1989).
>
> Despite the Supreme Court's emphasis on "classifications," the Equal Protection Clause "protects persons, not groups." *Engquist*, 553 U.S. at 597. For that reason, "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that [it] has been irrationally singled out as a so-called 'class of one.' " *Id.* at 601. In other words, "when it appears that the government is singling out an individual, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a rational basis for the difference in treatment." *Id.* at 602.
>
> [To prove] its "class of one claim," DMAC must [show] that (1) it "has been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To show differential treatment, [DMAC] must identify a comparator group. *See Integrity Collision Ctr. v. City of Flusher*, 837 F.3d 581, 586 (5th Cir. 2016).

ECF No. 137 at 55–56 (cleaned up).

i.   Whether Arbor Court, Imperial Oaks, and Biscayne are "similarly situated"

First, the City argues that it is entitled to summary judgment because Arbor Court was not similarly situated to DMAC's proposed comparators. The Court agrees.

"[T]here is no precise formula to determine whether an individual is similarly situated to comparators." *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225, 233 (5th Cir. 2012) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)). Rather, the Court must evaluate "the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision." *Id.* at 234 (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007)).

The Fifth Circuit's decision in *Beeler v. Rounsavall* provides helpful framing. 328 F.3d 813 (5th Cir. 2003). In that case, plaintiff Jon Beeler bought a convenience store with an existing permit to sell alcoholic beverages at "Location A." *Id.* at 814. Beeler decided to move the business to "Location B," so he applied for a permit for the new location. *Id.* at 814–15. The City of Terrell ("Terrell") initially approved Beeler's application. *Id.* Terrell later put the application on hold, however, because the initial approval had been in error. *Id.* Months later, Terrell reversed course and issued Beeler's permit. *Id.* In the meantime, another set of owners (the Rodríguezes) opened a convenience store at Location A. *Id.* at 816. Terrell granted a permit to the Rodríguezes for Location A. *Id.* Beeler filed suit, alleging that Terrell violated the Equal Protection Clause by treating him differently from the Rodríguezes. *Id.* Specifically, Beeler complained that Terrell delayed and initially refused his application in an idiosyncratic and discriminatory manner. *Id.* at 817. The Fifth Circuit, however, ruled against Beeler. Beeler had applied for a new permit at Location B, whereas the Rodríguezes had applied for a permit renewal at Location A. *Id.* Because the City Code treated applications for new permits differently from renewals, "Beeler and the Rodríguezes were not similarly situated." *Id.*

*Lindquist* presents another example of dissimilarly situated comparators. In that case, the Lindquists contended that the City of Pasadena violated the Equal Protection Clause when it

refused to grant them a license to operate a used car dealership. *Lindquist*, 669 F.3d at 232. To support their claim, the Lindquists pointed to other dealerships that received permits. But the Fifth Circuit found that the other dealers were not similarly situated. The Lindquists needed to satisfy a section of the ordinance that was not at issue for the other dealers. *Id.* at 234. One of the other dealers also gathered letters from affected residents assenting to that application, which differentiated that application from the Lindquists'. *Id.* In addition, another dealer already had a dealership at its proposed location, so that dealer's application triggered an idiosyncratic renewal exemption. *Id.* Based on these differences, the Fifth Circuit concluded that the Lindquists were not similarly situated to their proffered comparators. *Id.*

Here, DMAC offers Biscayne at Cityview and Imperial Oaks as its proposed comparators. DMAC's first comparator, Biscayne at Cityview, was built in 1978. *Id.* It is located near Arbor Court and offers twice as many units. *Id.* DMAC contends that Biscayne and Arbor Court were similarly situated because, among other reasons, "[b]oth were identified as buyout candidates per health and safety recommendations of LAN in its 2016 study, . . . both were multifamily properties, located in the floodplain and floodway[] that had suffered first floor flooding damage that required repairs with permits[,] . . . [and both] were required to have a specific relationship with Chapter 19 because both were classified by the City as repetitively flooding multi-family properties." ECF No. 204 at 26–27. But while DMAC applied for repair permits for Arbor Court, Biscayne's owner did not. *Compare* ECF No. 193-1 *with* ECF No. 193-4 at ¶ 10. That distinction matters. DMAC complains of the City's decision to deny its permit applications. But Biscayne never submitted comparable applications. A reasonable decisionmaker would therefore have treated the properties differently. To DMAC, this penalizes Arbor Court for applying for permits in the first place. But the question is not whether the City treated a compliant property better than a noncompliant

11

property. The question is whether the City treated two similarly situated properties differently. Here, in the context of the City's permitting process, Arbor Court and Biscayne were in manifestly different positions: one property sought repair permits and the other did not.

In addition, Arbor Court suffered more damage from Hurricane Harvey than Biscayne. Floodwater depths at Arbor Court ranged from 6 to 42 inches, with an average of 22.3 inches. ECF No. 193-4 at ¶ 5. By contrast, floodwater depths at Biscayne ranged from 6 to 18 inches, with an average of 11.7 inches. *Id.* These distinct floodwater profiles, in turn, produced distinct SDDs. When the FMO ran the SDD for Biscayne after the storm, it found that the structures were only 20.8% damaged. ECF No. 193-4 at ¶ 9. By contrast, the City determined that Arbor Court was 50.1% damaged (at last count). ECF No. 193-10. And even interpreting the evidence in the light most favorable to DMAC, DMAC's own 20.46% figure was at odds with the estimate provided by its insurance adjuster. ECF No. 193-5. Biscayne was not subject to similar SDD disputes. The Court therefore concludes that Biscayne and Arbor Court were not similarly situated for the purposes of the City's permitting decision.

DMAC's second proposed comparator is Imperial Oaks Apartments. ECF No. 137 at 7. Imperial Oaks was built in 1977. *Id.* It sits on the same street as Arbor Court and features a similar number of units. *Id.* DMAC, however, failed to substantively argue in its Response (and at the hearing) that Imperial Oaks was similarly situated to Arbor Court. And because DMAC has the burden of proof at trial on this issue, DMAC has essentially conceded the point. *See Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 407 (5th Cir. 2011) (per curiam) (Where the moving party points out the absence of evidence supporting the non-movant's claim, "the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.").

DMAC's silence aside, no reasonable factfinder could find that Imperial Oaks and Arbor Court were similarly situated. As DMAC takes pains to point out, the City considered acquiring Biscayne and Arbor Court "for health and safety reasons, pursuant to the LAN study recommendation." ECF No. 204 at 23. But there is no evidence to suggest that the City considered Imperial Oaks so flood prone as to warrant acquisition. And the record confirms that Imperial Oaks faced lower flood risks. *See* ECF No. 193-4 at ¶ 5 (averring that the floodwaters at Imperial Oaks were lower than those at Arbor Court). Furthermore, the City determined that Imperial Oaks was just 35% damaged (as compared to 50.1% for Arbor Court), and that some buildings at Imperial Oaks had no flood damage at all. ECF No. 193-4 at ¶ 9; ECF No. 193-10. And just like Biscayne, there is no evidence of wide-ranging SDD disputes for Imperial Oaks. For these reasons, the Court also finds that DMAC was dissimilarly situated to Imperial Oaks.

On the whole, then, the Court concludes that there is no genuine issue of material fact as to whether Arbor Court, Biscayne, and Imperial Oaks were similarly situated for the purpose of the City's permitting decisions: they were not. Accordingly, the Court **GRANTS** the City's Motion for Partial Summary Judgment on DMAC's Equal Protection Claim (ECF No. 193). *See Bryan v. City of Madison, Miss.*, 213 F.3d 267, 276 (5th Cir. 2000) ("As a prerequisite to [an equal protection] claim, the plaintiff must prove that similarly situated individuals were treated differently.").

### ii.  Whether the City had a rational basis to treat Arbor Court differently

For completeness' sake, the Court also analyzes whether the City had a rational basis for treating Arbor Court differently. "Under a rational basis review, a court affords governmental decisions a 'strong presumption of validity,' and will uphold a governmental decision 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' "

*Da Vinci Inv., Ltd. P'ship v. City of Arlington, Texas*, 747 F. App'x 223, 227 (5th Cir. 2018) (per curiam) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 319–20 (1993)). Rational basis grounds are not restricted to the explanation given at the time of the decision, "but encompass[] all conceivable bases, actual or hypothesized." *Id.* (citing *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir. 1988)). "As long as there is *a* conceivable rational basis for the official action, it is immaterial that it was not *the* or *a* primary factor in reaching a decision or that it was not actually relied upon by the decision-makers or that some other nonsuspect irrational factors may have been considered." *Reid*, 854 F.2d at 754 (emphasis in original). "[D]ecisions that are imprudent, ill-advised, or even incorrect may still be rational." *Da Vinci*, 747 Fed. App'x at 227 (quoting *Rossi v. West Haven Bd. of Ed.*, 359 F. Supp. 2d 178, 183 (D. Conn. 2005)).

The City points to a legitimate interest underlying its decision to deny DMAC's applications: it wished to protect low-income residents from flooding in their homes. ECF No. 193 at 19. And the same factors that differentiate Arbor Court from Biscayne and Imperial Oaks provide a rational basis for the City's differential treatment of Arbor Court. Unlike Arbor Court, Biscayne never applied for repair permits. ECF No. 193-4 at ¶ 10. The City therefore had good reason to treat Arbor Court differently. Arbor Court also suffered more damage than Biscayne and Imperial Oaks. *See* ECF No. 193-4 at ¶ 5 (noting that flood waters at Arbor Court ranged from 6 to 42 inches, at Biscayne from 6 to 18 inches, and at Imperial Oaks from 12 to 24 inches); *compare id.* at ¶ 9 (describing SDDs of 20.8% for Biscayne and 35% for Imperial Oaks) *with* ECF No. 193-10 (describing an SDD of 50.1% for Arbor Court); *see* ECF No. 193-12 (noting that repair and replacement items were omitted from DMAC's permit applications). Arbor Court's idiosyncratic damage profile, in conjunction with its uniquely disputed SDDs, proves that the City had a rational

basis for treating Arbor Court differently. Alternatively, then, the Court **GRANTS** summary judgment for the City on DMAC's equal protection claim on this basis (ECF No. 193).

### B. *The City's Motion to Strike DMAC's Response*

Before delving into the City's Motion to Exclude Mr. Marchitelli, the Court first adjudicates the City's Motion to Strike DMAC's Response (ECF No. 224).

The City moves to strike DMAC's Response "because it contains redundant and immaterial matter." ECF No. 224 at ¶ 1. The City complains that DMAC's Response "contains a litany of allegations that are irrelevant to [the] argument regarding [Mr.] Marchitelli's testimony, that are copy-pasted from [DMAC's] prior pleadings, and that in some instances are facially false." *Id.* (cleaned up). The City also argues that DMAC's Response "is largely devoid of supporting authority." *Id.* at ¶ 2. The City contends that DMAC "needlessly included entire documents . . . [that it] had already filed with the Court." *Id.* at ¶ 3. Finally, the City "moves to strike Mr. Marchitelli's Declaration because it is qualified by the expression 'to the best of my knowledge[,]' " and is therefore "meaningless." *Id.* at ¶ 4.

The City's arguments are not proper grounds for striking DMAC's Response and associated materials. The Court is more than capable of ignoring irrelevant facts and identifying insufficient legal authority. The City's disagreements with DMAC's Response go to the merits of the underlying motion. The Court therefore **DENIES** the City's Motion to Strike DMAC's Response (ECF No. 224).

### C. *The City's Motion to Strike Mr. Marchitelli's Errata Sheet*

Next, the City moves to strike Mr. Marchitelli's errata sheet (ECF No. 241). The City deposed Mr. Marchitelli on April 15, 2022. ECF No. 221-1 at ¶ 1. He signed an errata sheet on

May 18, 2022. *Id.* In that errata sheet, Mr. Marchitelli made six changes to his deposition

testimony. The City takes issue with two. The Court sets these out below (the deletions are

underlined and struck through, while the additions are bolded):

**Correction #1**

**Q.** But, sir, isn't [the permissible scope of construction under Chapter 19] important
to your analysis? Because you've put a zero value on the property when actually
there could be a highest and best use analysis under the -- in compliance with the
Chapter 19 that would make the property worth something?
**A.** Well, something would be maybe ~~de minimis~~ **zero**, I don't know. But, again, I
consider the [deprivation] of the rights of the property owner.

ECF No. 221 at 46:11-19.

**Correction #2**

**Q.** But isn't ownership of [Arbor Court] by its current owner an ongoing liability?
. . .
**A.** Well, [it] is an ongoing liability. Some people would argue it has a negative
value because of the liabilities that the owner is forced to incur every month.
However, in my view, the value is ~~either zero or something in excess of zero~~ **zero**.
That does not diminish the owner's experience with this property with every month
having to fund the shortfall in some way. So that's another factor that [you] have
to consider with this property.

ECF No. 221 at 138:18–139:6.

DMAC says that these changes simply clarify Mr. Marchitelli's testimony and align it with

the rest of his deposition. To that end, DMAC cites other portions of Mr. Marchitelli's deposition

to show that the changes are harmonious:

**Q.** [M]y question is, did you do a highest and best use analysis of the land as it
stands now?
**A.** Well, I just told you what [the] scope of my methodology was. There's no ability
to achieve an economically viable use. There's no ability to achieve investment-
backed expectations. That ability is gone, so the property owner winds up with zero.
. . .
**Q.** Mr. Marchitelli, you mentioned earlier that there was nothing to be done with
the property, that the City wouldn't allow anything to be done with the property.
Did I hear that right?
. . .

**A.** No. I said the City denied the permits to renovate the property. I think a reasonable expectation might be that the City's not going to permit this property to be developed. I don't know. But that's a [side] point. What I really -- and I testified this, and I don't think you liked the answer, because you said I wasn't responsive. What I really considered was, this was an investment-backed expectation. What were the damages to the property owner as a result of this? And I concluded that the value after was zero for the reasons I expressed.

. . .

**Q.** And you have defined that loss as being the difference between [$24.8 million] and zero, right?

**A.** Yes

**Q.** But you haven't really answered my question. I pretty clearly heard you say zero, in excess of zero, and I jumped on it, and I wrote it down.

**A.** Here's what I said. I said it's zero given the amount of money that had to be invested. I said it could be argued that there is a negative value. However, as an appraiser, I don't really express negative values, either it's zero, or it's positive. I could understand someone saying, "Well, gee, this property has a negative value, because you're going to continue to pour good money after bad."

ECF No. 221-1 at 40:7-15, 41:16–42:8, 138:12-17, 157:2-21.

1.  Legal Standard

Federal Rule of Civil Procedure 30(e)(1) provides:

On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which: (A) to review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

FED. R. CIV. P. 30(e)(1). District courts apply one of three approaches to proposed changes to deposition testimony. "The least restrictive approach allows substantive changes, but the prior testimony remains a part of the record and can be used for impeachment purposes. The most restrictive approach allows deponents to correct only typographic and transcription errors. Other courts take a 'sham affidavit' approach." *Mata v. Caring For You Home Health, Inc.*, 94 F. Supp. 3d 867, 871–72 (S.D. Tex. 2015) (internal citations omitted); *see Nucor Corp. v. Requenez*, 2022 U.S. Dist. LEXIS 881, at *43–44 (S.D. Tex. 2022) ("[W]hile substantive changes to testimony in an errata sheet are permissible, they must adhere to the allegations supporting the proponent's

claim and they must be adequately explained beyond conclusory assertions to prevent sham errata changes from precluding a deserved summary judgment."). The Fifth Circuit has not taken a position on the proper approach. *Mata*, 94 F. Supp. 3d at 872.

### 2.  Analysis

In a vacuum, Mr. Marchitelli's proposed changes may seem unimportant. The purpose of the changes becomes clear, however, in the context of the City's *Daubert* Motion. Mr. Marchitelli's primary role in this case is to calculate the value of Arbor Court before and after the City denied DMAC's permit applications. DMAC subtracts Mr. Marchitelli's "after" value from his "before" value to quantify the compensation that it is due. In the City's *Daubert* Motion, it argues that Mr. Marchitelli's "after" value is baseless, in part because he "testified that the value was zero 'or something in excess of zero,' without ever explaining what this non-zero value was." ECF No. 201 at ¶ 43. The City also argues that, "because Marchitelli cannot decide whether the after value of the property is zero, or in excess of zero[,] . . . his expert opinion is self-contradicted and inadmissible." *Id.* at ¶ 44.

But the City's Motion to Strike makes a mountain out of a molehill. If Mr. Marchitelli lacked the foundation to testify that Arbor Court's value may be "something in excess of zero," the City should have no problem with an errata sheet that strikes that testimony. That is particularly true where, as here, Mr. Marchitelli indicated elsewhere in his deposition that he believes that Arbor Court had no value after the alleged taking. What's more, the changes do not materially affect the parties' summary judgment motions, so the "sham errata" doctrine is not seriously implicated. *See Nucor*, 2022 U.S. Dist. LEXIS 881, at *44 (reasoning that substantive changes to testimony must be adequately explained "to prevent sham errata changes from precluding a deserved summary judgment"). Additionally, Mr. Marchitelli's "original answers will remain part

of the record," so the City can use them to impeach him or attack his credibility. *Hernandez v. Rush Enters.*, 336 F.R.D. 534, 536 (E.D. Tex. 2020). That seems an adequate remedy. The Court therefore **DENIES** the City's Motion to Strike Mr. Marchitelli's Errata Sheet (ECF No. 241).

### D. The City's Motion to Exclude Mr. Marchitelli

#### 1. Legal Standard

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Under Rule 702, the Court must act as a gatekeeper, "ensur[ing] that proffered expert testimony is 'not only relevant, but reliable.' " *Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 535 (5th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). To discharge this gatekeeping function, the Court "must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " *Id.* (quoting *Daubert*, 509 U.S. at 592–93).

District courts need not " 'admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.' " *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Still, *Daubert* "does not conscript judges into service as the adversary system." *Earl v. Boeing Co.*, 2021 WL 3140545, at *2 (E.D. Tex. July 26, 2021) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)). The party offering the expert must prove " 'by a preponderance of the evidence that the testimony is reliable,'

not that it is correct." *Swanston v. City of Plano, Tex.*, 2021 WL 327588, at *2 (E.D. Tex. Feb. 1, 2021) (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)).

2.  Analysis

From the outset, the Court notes that the City's Motion falls in a disfavored category. "Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where the district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000); *see Nassri v. Inland Dredging Co.*, 2013 WL 256747, at *1 (M.D. La. Jan. 23, 2013) (recognizing that *Daubert*'s objectives "are no longer implicated" in a bench trial). Expert testimony from the plaintiff in a takings case also receives additional deference:

> The value of property taken by the Government, which is no longer on the market, is largely a matter of opinion. Since there are no infallible means for determining with absolute conviction what a willing buyer would have paid a willing seller for the condemnee's property at the time of taking, eminent domain proceedings commonly pit the Government's valuation experts against those of the landowner. Thus, the exclusion of one or all of either party's proposed experts can influence substantially the amount of compensation set by the factfinder. Not only does the landowner have a strong interest in receiving just compensation for property, the public as well has vested interests in insuring that the Government does not pay more than what the owner justly requires. Recognizing the critical role of expert witnesses in these cases and the strong interest on both sides that compensation be just, trial courts should proceed cautiously before removing from the jury's consideration expert assessments of value which may prove helpful.

*United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1077–78 (5th Cir. 1996) (quoting *United States v. 68.94 Acres of Land, More or Less, Situated in Kent County, State of Delaware*, 918 F.2d 389, 393 (3rd Cir. 1990)).

Nevertheless, the City sets out two main arguments for excluding Mr. Marchitelli. First, the City argues that Mr. Marchitelli's "before" valuation improperly incorporates the value of the HAP contract, relies on insufficient facts and data, and ignores USPAP ("Uniform Standard of Professional Appraisal Practice") principles. ECF No. 200 at ¶ 1. Second, the City argues that Mr.

Marchitelli's "after" valuation "is unsubstantiated, unsupported, and is not the product of properly applied 'highest and best use' USPAP principles and Fifth Circuit case law." *Id.* The Court is unpersuaded by the City's arguments.

      i.   Mr. Marchitelli's "before" valuation

First, the City argues that Mr. Marchitelli incorrectly calculated the "before" value of Arbor Court because he included the value of the HAP contract. But when DMAC bought Arbor Court, the HAP contract was already attached to the property. ECF No. 203 at APPX0448. And DMAC bought the property "to own it, and to continue [to] operate it as a HUD subsidized residential community." *Id.* The record therefore indicates that sophisticated real estate buyers consider the HAP contract in deciding whether to purchase the property. That conclusion is bolstered by communications between the City and HUD. HUD Deputy Assistant Secretary Christopher Seats told the City that, if the City took title to Arbor Court, it could select new recipient properties for the budgetary authority underlying the HAP contract. ECF No. 250 at 5–6. Thus, HUD recognized that the owner of Arbor Court could exert some control over the HAP contract. The HAP contract, then, has value; as between a building with a HAP contract and a building without one, a buyer would likely prefer the building with the HAP contract.[5]

The City, for its part, directs the Court to *Monongahela Navigation Co. v. United States*, 148 U.S. 312 (1893). In that case, the Supreme Court considered the compensation owed when the government took a river lock and dam from a private owner. The Court concluded that, "if the

---

[5] Additionally, the City's argument is in tension with its position that the taking occurred on July 17, 2018. The City submits that the HAP contract should be excluded from the "before" value because DMAC "planned and arranged to have the HAP contract transferred by HUD to another property under the same umbrella group." ECF No. 200 at ¶ 41. But DMAC did not apply to transfer the budgetary authority until December 2018. ECF No. 219 at APPX0219–APPX0224. On the date of the alleged taking, then, the HAP contract remained attached to Arbor Court.

property is held and improved under a franchise from the state, with power to take tolls, that franchise must be paid for, because it is a substantial element in the value of the property taken." *Id.* at 337. Proper compensation exceeded the brick-and-mortar value of the property because, "after taking th[e] property, the government will have the right to exact the same tolls the navigation company ha[d] been receiving." *Id.* The City believes that *Monongahela* is distinguishable because the buyer of Arbor Court could not exact HAP rates after purchasing the property. ECF No. 200 at ¶ 37. But the City's argument is at odds with HUD's statement that, "[i]f the [City] were to take title to the property, the recipient propert(ies) would be selected by the City, subject to the final approval of HUD." ECF No. 250 at 5–6. On the current record, it appears that a buyer *could* exact HAP rates after purchasing Arbor Court. *Monongahela* does not favor the City; just the opposite.[6]

The City also complains that Mr. Marchitelli failed to perform an independent assessment of nearby market rent rates as required by USPAP. But USPAP compliance is more relevant to weight than admissibility. *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 332 (5th Cir. 2010); *see United States v. 4.620 Acres of Land, more or less, in Hidalgo Cnty., Texas*, 2021 WL 5999388, at *5 (S.D. Tex. Dec. 20, 2021) ("[T]he Court has rejected the argument that a landowner's expert must comply with either Uniform Standards manual."). What's more, the City's USPAP argument relies on its misleading truncation of a USPAP standard. The City writes: "USPAP Standards Rule 1-4(c) requires that '[w]hen an income approach is necessary for credible

---

[6] Even though the Court concludes that Mr. Marchitelli correctly included the HAP contract in his "before" valuation, the contract may ultimately net out from DMAC's damages. As described in more detail in the section on DMAC's takings claim, DMAC's ultimate owner may not have truly lost the contract's value. This point was not relevant for Mr. Marchitelli's damage determination; he looked only to the value of Arbor Court and had no occasion to consider whether Marquis retained the contract's value. Still, just compensation does not necessarily encompass the value of the HAP contract simply because Arbor Court's "before" value includes it.

assignment results, an appraiser must: (i) analyze such comparable rental data as are available.' "
ECF No. 200 at ¶ 19. In reality, however, the Rule's full text reads: "When an Income approach is
necessary for credible assignment results, an appraiser must: (i) analyze such comparable rental
data as are available *and/or the potential earnings capacity of the property to estimate the gross
income potential of the property*[.]" USPAP Standards Rule 1-4(c) (emphasis added). By
incorporating HUD subsidized rents into the "before" value of Arbor Court, Mr. Marchitelli
considered "the potential earnings capacity of the property." *See* ECF No. 201-1 at 3 (calculating
the market value of Arbor Court in "as is" condition at $21,120,000 because of the "above-market
HAP contract"). Thus, the City's USPAP arguments miss the mark as well.

### ii.  Mr. Marchitelli's "after" valuation

Second, the City argues that Mr. Marchitelli's approach to Arbor Court's "after" value is
baseless. Mr. Marchitelli concluded that Arbor Court was worthless after the City denied DMAC's
permit applications because "[the denial] of the permits to repair the hurricane damage result[ed]
in a complete loss of economic use of the property, also depriving the owner of achieving any
return on its investment." ECF No. 219 at APPX0064. According to Mr. Marchitelli, the aftermath
of Harvey and the permit denial left "empty, extensively damaged buildings" so hazardous that
they "will need to be razed at considerable expense to the owner." *Id.* Mr. Marchitelli also
explained that he could not imagine any possible use for the property following the permit denial:

> [T]he owner of the property [will not] achieve anywhere near the investment
> expectations. That's really what I'm measuring here. . . . I can't imagine any sort
> of scenario given all of the money that's been spent, the money that would have to
> be spent to demolish the existing buildings, the money that would have to be spent
> to build something on stilts . . . I can't imagine . . . it would come close to the
> expectations that this owner had when he made the investment in the property.

*Id.* at APPX0468–0469.

The Court acknowledges that Mr. Marchitelli's "after" analysis is blinkered. Mr. Marchitelli testified that Arbor Court has no value "based on the expectations that the property owner had when the property was purchased." *Id.* But Arbor Court's "after" value does not turn on DMAC's investment-backed expectations. The fact that DMAC could not continue running Arbor Court in the same manner after the permit denial does not necessarily mean that the property was worthless. Still, the unique procedural posture of the City's Motion—directed against a plaintiff's valuation expert in a takings case that will proceed to a bench trial—calls for some level of deference. And as discussed above, Mr. Marchitelli's report provides some basis for his conclusion that the property was worthless after the permit denial. Mr. Marchitelli testified that he could come up with no possible alternative use. And he cited evidence regarding the costly nature of maintaining the building to support that point. Consequently, while Mr. Marchitelli's "after" valuation must be taken with several grains of salt, exclusion is not warranted at this time.

iii. Summary

The City's arguments for excluding Mr. Marchitelli's "before" valuation go more to weight than admissibility. The City's arguments for excluding Mr. Marchitelli's "after" valuation, , have some purchase, but the Court can account for those issues at the bench trial. The Court therefore **DENIES** the City's Motion to Exclude Mr. Marchitelli (ECF No. 200).

E.   *The Parties' Cross-Motions for Partial Summary Judgment on DMAC's Takings Claim*

1.   Legal Standard

The Court sets out the legal standard on summary judgment in Part II.A.1.

2.   Analysis

Judge Miller's opinion on the City's Motion to Dismiss provides an overview of the law

of the case on DMAC's takings claim:

> The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. . . . As its text makes plain, the Takings Clause "requires the payment of compensation whenever the government acquires private property for a public purpose." *See Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321, (2002). . . .
>
> But while the Takings Clause requires "just compensation" when there is a "taking," it neither defines a taking nor "address[es] in specific terms the imposition of regulatory burdens on private property." *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017). That task is left to the courts. In that vein, the Supreme Court has advised that the "paradigmatic taking" involves the "direct appropriation of property." [*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537–38 (2005)]; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) (citing *Legal Tender Cases*, 12 Wall. 457, 551 (1871)). . . .
>
> Charting a new course in takings jurisprudence, [Justice Holmes's opinion in] *Mahon* recognized that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." [*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)]. Though the Court has not defined what constitutes a regulation gone "too far," it has acknowledged that this class of regulations "may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537. Therefore, in reviewing a regulatory takings claim, the court keeps in mind the doctrine's "aim to identify regulatory actions that are functionally equivalent" to . . . classic takings. *Id.* at 529.
>
> Three species of regulatory takings identified by the Supreme Court inform this court's analysis. *See* [*id.*] at 538–39. First, the government causes a taking when it "requires an owner to suffer a permanent physical invasion of her property." *Id.* at 538. . . . Second, "regulations that completely deprive an owner of all economically beneficial use of her property" likewise constitute a "categorical" taking, except

where principles of nuisance and property law "independently restrict" the owner's use. [*Id.*]

A third category applies to regulations that do not effect a physical taking and fall short of completely eliminating a property's value. This catchall category asks courts to apply the factors outlined in *Penn Central Transportation Co. v. New York City* to determine whether a regulation effects a taking. *See* 438 U.S. 104, 124 (1978). Those factors test the "magnitude of a regulation's economic impact" and "the extent to which the regulation has interfered with distinct investment-backed expectations." *Lingle*, 544 U.S. at 540. The court may also consider the "character of the governmental action. *Penn Central*, 348 U.S. at 124. Importantly, even regulatory restrictions reviewed under the *Penn Central* framework must "entirely deprive an owner of property rights" to qualify as a taking. *Horne v. Dep't of Agric.*, 576 U.S. 350, 364 (2015).

However, regardless of how a regulation might be classified, the key inquiry is "whether the government has physically taken property for itself or someone else —by whatever means— or has instead restricted a property owner's ability to use his own property." [*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021)].

*Id.* at 37–39 (cleaned up).

"[I]t is well-settled that when a regulatory taking arises from a permit denial, the taking accrues when a permit is denied." *Resource Investments, Inc. v. United States*, 85 Fed. Cl. 447, 483 (2009) (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985)). A permit denial effects a categorial taking when it precludes the plaintiff from using the property in an economically viable manner. *Id.* A permit denial effects a non-categorical taking when it meets the *Penn Central* test and diminishes the value of the plaintiff's use interests. *Id.*

DMAC alleges that "the City's refusal to issue [DMAC] a repair permit effected a categorical regulatory taking and a non-categorical regulatory taking without just compensation in violation of the Fifth Amendment of the U.S. Constitution." ECF No. 137 at 37. The Court takes each form of takings claim in turn.

26

    i.   DMAC's Motion for Partial Summary Judgment on its Categorical Takings Claim

DMAC argues that it is entitled to summary judgment on its categorical takings claim under *Lucas*. Ultimately, however, there is a genuine dispute of material fact as to whether the City's permit denial completely deprived DMAC of the economically beneficial use of Arbor Court.

A categorical taking occurs where a regulation "completely deprive[s] an owner of 'all economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at 538 (quoting *Lucas*, 505 U.S. at 1019) (emphasis in original). "Government regulations that constitute such a taking are typically those that require land to be left substantially in its natural state." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 626 (9th Cir. 2020), *cert. denied* 141 S. Ct. 731 (2021). "[W]here an owner is denied only some economically viable uses, a taking still may have occurred" under *Penn Central*, but not under *Lucas*. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1432 (9th Cir. 1996), *aff'd*, 526 U.S. 687, 119 S. Ct. 1624 (1999).

To support its *Lucas* claim, DMAC first cites the declaration of Mr. Hickock. Mr. Hickock avers that the value of Arbor Court "went from $25,496,890.00 to zero" after the City denied DMAC's permit applications. ECF No. 203 at APPX0454. Mr. Hickock further declares that, "[w]ithout the repair permits[] and repairs, the property has no economically feasible, viable or beneficial use." *Id.* After all, "[t]he property cannot feasibly attract any tenants in its unrepaired condition," and "[t]here is no feasible way to lease any units at Arbor Court without repairing the damage to the buildings caused by Hurricane Harvey flooding[.]" *Id.* However, Mr. Hickock provides no evidence to support his contention that the property lacks another economically viable use. He considers no other possible uses, and he does not address the fact that DMAC could elevate the structures to comply with the Ordinance. What's more, Mr. Hickock conceded at a hearing before the General Appeals Board that he did not hire anyone to investigate alternate uses for the

property, and simply "know[s] there's no other use for the property." ECF No. 213-1 at 123. Thus,

there is no indication that Mr. Hickock's views are founded on hard evidence.

Second, DMAC cites testimony from City Engineer Thomas Myers:

**Q.** And on the last paragraph, it says: "This determination does not preclude Arbor Court from making applications for repairs for safety reasons or requesting a variance as referenced above." . . . What kind of additional information would you be looking for or would you want in connection with granting these folks a variance?
**A.** We believe one item was if there was better data that would be submitted on the – to determination of Substantial Damage.
. . .
**Q.** Hypothetically, what would you want to see that might change your decision that this is, you know, not a health and safety concern?
. . .
**A.** These structures are too low; they need to be raised. That would be the only situation I would consider.
**Q.** Okay. And isn't it true, really, there's nothing else these folks could have done or could have brought to you that would have changed this determination, correct?
**A.** That's basically what I said. Correct, there is nothing that they could do.

*Id.* at APPX0410. To DMAC, Mr. Myers' inability to imagine alternative uses for Arbor Court

indicates that the property is worthless. Not so. Mr. Myers' testimony suggests that DMAC could

overcome the initial permit denial by providing more information or complying with the elevation

requirements. Elevating the structures and reopening the property could constitute a viable use;

the record contains no analysis that proves such an approach is infeasible. Read in the light most

favorable to the City, then, Mr. Myers' testimony does not prove that Arbor Court lacks an

economically viable use.

Third, DMAC cites to Mr. Marchitelli's deposition. Mr. Marchitelli testified that Arbor

Court was worth "zero" after the permit denial because: "This is a regulatory taking, it goes back

to investment-backed expectations, and as a result of the City's actions, the owner could not

achieve any investment-backed expectations." *Id.* at APPX0421. Mr. Marchitelli further stated that

the permit denial "deprived [DMAC] of the beneficial use of the property" because "[w]e're

dealing with a property that the City would not even permit alterations to be made." *Id.* But Mr. Marchitelli did not actually address whether Arbor Court could be put to an alternative use. *See id.* at APPX0422 ("**Q.** So the property is worth zero right now. Should the owner just give it away? **A.** Well, the property owner is deprived of a viable use of the property. What the property owner decides to do, I mean, I don't know."). Indeed, Mr. Marchitelli never conducted a highest and best use analysis. *Id.* at APPX0421. And the fact that the City may have disrupted DMAC's expectations does not necessarily mean that the City deprived DMAC of all economic use of the property. Mr. Marchitelli's testimony therefore does not strongly favor DMAC's *Lucas* claim.

Fourth, DMAC cites the City's 30(b)(6) deposition. There, Mr. Ray Miller testified on behalf of the City that Arbor Court was no longer an income-producing property. *Id.* at APPX0352. Mr. Miller stated that he was "not aware" of any way for the property to generate income since the repair permits had been denied. *Id.* Again, however, this statement does not rule out the elevation of the buildings to comply with the Ordinance. Consequently, the City's 30(b)(6) deposition does not present conclusive evidence that the City deprived DMAC of all economically beneficial use of Arbor Court.

The City's evidence, meanwhile, exacerbates the uncertainty that inheres in DMAC's evidence. The City's appraisal expert (Stout) found that Arbor Court has value as an asset to be held for future development. *Id.* at APPX0174. Stout concluded: "This use is legally permissible, physically possible, and financially feasible." *Id.* Stout also determined that the property could be used as a garden-style apartment complex, and that such a use is "physically possible" and "financially feasible." *Id.* In addition, the City's architectural expert (Fiebig Architecture) stated: "Requiring new construction or substantial improvements in the Arbor Court Apartments site to comply with the applicable flood ordinance rules and regulations is reasonable and necessary in

this locale, and does not result in an undue burden on any designer, developer, or contractor." ECF No. 213-2 at pp. 20.

Taken together, DMAC's inconclusive evidence and the City's countervailing opinions beget a genuine issue of material fact as to whether the City deprived DMAC of all economically viable use of Arbor Court.[7] DMAC's refusal to elevate the structure does not prove that the City effectuated a categorical regulatory taking. *See Hoehne v. County of San Benito*, 870 F.2d 529, 532−33 (9th Cir. 1989) ("A government entity is not required to permit a landowner to develop property to the full extent it may desire. Denial of the intensive development desired by a landowner does not preclude less intensive, but still valuable development."). Viewed in the light most favorable to the City, the record does not conclusively establish that it was uneconomical to do anything other than rebuild Arbor Court as it stood before Hurricane Harvey. As a result, the Court **DENIES** DMAC's Motion for Partial Summary Judgment on its Categorical Regulatory Takings Claim (ECF No. 202).

> ii.  DMAC's Motion for Partial Summary Judgment on its Partial Regulatory Takings Claim

DMAC also moves for summary judgment on its partial regulatory takings claim. The three *Penn Central* factors that determine whether a regulatory action rises to the level of a partial taking are: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Degan v. Bd. of Trs. of Dallas Police & Fire Pension Sys.*, 956 F.3d 813, 815 (5th Cir.), *cert. denied*, —— U.S. ——, 141 S. Ct. 375 (2020). The Court "must consider all of

---

[7] DMAC attempts to shift the burden to the City on this issue by stating: "the City has not and cannot identify" an alternate viable economic use. ECF No. 202 at 32. But this is DMAC's Motion for Summary Judgment, and DMAC bears the burden of proof on this issue at trial.

the surrounding circumstances and employ a fact-sensitive test of reasonableness" when evaluating a noncategorical regulatory takings claim. *Da Vinci*, 747 F. App'x at 228 (cleaned up).

Whether a partial regulatory taking has occurred "is a question of law based on factual underpinnings[.]" *Chancellor Manor v. United States*, 331 F.3d 891, 904 (Fed. Cir. 2003). Evaluating those factual underpinnings involves "complex factual assessments of the purposes and economic effects of government actions" that are "essentially ad hoc." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 720 (1999) (cleaned up). Because partial regulatory takings claims are rooted in the facts of each case, genuine issues of material fact bar summary judgment. *Naegele Outdoor Advert., Inc. v. City of Durham*, 844 F.2d 172, 175 (4th Cir. 1988); *Sansotta v. Town of Nags Head*, 97 F. Supp. 3d 713, 735 (E.D.N.C. 2014); *MDG-Rio V Ltd. v. City of Seguin, Texas, 2021 WL 4267718*, at *12 (W.D. Tex. Sept. 17, 2021).

a.   The economic impact of the regulation

To assess a regulation's economic impact, courts in the Fifth Circuit "compare the value that has been taken from the property with the value that remains in the property." *Hackbelt 27 Partners, L.P. v. City of Coppell*, 661 F. App'x 843, 850 (5th Cir. 2016). The City offers the Stout report to quantify the economic impact of the regulation. Deploying highest and best use principles, Stout concluded that the property was worth around $6.2 million before the City denied the permits on July 17, 2018, and $1.07 million after. ECF No. 203 at APPX0136. Stout's estimate of the "before" value excludes the HAP contract and accounts for the costs necessary to restore the units to a going concern. ECF No. 213 at ¶ 21. The City therefore argues that the denial of the permits resulted in a loss of $5.1 million (83%).[8] Unsurprisingly, DMAC provides a different

---

[8] Stout also concluded that following the storm, the value of the undamaged upper floors of the buildings was $2,700,000 without the HAP contract. ECF No. 203 at APPX0136. The City does

measure of damages. Citing Mr. Hickock's declaration and Mr. Marchitelli's report, DMAC contends that, "once the property could no longer be used as a HUD subsidized apartment complex, . . . the fair market value of the property as if operated as a fully occupied HAP contract property, which it would have continued if permits allowing repairs to be made had been issued, went from $25,496,890.00 to zero." ECF No. 202 at 33 (citing ECF No. 203 at APPX0454).

One driver of the divergence in the parties' valuations is the parties' disagreement as to whether DMAC should be compensated for the value of the HAP contract. The Court therefore takes this opportunity to address the issue. Consider the following hypothetical. Entity A owns Property A. The underlying value of Property A is $10 million. Entity A also has a HAP contract on Property A that is worth $15 million. The "as is" value of Property A to Entity A is therefore $25 million. Entity A also has $15 million in cash. In total, then, Entity A has $40 million in assets ($10 million in Property A, $15 million in the HAP contract, and $15 million in cash). Now, imagine that a governmental act puts Property A in danger of losing the HAP contract. If Entity A uses its $15 million in cash to buy Property B, and HUD subsequently approves a transfer of the HAP contract to Property B, Entity A would still have $40 million in assets: $10 million in Property A, $15 million in the HAP contract, and $15 million in Property B. In this scenario, Entity A would occupy the same economic position before and after the transfer of the HAP contract. Entity A's $15 million in cash would change form (from cash to real property), and the HAP contract would move from Property A to Property B, but Entity A would suffer no net loss. Consequently, compensation for the HAP contract would not be "just": Entity A would be "in as

---

not make clear how to square this figure with the $1,070,000 figure that it uses for the true "after" value of Arbor Court.

good a position pecuniarily as if [its] property had not been taken." *United States v. 320.0 Acres of Land, More or Less in Monroe Cnty., State of Fla.*, 605 F.2d 762, 780 (5th Cir. 1979).

This hypothetical bears many similarities to the present case. Setting aside the direct damage to Arbor Court, Marquis arguably kept the HAP contract within its grasp by acquiring Cullen Park and securing HUD's permission to transfer the budgetary authority. DMAC takes issue with this conclusion because Marquis had to buy Cullen Park. ECF No. 218 at 23. But Marquis did not lose the funds that it invested into Cullen Park. Those funds simply changed form. Nevertheless, there is still one key difference between the hypothetical and this case. Here, there is no single "Entity A." Instead, DMAC owns Arbor Court, and DM Cullen Park, Ltd. owns Cullen Park. If those entities are truly separate, transferring the HAP contract to Cullen Park would result in a loss to DMAC.

Ultimately, the Court concludes that whether DMAC retained the value of the HAP contract is subject to a genuine dispute of material fact. DMAC contends that the entities are indeed separate: "Plaintiff transferred nothing. . . . HUD, not Plaintiff, transferred the budget authority. . . . Plaintiff did not accept such a transfer. The owner of Cullen Park Apartments—DM Cullen Park, Ltd., did. . . . And while the City argues that the value of the HUD contract or budget authority has been retained by DMAC, the provable and proven facts confirm otherwise." ECF No. 218 at 21–22. But a fair bit of evidence suggests that Plaintiff was not injured by the transfer of the contract. In the memorandum that Ms. Monica Sussman sent HUD, she wrote: "Marquis Acquisition, Inc., [which] controls [DMAC], is in the process of acquiring [Cullen Park], which will be owned by a single-purpose entity affiliate[.] . . . [And Cullen Park] is an affiliate of [DMAC]." ECF No. 219 at APPX0219–0220, APPX0224. The link between DMAC and Cullen Park is further confirmed by the executing documents: Mr. Morgan Cox signed the Certification of Compliance with Notice

H 2015-03 on behalf of DMAC, *id.* at APPX0244, the purchase agreement for Cullen Park on behalf of Marquis Acquisitions, Inc., *id.* at APPX0298, and the Certification of Fair Housing Compliance and Acceptance of Budget Authority on behalf of Marquis Acquisitions, Inc., *id.* at APPX0332–34. Furthermore, when Mr. Hickock was asked whether the HAP contract was "going away from [his] umbrella group of companies," he responded: "Not going away from my umbrella company, no. Thank goodness." ECF No. 200-2 at pp. 135:17-22. And the economic realities suggest that DMAC did not lose the HAP contract. DMAC claims that the contract was hugely valuable. Yet DMAC petitioned HUD to transfer the budgetary authority to Cullen Park without receiving anything of value. ECF No. 218 at 23. It would be quite strange for DMAC to ask HUD to transfer such a valuable contract unless DMAC functionally retained its value.

At present, then, while the parties' estimates for economic impact run from $5.1 million (the City's estimate) to nearly $25.5 million (DMAC's estimate), the Court harbors some doubts about DMAC's final figure. Without more information on the relationship between DMAC and DM Cullen Park, Ltd., however, the Court cannot pinpoint the true economic impact at this stage. Still, even a $5.1 million decrement can support a partial takings claim. Thus, while the "economic impact" factor weighs in favor of DMAC's Motion, the full import remains uncertain.

### b.   Interference with investment-backed expectations

"[W]hat is 'relevant and important in judging reasonable expectations' is 'the regulatory environment at the time of the acquisition of the property.' " *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1350 n.23 (Fed. Cir. 2001) (en banc)); *see Loveladies Harbor v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994) (noting that investment-backed expectations "limit[] takings recoveries to owners who could demonstrate that they bought their property in reliance on

a state of affairs that did not include the challenged regulatory regime"), *abrogated on other grounds by Bass Enterprises Prod. Co. v. United States*, 381 F.3d 1360, 1369–70 (Fed. Cir. 2004).

DMAC notes that the City issued repair permits for Arbor Court following the Tax Day Flood. *Id.* Consequently, DMAC argues that it reasonably expected the City to issue a second set of permits after Harvey. *Id.* DMAC also points to Mr. Hickock's averment that, when DMAC bought Arbor Court in 2016, it conducted a property-loss history going back five years and discovered only one previous flooding incident (that affected just one building). ECF No. 203 at APPX0448–0449. Extrapolating from these facts, DMAC suggests that its reasonable investment-backed expectations encompassed the City's continued approval of repair permit applications.

DMAC's argument does not capture the essence of this prong of *Penn Central*. The Ordinance was in effect when DMAC bought Arbor Court. DMAC knew that the property was in the floodplain, required flood insurance, and was subject to the City's Flood Ordinance. ECF No. 213-3 at 28:16-25. And when DMAC acquired the property, the Ordinance already endowed the City with the power to refuse permits for buildings that posed a danger to health and property. As a result, the critical issue here is whether the City fairly applied the Ordinance to Arbor Court. If the City applied the Ordinance in an evenhanded manner, it could not have interfered with DMAC's reasonable investment-backed expectations. If, by contrast, the City unfairly targeted DMAC's property, the permit denial could have disrupted DMAC's reasonable expectations.[9]

Viewed as a whole, the record contains cross-cutting facts as to whether the City fairly applied the Ordinance. Arbor Court faced repeated flooding that endangered residents and their

---

[9] DMAC notes that Arbor Court was built in 1979, while the Ordinance went into effect in 2006. ECF No. 202 at 37. But it is immaterial that the Ordinance was passed after Arbor Court was built. The key window for investment-backed expectations is the window in which the plaintiff acquired the property. DMAC acquired Arbor Court in 2016. The Ordinance was in full effect at that time. DMAC's arguments about the year that Arbor Court was built are therefore irrelevant.

property. These repeated issues support the City's decision to characterize Arbor Court as presenting a "danger to both life and property." What's more, the City's SDDs and some of DMAC's own figures suggested that Arbor Court was "substantially damaged." ECF No. 193-3; ECF No. 193-5. Interpreting these facts in the light most favorable to the City, it is difficult to conclude that the City unfairly applied the Ordinance to Arbor Court. That is not to say that all the evidence points one way, however. The City flip-flopped as to how to treat Arbor Court, and picked a new rationale for denying the permit after DMAC filed suit. There is also some evidence that the City previously wanted to acquire the property, which implies that it may have acted as it did to lower the cost of acquisition. *See* ECF No. 203 at APPX0047. At this stage, however, there is sufficient uncertainty such that the investment-backed expectations prong weighs against DMAC's Motion.

c.   The character of the governmental action

The character of the governmental action is also relevant in discerning whether a taking has occurred. *Lingle*, 544 U.S. at 539. In *Lingle*, the Supreme Court distinguished between regulations that "amount[] to a physical invasion," and those that "merely affect[] property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.' " *Id.* (quoting *Penn Central*, 438 U.S. at 124). When the government "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," that denotes a taking. *Id.* at 537 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). To that end, "government action that singles out a landowner from similarly situated landowners raises the specter of a taking." *Bridge Aina Le'a*, 950 F.3d at 636.

Some evidence in the record suggests that the City took an idiosyncratic approach to Arbor Court. The City initially denied the permits under its "substantial damage" framework. ECF No.

193-3. Not until after DMAC filed suit did the City volunteer another explanation for denying the applications: Arbor Court presented a "danger to both life and property due to flooding in the vicinity of the site." ECF No. 14-3. The City also waffled on the proper approach to Arbor Court's SDDs. The City's shifting positions, in conjunction with its apparent desire to acquire the property, implies that it may have targeted Arbor Court in a manner befitting a regulatory taking. Nevertheless, the City did not physically invade Arbor Court. And the purpose of the Ordinance is to prevent flooding in order "to promote the public health, safety and general welfare." Hous., Tex., Rev. Ordinances ch. 19, art. I, § 19-1(a)(1) (2006) (p. 1343). The Supreme Court has already confirmed that this a "legitimate public purpose." *See Dolan v. City of Tigard*, 512 U.S. 374, 387 (1994) (flood prevention is a "legitimate public purpose"); *see also Adolph*, 854 F.2d at 737–40 (describing how a local ordinance adopted to facilitate the NFIP is in the broader public interest). What's more, DMAC provided ever-changing SDD calculations, giving the City reason to believe that the property was not eligible for minor repair permits. On the whole, then, there is contradictory evidence regarding the character of the governmental action. The Court cannot conclusively say that the City "forc[ed] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole[.]" *Lingle*, 544 U.S. at 537. Consequently, this factor weighs against DMAC on summary judgment.

### d.   Summary

The Court concludes that there are genuine issues of material fact regarding the *Penn Central* factors. Thus, summary judgment for DMAC is not warranted on the current record. The

Court therefore **DENIES** DMAC's Motion for Partial Summary Judgment on its Partial Regulatory Takings Claim (ECF No. 202).[10]

iii.  The City's Motion for Partial Summary Judgment on DMAC's Takings Claims

In its Motion for Partial Summary Judgment on DMAC's Takings Claims, the City argues that summary judgment is warranted because this case is controlled by *Adolph v. Federal Emergency Management Agency of the U.S.*, 854 F.2d 732 (5th Cir. 1988). In *Adolph*, a group of property owners alleged an unconstitutional taking after the Plaquemines Parish Commission Council passed stringent flood regulations. *Id.* at 733. The regulations required new or additional structures to meet certain elevation requirements. *Id.* at 734. The Council passed the regulations to facilitate participation in the NFIP. *Id.* The plaintiffs argued that the ordinance made development of their property "prohibitively expensive, rendering their property unmarketable, and resulting in an unconstitutional taking in violation of the fifth and fourteenth amendments." *Id.* The Fifth Circuit, however, concluded that "the NFIP, when operating precisely as intended by Congress, results in no unconstitutional taking of plaintiffs' property[.]" *Id.* at 737. The Court noted that the plaintiffs were "challenging not only the building elevation requirements, but [also] the sanctions which Congress has prescribed. In other words, the plaintiffs challenge the entire Congressional scheme, and to hold in favor of them would require a holding that virtually the entire statute is unconstitutional." *Id.* Citing several state supreme court cases, the Fifth Circuit reasoned that the enactment of flood plain ordinances tends to be "reasonably necessary for the public safety, health

---

[10] Throughout its Motion, DMAC makes the mistake of treating Judge Miller's opinion on the City's Motion to Dismiss as conclusively resolving the issues raised here. *See e.g.*, ECF No. 202 at 32 ("As found by Judge Miller already, DMAC alleges facts that satisfy each of the *Penn Central* factors."). But there is a serious difference between alleging facts for a motion to dismiss and proving facts for a motion for summary judgment. The fact that DMAC alleged certain items in its pleadings has no bearing on DMAC's Motion for Partial Summary Judgment.

and welfare," and concluded that, "[s]o long as the challenged ordinances do not directly affect the then-current use of plaintiffs' property, the prohibitive cost of complying with the regulation provides no proof of a taking." *Id.* at 739.

In its Motion to Dismiss, the City argued that *Adolph* controlled. ECF No. 108 at 17. But Judge Miller disagreed:

> First, DMAC does not challenge the entirety of a "carefully-crafted nationwide scheme" and an ordinance exclusive to new or additional development but, instead, the local denial of a permit to rebuild existing structures. *See* [*Adolph*, 854 F.2d] at 737. Second, DMAC claims that there are no conditions—prohibitively expensive or otherwise—that it can comply with to secure the permit necessary to restore Arbor Court's economic viability. *See* [ECF No.] 106 at 39 ¶ 126. Third, the Adolph Court explicitly narrowed its holding to regulations that did not "directly affect the then-current use" of a property. 854 F.2d at 739. But that's exactly what DMAC alleges the City did by denying it a repair permit to rebuild Arbor Court's existing structures, which functioned as an apartment complex just before Hurricane Harvey's flooding and indeed appear to entirely predate the floodplain ordinance. See generally [ECF No.'s] 106, 108.

*Id.* at 41. Now, the City contends that the previous Order wrongly reasoned that the "then-current" use of Arbor Court at the time of the taking was as a viable apartment complex. When the City denied the permit applications, Arbor Court was seriously damaged. The City therefore submits that DMAC's posture mirrors that of the *Adolph* plaintiffs, who complained that the flood ordinance placed impermissible barriers on their efforts to construct new buildings. To the City, "Houston merely applied its Ordinance to the damaged Apartments when it found that they were a 'danger to both life and property due to flooding in the vicinity of the site' and denied Plaintiff's repair-as-before permit applications." ECF No. 199 at ¶ 16.

Unlike the *Adolph* plaintiffs, however, DMAC does not argue that the Ordinance constitutes a facial taking. Rather, DMAC argues that the City inequitably applied the Ordinance to depress the value of Arbor Court. *See* ECF No. 202 at 25 ("[T]he motivations of the City in choosing to prevent a use of a property via Chapter 19, under the facts and circumstances of this

39

case, reveal actions and motivations that can be characterized fairly as dishonest, nefarious, and pretextual."). DMAC believes that the City decided "at the highest level . . . that Arbor Court would not be repaired after Hurricane Harvey so that it could no longer be used to provide residences to tenants who needed and were eligible for HUD rental assistance." *Id.* This is distinguishable from *Adolph*, where the plaintiffs argued that the flood ordinance itself constituted an unconstitutional taking. Victory for the *Adolph* plaintiffs meant that the Plaquemines ordinance was unconstitutional. Victory for DMAC, meanwhile, would not invalidate the City's Ordinance. It would simply indicate that the manner in which the City applied the Ordinance to Arbor Court was unconstitutional. The Court therefore disagrees with the City that *Adolph* is so similar as to compel summary judgment against DMAC.[11]

---

[11] Judge Miller reasoned that DMAC's claims were closer to those of the plaintiffs in *Del Monte Dunes*. Judge Miller described *Del Monte Dunes* as follows:

> There, a developer purchased dozens of acres of beachfront property zoned for multi-unit residential use. *See* [*Del Monte Dunes*, 95 F.3d at 1425, 1434]. The prior owner had unsuccessfully applied for a development permit but re-applied. *Id.* That second application for development permits was pending with the City of Monterey when plaintiff Del Monte purchased the property. *Id.* After the [City] again denied the development permits, citing environmental impact, Del Monte sold the property to the State of California for an $800,000 profit. *See id.* at 1432. Despite its profit, Del Monte sued, alleging a categorical regulatory taking because the [City] effectively required it to leave the property in its natural state, despite its zoning for residential use. *Id.* at 1433. Unable to be developed, Del Monte argued that the property was only valuable to the city or state, which later converted the property into a public park. *Id.* The Ninth Circuit agreed because the jury heard evidence that the extensive list of development conditions the [City] placed on the property "made any development . . . impossible." *See id.* at 1434

ECF No. 137 at 41–42. After evaluating the factual record, the Court is less convinced that this case is more like *Del Monte Dunes* than *Adolph*. Regardless, the issue raised by the City's Motion is whether *Adolph* compels summary judgment. It does not. The Court therefore denies the City's Motion without rendering unnecessary comment on *Del Monte Dunes*.

What's more, as the City repeatedly notes in its Response to DMAC's Motion for Partial Summary Judgment, there are genuine issues of material fact on the takings issues here. *See* ECF No. 213 at ¶ 17 ("Given these facts, there is a genuine issue of material fact whether Houston deprived the property of all economically viable use, which bars summary judgment."), ¶ 22 ("All these facts show that there are genuine issues of material fact regarding the economic impact of the Flood Ordinance that bar summary judgment."), ¶ 27 ("These facts show that there are genuine issues of material fact regarding whether Houston interfered with Plaintiff's distinct investment-backed expectations, which bar summary judgment."). Consequently, the Court **DENIES** the City's Motion for Partial Summary Judgment on DMAC's Takings Claims (ECF No. 199).

## III. CONCLUSION

For the reasons set out above, the Court takes the following steps:

➢ **GRANTS** the City's Motion for Partial Summary Judgment on DMAC's Equal Protection Claim (ECF No. 193);

➢ **DENIES** the City's Motion to Strike DMAC's Response to the City's Motion to Exclude (ECF No. 224);

➢ **DENIES** the City's Motion to Strike Mr. Marchitelli's Errata Sheet (ECF No. 241);

➢ **DENIES** the City's Motion to Exclude Mr. Marchitelli (ECF No. 200);

➢ **DENIES** the City's Motion for Partial Summary Judgment on DMAC's Takings Claim (ECF No. 199); and

➢ **DENIES** DMAC's Cross-Motion for Partial Summary Judgment on its Takings Claim (ECF No. 202).

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 17th day of August, 2022.

KEITH P. ELLISON
UNITED STATE DISTRICT JUDGE