United States District Court
Southern District of Texas

**ENTERED**

July 11, 2023

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DM ARBOR COURT, LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:18-CV-01884** |
| | § | |
| **THE CITY OF HOUSTON, TEXAS,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**FINDINGS OF FACT & CONCLUSIONS OF LAW**</u>

The Court submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.[1]

## I.     BACKGROUND

This cause was brought pursuant to the Takings Clause of the Fifth Amendment of the U.S Constitution. Plaintiff DM Arbor Court, Ltd. ("DMAC") owns and operates the Arbor Court Apartments. During Hurricane Harvey, Arbor Court was damaged. DMAC applied for repair permits, and the City of Houston denied those permits.

DMAC then brought this suit. DMAC's Third Amended Complaint alleged various causes of action. *See* ECF No. 106. On October 21, 2021, Judge Miller, to whom the case had previously been assigned, granted in part and denied in part the City's Motion to Dismiss. ECF No. 137. He found that DMAC plausibly alleged takings and equal protection claims.

On August 17, 2022, the Court granted summary judgment to the City on DMAC's equal protection claim, but denied both parties' cross motions for summary judgment on DMAC's takings claims. Specifically, DMAC contended that the denial of repair permits constituted an

---

[1] Any Finding of Fact that should be a Conclusion of Law shall be deemed such, and any Conclusion of Law that should be a Finding of Fact shall be deemed such.

unconstitutional taking because (1) it deprived the DMAC of all economically beneficial use; and (2) alternatively, constituted a taking under the three-part balancing test set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). The Court found that factual disputes precluded granting summary judgment to either party.

On February 6, 2023, this Court commenced a bench trial on DMAC's takings claims. Over the course of the four-day trial, the Court received exhibits and heard sworn testimony. Having considered the evidence, testimony, oral arguments presented during the trial, post-trial filings, and the applicable law, the Court sets forth the following Findings of Fact and Conclusions of Law.

## II.     FINDINGS OF FACT

### A.   Flood Ordinance

1.     During all times relevant to this case, Houston had a Flood Ordinance, located at Chapter 19 of the Houston Code of Ordinances. As described in this Court's prior Orders, the Flood Ordinance, which was adopted in 1985, "has helped to ensure that development within Houston complies with the development standards the Federal Emergency Management Agency ("FEMA") mandates for property owners to participate in the National Flood Insurance Program ("NFIP")." ECF No. 252 at 2 (quoting ECF No. 137 at 1); *see* DX 4 § 19-1(c). The Ordinance lists five purposes: (1) to "[p]rotect human life and health"; (2) to "[m]inimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public"; (3) to "[m]inimize prolonged business interruptions"; (4) to "[m]inimize damage to public facilities and utilities"; and (5) to "[p]rovide for the sound use and development of floodprone areas in such a manner as to minimize the future flood-blight areas." DX 4 § 19-1(a).

2.     The Flood Ordinance creates a regulatory system for permits. DX 4, Art. II. Building permits may only be issued pursuant to the Flood Ordinance. *Id.* § 19-11. The Flood Ordinance charges the city engineer "with exercising best engineering judgment in the administration and implementation of this chapter." *Id.* § 19-12. The city engineer's duties include "[r]eviewing, approving, or denying all applications for development permits required by the adoption of [the Flood Ordinance]." *Id.* § 19-12(2).

3.     "Approval or denial of a permit by the city engineer shall be based on compliance with the applicable provisions of [the Flood Ordinance]." DX 4 § 19-19(a). These provisions include, among other requirements, requirements that permit applications include certain forms and information when submitted, *id.* § 19-17, and requirements that applicants submit follow-up documentation as required, *id.* § 19-18.

4.     Further, "the city engineer may deny a permit application if the issuance of the permit could result in" one of five factors: (1) "[d]anger to life or property due to flooding or erosion damage in the vicinity of the site"; (2) "[s]usceptibility of the development and the contents of any structure to flood damage and the effect of such damage on the individual owner"; (3) "[d]anger that materials may be swept onto other lands to the injury of others"; (4) "[i]mpairments of the access to and exit from the site in times of flood for ordinary and emergency vehicles"; **or** (5) "[u]nusually high costs of providing governmental services during and after flood conditions, including maintenance and repair of streets, bridges, public utilities and facilities such as sewer, gas, electrical and water systems." *Id.* § 19-19(a).

5.     The Flood Ordinance also imposes certain standards for Flood Hazard Areas, including elevation requirements. *Id.* §§ 19-32, 19-33. These standards apply only to new construction or substantial improvements, so pre-existing structures are exempt from these

requirements. *Id.*; ECF No. 296 at 85:2-14. However, the category of "substantial improvements" includes situations in which a building sustained "substantial damage" [2] and need to be repaired. *Id.* § 19-2.

### B. Arbor Court Apartments

6.      The Arbor Court Apartments ("Arbor Court") is a 15-building multi-family apartment community located at 802 Seminar Drive in Houston Texas. It is fully located in a 100-year floodplain, and is largely in the floodway ECF No. 298 at 10:22-24.

7.      Plaintiff DMAC is an entity that has a general partner, DM Arbor Court GP, and eighteen limited partners. ECF No. 298 at 73:19-22. Those limited partners include the individuals Douglas Hickock and Morgan Cox. *Id.* at 73:21-22; 163:11-13.

8.      DMAC purchased Arbor Court in January of 2016 for $11.85 million. ECF No. 298 at 9:10-14. DMAC spent an additional $1.4 million on improvements to the property. *Id.* at 9:14-15.

9.      To finance the acquisition of Arbor Court, DMAC borrowed $10.8 million. ECF No. 298 at 9:18-22.

10.      DMAC operated Arbor Court under a Housing Assistance Payment Contract ("HAP Contract") from the U.S Department of Housing and Urban Development ("HUD"). ECF No. 298 at 11:23-12:4. Pursuant to the HAP contract, HUD subsidizes the apartments, and DMAC must use these units as affordable housing for low-income residents.

11.      In September 2016, HUD and DMAC renewed the HAP Contract for an additional twenty years. *Id.* at 35:1-3, 114:18-24. The Court finds that those HAP contract rates were somewhat inflated, reflecting a higher-than-market rent. *See* ECF No. 296 at 215:10-20;

---

[2] The flood ordinance determines whether a substantial damage by looking to whether "the cost of restoration of the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure." DX 4 § 19-2.

ECF No. 299 at 14:18-15:25; PX 72 at 3. Nevertheless, DMAC was entitled to receive these rates pursuant to the HAP Contract.

### C. Tax Day Flood, Rebuilding, and the LAN Report

12.     In April 2016, a storm hit Houston, causing widespread flooding (the "Tax Day Flood"). Arbor Court flooded, and the buildings sustained damage.

13.     After the Tax Day Flood, DMAC sought repair permits from the City pursuant to the Flood Ordinance PX 4.

14.     As part of the permit application to rebuild after the Tax Day Flood, DMAC submitted Proofs of Loss for the damaged Arbor Court buildings. DX 33. These Proofs of Loss indicated that the cost to repair or replace each Arbor Court Building (excluding the office building) ranged from $205,5978 to $409,234, and the actual cash values of the building structures (again, excluding the office building) ranged from $687,234 to $984,303. *Id.* Dor the purposes of the Flood Ordinance's Substantial Damage Determination,[3] the buildings (excluding the office building) were between  27.1% damaged and 54.3% damaged. DX 33. Only two buildings—Building 3 and the office building—were more than 50% damaged. *Id.*

15.     On April 27, 2016—less than two weeks after the Tax Day Flood—Houston issued the repair permits for Arbor Court after the Tax Day Flood. ECF No. 298 at 134:8-9, 14-16; PX 4.  DMAC repaired Arbor Court and, as discussed above, renewed the HAP Contract on the Property that September—just five months later.

---

[3]Recall that a building is substantially damaged if "the cost of restoration of the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure." DX 4 § 19-2. Thus, to determine the percentage damage from the Proofs of Loss, the Full Cost of Repair or Replacement (Row 5) is divided by the Actual Cash Value of Building Structures (Row 2). *See* ECF No. 298 at 263:20-264:1.

16.     Following the Tax Day Flood, the North Houston District—an entity that is separate from and independent of the City of Houston[4]—contracted with the engineering firm of Lockwood, Andrews & Newman, Inc. ("LAN") to determine the root causes of flooding in the Greens Bayou watershed (which includes Arbor Court). PX 10.

17.     LAN used simulations to determine water flow during 100-year flood events. ECF No. 299 at 140:18-22. The Report found that flooding would likely reach as high as seven feet in certain areas of Arbor Court—particularly near the entrance and exit. ECF No. 299 at 144:5-18. It also found that the water around Arbor Court would likely travel at a high velocity, up to 3.4 feet per second. ECF No. 299 at 144:19-145:7.  Because of the relative elevations of the land, water would flow in the opposite direction of people attempting to evacuate, meaning that residents trying to leave Arbor Court would have to fight against the flow of the water. ECF No. 299 at 146:20-147:7. Together, the water's depth and velocity made flood situations particularly hazardous. ECF No. 299 at 145:8-146:8.

18.     The Report included five recommendations, one of which was "the pursuit of buyouts of repetitive and severe repetitive loss properties." PX 10 at 3. These properties were ones that "have filed multiple flood insurance claims," but no properties are specifically mentioned in this recommendation. *Id.* Nevertheless, it seems clear that all relevant actors understood that Arbor Court and Biscayne (a nearby complex) were among the properties referred to in the Report's buyout recommendation. The Report further recommended that "[i]f buyouts are actively pursued, the cleared buyout property could be repurposed for a multiuse park and localized detention facility," to mitigate the impact of flood risk. *Id.* The LAN Report was completed in November 2016. *Id.* at 1.

---

[4] ECF No. 296 at 185:18-22.

19.     In the months following the LAN Report, the North Houston District made some efforts to convince the City to pursue a buyout of Arbor Court. On June 20, 2017, Robert Fiederlein, who worked for the North Houston District, emailed several City of Houston employees, including Karun Sreerama (then the Public Works director for the City), and Stephen Costello (the City's Flood Czar). *Id.*; *see* ECF No. 296 at 106:1-4, 9-11.

20.     Fiederlein proposed a three-phase approach to drainage updates in the Greens Road area. PX 10A. Fiederlein stated that "[t]he first phase would be acquisition and demolition of Arbor Court Apartments," which "has been the focus of the Housing Director for some time," and "[t]he second phase of the project would be to construct a local detention pond on the Arbor Court site." *Id.* Fiederlein indicated that he was meeting the following day with Tom McCasland (then, the City's Director of Housing[5]) to "follow up on his current thoughts" and to ask him to recommend to the Mayor to proceed along these lines. *Id.*

21.     After this meeting, McCasland did not recommend to the mayor that the City purchase Arbor Court. ECF No. 296 at 281:12-18.

22.     Still, McCasland seemed to agree that Arbor Court needed to be relocated. Relocation typically happens in one of two ways. It could occur through a City buyout, like Fiederlein advocated, or by funding the current owner to move the property to a safer location. ECF No. 297 at 212:24-213:12, 214:24-2:15:2, 276:20-277:9. On September 9, 2016, McCasland, sought information about potential additional relief funds, noting that "[g]etting Arbor Court relocated should be one of our highest priorities and ensuring sufficient funding for that in addition to any other recovery activities is key." PX 8.

---

[5] The Housing Department manages HUD grants, housing funds, and other programs, including disaster recovery funds. ECF No. 296 at 64:9-1, 65:21-25.

23.     This aftermath is indicative of continued concern among City officials about potential safety issues at Arbor Court in the event of flooding. Nevertheless, in the following months, the City did not pursue the relocation of Arbor Court.

### D.  Hurricane Harvey

24.     Hurricane Harvey struck Houston on August 25, 2017. The first-floor units were flooded with three to four feet of water. PX 43. As a result of the flood damage, these first-floor units became uninhabitable. PX 67. The residents of Arbor Court were forced to evacuate.

25.     Although the water in the apartments reached three-to-four feet, water around the apartments, including near the exits, likely reached a greater depth. This is because the entrances and exits are at a lower elevation than other areas of the complex, and are thus have deeper waters when the property floods. PX 32, Exs. 2, 3; ECF No. 299 at 143:1-144:18. Compared with shallower waters, the deeper water near entrances and exits would have made it more difficult and dangerous for residents to evacuate during the flood.

### E.  Communications in the Immediate Aftermath of Harvey

26.     After Hurricane Harvey, there was a flurry of communications between governmental entities and other interested parties. As discussed below, the Court finds that these communications did not impact on the permit denial at issue in this case. Nevertheless, the Court briefly summarizes these communications to provide a fuller context. As part of this context, the Court observes that these emails are rather rushed and harried, reflecting the fact that City officials were urgently responding to a medley of time-sensitive and significant crises.

27.     A central figure in these communications was Andy Icken. Icken was the chief development officer for the City of Houston. ECF No. 296 at 58:4-8. In this position, he does not

play a role in permitting. ECF No. 296 at 64:13-65:5. Rather, he focuses on economic development, including jobs and other economic projects. ECF No. 296 at 58:13-17.

28.     On August 31, 2017—less than a week after Hurricane Harvey—Robert Fiederlein of the North Houston District emailed Icken. PX 13; DX 20. Fiederlein's email stated that maps for 2000, 2007, and 2017 all show Arbor Court in the floodplain or floodway. PX 13; DX 20. Fiederlein stated that he had access to DMAC's HAP contract, including the August 2016 renewal. *Id.* Essentially, Fiederlein sought to bring the flooding at Arbor Court to Icken's attention.

29.     Just after midnight, Icken responded, cc-ing Carol Haddock (the City's director of public works, ECF No. 296 at 69:5-9) and Christon Butler (who worked at the permitting center, ECF No. 296 at 198:21). DX 21. Icken's email stated in full "And I would think that permits for any property that has repeatedly flooded and are in the flood way should be considered very carefully in the context of FEMA regulations." *Id.* The Court finds credible Icken's explanation that he sought to explain to Fiederlein that the City applied equal scrutiny to all repetitively flooded properties in the floodway, including Arbor Court. ECF No. 296 at 186:9-187:1.

30.     Separately, Icken forwarded Fiederlein's email to Neal Rackleff. PX 16. Rackleff had previously worked for the city but worked for HUD at the time of these emails. ECF No. 296 at 191:16-192:7. Icken and Rackleff had previously worked together on projects constructing homes using HUD money, where they learned that they could not use federal funds for projects in the floodplain. *Id.* at 192:17-24.

31.     When forwarding Fiederlein's email, Icken wrote to Rackleff: "This will boil your blood. It did mine. Shut him down. And find a way that buyouts of units like this can happen asap." PX 16. This email stemmed from Icken's frustration that HUD money was subsidizing

low-income housing in the floodway, whereas normally federal funding could not go even to housing projects in the floodplain. ECF No. 296 at 192:17-193:6.

32.     No action occurred as a result of this email. *Id.* at 192:7-19. Rackleff did not take any significant or impactful action in response to this email. ECF No. 307-2 at 20:8-23:11.

33.     The next morning, September 1, 2017, Fiederlein responded to Icken. PX 15; DX 21. Fiederlein stated that he "[w]ould love to visit with [Icken] in detail on Arbor Court when time allows," and noted that DMAC "ha[s] indicated to us they have started a claim and will begin rebuilding." *Id.* Fiederlein advocated for the City to put pressure on Marquis or HUD to "do something" regarding the HAP contract or to consider condemnation. *Id.* With respect to the condemnation suggestion, Fiederlein stated that "[p]rice is going to be a challenge" because "the per door price of recent transactions in the area have been . . . in the $30k-$35k range," but, "because the HAP contract pays so generously, the per door value is 2x-3x this." *Id.*

34.     At 1:34 p.m. on that same day, Fiederlein sent a third, separate email to Icken, this time about the Biscayne property, which is located near Arbor Court. ECF No. 22. Fiederlein suggested buying out Biscayne in exchange for dedicating affordable units to other of the owner's complexes in the area. *Id.* In support of this suggestion, Fiederlein points to the LAN Report after the Tax Day Flood, which according to Fiederlein, "recommended buying out both Arbor Court and Biscayne to allow for the construction of the detention ponds." *Id.*

35.     Fiederlein did not work for the City. ECF No. 296 at 185:23-24. His emails did not reflect the view of any City official. Further, there is no evidence that any of his emails had any impact on any permitting decision, which are the challenged government action in this case.

36.     In fact, the City officials involved in these communications—Icken and McCasland—had no role in or influence over the permitting process. ECF No. ECF No. 296 at 198:14-199:1, 213:15-20; 299 at 173:17-22.

37.     As before, City officials took no action on pursuing a buyout at this time. ECF No. 296 at 185:7-10. This makes sense—long term buyouts were "not a priority" because, at this time, the City was in the midst of a crisis as City officials tried to relocate 10,000 individuals who had been displaced in the immediate aftermath of Harvey. ECF No. 296 at 185:3-8.

38.     On September 12, 2017, Tom McCasland reached out to Neal Rackleff at HUD "to request HUD's assistance with coordinating with the owner of Arbor Court, Morgan Cox, to ensure that the units are not rehabbed." PX 18. McCasland explained that it was "a priority for both [him] and the Mayor that low-income families not be placed once again in the way of storm water given that Arbor Court is in the floodway." *Id*.

39.     On September 18, 2017, Rackleff responded that the "City may have to use other funds to move quicker" and that "the key to getting this done will be the economics." PX 20. Rackleff suggested talking to "come up with a game plan" before Rackleff met with Arbor Court's owners. PX 20.

40.     On September 18, 2017, Rackleff then forwarded to Icken and McCasland correspondence about Arbor Court among HUD officials. PX 21. He asked McCasland to confirm that the information HUD had received from Morgan Cox—that the city was "ready to move forward" in purchasing Arbor Court—was correct. *Id.*

41.     McCasland responded that the City awaited certain funds, but "[i]f those funds could be expedited, this property would be a priority for the City." *Id.* Put differently, McCasland was attempting to get money from HUD to find a solution. *See* ECF No. 296 at

218:15-20. McCasland and Rackleff subsequently met, again with McCasland attempting to find money, which was the first step in any relocation effort. *Id.*

42.      Icken also responded to Rackleff's email. He clarified that the "Mayor has been very clear on likely use of 2016 funds," and that the City was "carefully considering the application of chapter 19 to repetitively flooding properties" and that "[n]o permits will be issued until that review is complete." *Id.* Icken was not giving a directive—merely communicating the City's decision that permits would not issue until the city engineer had made a decision about chapter 19, substantial damage determinations, and repetitively flooding properties. ECF No. 296 at 155:23-156:18; 198:7-11.

### F. Permit Application

43.      On September 22, 2017, DMAC applied for permits to repair Arbor Court. PX 27; DX 5. The permit applications sought to replace cavity insulation, replace electrical outlets, and replace the flooring. *Id.*

44.      After DMAC submitted its applications, the City did its own substantial damage calculations. PX 34; *see* PX 26. Jamila Johnson was the City's floodplain manager at the time, meaning that she managed the flood office for the permitting center and regulated development of the city's floodplain, including dealing with permitting, inspection, and making substantial damage determination. ECF No. 298 at 254:16-18, 255:5-17. She testified that her office performed more than 1100 substantial damage determinations in the wake of Harvey. ECF No. 298 at 255:23-25.

45.      With respect to the substantial damage determinations for Arbor Court, the City calculated the cash value of the building, as well as the total estimated damages using FEMA's Substantial Damage Estimator software. *Id.* The City determined that the buildings were

substantially damaged because the cost to repair each building exceeded 50% of each building's value. *Id.* In particular, the City found that each building was between 72.8% and 74.1% damaged. *Id.* Jamila Johnson credibly testified that this application was treated the same as every other substantial damage determination. ECF No. 298 at 259:7-13.

46.     The City communicated this determination to DMAC in a letter dated October 6, 2017, and informed DMAC that, as a result of these substantial damage determinations, DMAC was required to bring the buildings into compliance with Chapter 19. *Id.* The letter explained that there were "several aspects that must be addressed to achieve compliance," including, "most significant[ly], . . . that the lowest living floor must be elevated to one foot above the base flood elevation." *Id.*

47.     On January 10, 2018, DMAC appealed the City's substantial damage determination and permit denial. DX 1. In the appeal, DMAC represented that the market value of the structure was $16,633,222, and the total cost of repair was $3,402,586. *Id.* Based on these numbers, percentage of damage would be 20.46%, which would mean that the buildings were not substantially damaged. *Id.*[6]

48.     On March 28, 2018, Choyce Morrow, then a Supervising Engineer and the City's Floodplain Management Office, emailed Morgan Cox to let him know that the City had completed the Substantial Damage Determination Appeal process for Arbor Court. PX 41. Two

---

[6] Whether the Arbor Court was actually substantially damaged does not impact the resolution of this case. As discussed below, the City found that it could not come to a conclusion as to whether Arbor Court was substantially damaged and ultimately relied on a separate justification to deny permits. The Court's findings and conclusions would be the same regardless of whether the buildings in fact had been or had not been substantially damaged.

Nevertheless, the Court observes that there are at least some reasons to doubt DMAC's representations about the extent of the damage that Arbor Court sustained. The estimated repair costs on the substantial damage appeal, DX 1, were less than the amount that DMAC was paid out by insurance, *see* DX 8. Further, Wayne Milam, a FEMA adjustor who worked with DMAC's contractor prepared draft proofs of loss that estimated the cost of repair to be significantly higher than what DMAC represented to the City. PX 6. Again, this issue need not be resolved. But the Court notes these concerns to further underscore the Court's finding that it was reasonable for the City to be unsure of the precise substantial damage determinations.

letters (dated March 18, 2018) were attached. *Id.* The appeal for Buildings 7-9 and 12-15 was approved; in other words, the City found that these buildings were *not* substantially damaged. *Id.* The appeal for Buildings 1-6 and 10-11 was denied, meaning that the City found that these buildings *were* substantially damaged. *Id.*

49.     On April 4, 2018, an administrative hold was placed on the permits.

50.     On April 10, 2018, consistent with the City's policy allowing property owners to pursue an unlimited number of substantial damage determination appeals, DMAC appealed again. PX 43. This letter explained that "[t]he roof and structural elements are and have been intact" and represented that "[o]ur damages are in the 2% range nowhere near the 50% threshold established by the City of Houston and related FEMA guidance for substantial damage." *Id.*

51.     On April 23, 2018, inspectors from the City's Flood Management Office conducted a field investigation of the first-floor units in Buildings 1-6 and 10-11.   DX 28. DMAC's contractor accompanied them. *Id.* It is common practice for the City to send out inspectors when completing a substantial damage determination. ECF No. 299 at 166:4-6.

52.     On May 1, 2018, Choyce Morrow emailed Pat Casey, the City's Senior Assistant City Attorney. PX 45. Morgan Cox from DMAC was copied, but the email was neither an official City of Houston communication nor a final substantial damage determination. *See* ECF No. 298 at 277:15-17; ECF No. 299 at 165:3-5. The Court finds that Cox was likely cc-ed by mistake.   This email reads in full: "Ms. Casey, I have re-reviewed Chapter 19's definition of Substantial Damage and it does not specifically state that, "repair costs should be at fair market value. Arbor Court has provided cost estimates prepared and sealed by a State of Texas Architect that show that repairs will cost less than 50% of building values, therefore all buildings will be classified as non-substantial…" PX 45.

53.     As a result of this email, DMAC believed that the permits were going to be approved and it was going to be able to repair the units in Arbor Court. ECF No. 298 at 29:17-18. The Court understands why DMAC had that subjective impression from the email. But that subjective understanding, even if reasonable, does not mean that the permits had been approved or that DMAC was entitled to approved permits. Rather, the Court finds that the informal email does not constitute an approval of the permits, nor does it indicate that the City has reached a final decision.

54.     Two days later, on May 3, 2018, Morrow emailed Morgan Cox, cc-ing Pat Casey. DX 28. This email was a standard part of the back and forth between the City and a property owner regarding a substantial damage determination. ECF No. 299 at 167:5-9. Morrow informed Cox that in the April 23, 2018, inspection, City inspectors found several items that were not included on the proposal that DMAC had submitted. DX 28. Morrow listed nine specific items, including damage to the foundation, the first floor framing, and other aspects of the building. *Id.* Morrow requested a revised cost estimates that included repairs for the listed items, as we'll as "any other cost estimates you have received as well as your NFIP Proof of Loss Statement." *Id.*

55.     DMAC never provided any of these materials to the City in response to this email. PX 60.

56.     The failure to submit this information created a problem under the Flood Ordinance, which provides that "an applicant may be required to submit . . . [a]ny other relevant information requested by the city engineer." DX 4 § 19-18(7).[7] Thus, the substantial damage determination issue remained unresolved. PX 60.

57.     On May 31, 2018, Morgan Cox of DMAC emailed several officials expressing two  concerns. PX 54. First, the fire marshal said that it was going to place stickers on the

---

[7] The requested information was relevant to the substantial damage determination. ECF No. 299 at 167:23-168:6.

upstairs apartments at Arbor Court because the units were not up to code due to the damaged downstairs units. *Id.* Second, Cox said that he believed the City improperly withheld the permits and said that DMAC would "proceed with firing up [its] litigation team" if it had not heard back from the City. *Id.*

58.     Cox's email kicked off a back-and-forth of emails between various City officials. During this exchange, Tom McCasland the Director of the Housing and Community Development Department, clarified that this impacted the department because they "are usually the responsible party when the current 100+ units of low income individuals lose their homes" and "are the party with the funding to buyout this property owner to ensure that the long-term solution of moving this facility is achieved." *Id.* Subsequently, Harry Hayes, the City's Chief Operating Officer, told McCasland: "You should crank up your role right now and not wait. Assume as of today that the residents will need to be relocated and we will purchase the property from the floodway." *Id.*

59.     On June 8, 2018, DMAC brought this suit. ECF No. 1.

### G.  Permit Denial

60.     On July 17, 2018, Carol Haddock, the City's Director of Public Works, emailed Cox. PX 60.   The letter states that the City reviewed the repaired permit applications and determined that they should be denied. *Id.*

61.     The letter explained that the City could not finalize its substantial damage determination because Arbor Court did not provide the requested information in response to the City's May 3, 2018, request. *Id.* As a result, the letter explained, "[t]he City is pursuing other means to obtain the requested information to make a final determination whether any or all of the buildings are substantially damaged." *Id.*

62.     Nevertheless, the letter explained that the City Engineer, using his judgment pursuant to sections 19-1(a)-b) and 19-19 of the Flood Ordinance, "has reviewed information submitted thus far and publicly available data and has concluded that there is danger to both life and property due to flooding in the vicinity of the site." *Id.*

63.     The letter offered several rationales. First, the property is right on the Greens Bayou and mostly in the floodway. The data reviewed by the engineer showed that past flooding had exposed residents to danger when the Greens Bayou rose out of its banks. The letter pointed to the LAN study following the Tax Day Flood as well as FIRM data to show that flood depths at Arbor Court may have been as high as six feet during the Tax Day Flood. Further, it pointed to media photos from both the Tax Day Flood and Hurricane Harvey, showing "residents wading in water as high as chest deep," which is "dangerous," both "because of the risk of injury or drowning" and because of pests like snakes and ants in the waters. *Id.*  The letter also pointed to the models from LAN showing velocities of 5.5 to 7.5 feet per second, which pose further dangers. Last, the letter pointed to the development' susceptibility to flood damage and the impairment of access to the site during flooding, making it difficult for rescue and emergency vehicles. *Id.*

64.     Although Carol Haddock sent the letter, the letter's author was Joe Myers, the City Engineer. ECF No. 299 at 159:8-11, 162:8-15. Myers made the decision to deny the permits pursuant to Chapter 19-19 (health and safety) due to the reasons outlined in the letter. Nobody— such as the mayor, Icken, McCasland, or anybody else—directed Myers to deny Arbor Court's permits or influenced Myers in his decision. ECF No. 299 at 173:14-174:2; *see* ECF No. 296 at 213:15-20, 275:9-23.

65.     The effect of the permit denial was that the requested repairs could not be made. Other uses for the property would still be permitted, so long as those purposes complied with the Flood Ordinance. ECF No. 296 at 202:4-8.

66.     Because the repairs could not be made, all of the tenants had to be moved out of Arbor Court. The last tenant moved out in December 2019. ECF No. 298 at 113:11-12.

67.     The Court credits the explanation of City employees that health and safety concerns motivated the denial of the permits. The Court does not find that any prior discussion of possible buyouts or relocation of Arbor Court undercuts this explanation. Rather, there was a widespread concern about health and safety issues at Arbor Court, and that concern manifested in various departments in various ways.

68.     DMAC nonetheless argues that the City's stated rationale was pretextual, and that the City improperly targeted Arbor Court. DMAC offers several points to support its claim that the City's rationale was pretextual. None is persuasive.

69.     First, DMAC argues the City kept changing rationales. First, the City denied the permits because it found that the properties had been substantially damaged. PX 34. After an appeal, the City found that only buildings 1-6 and 10-11 were substantially damaged. PX 41. Choyce Morrow then sent an email indicating that the buildings may not be substantially damaged (based on the cost of repairs). PX 45. Then, Morrow emailed Morgan Cox noting that City inspectors had found damage not listed in DMAC's Proposal. DX 28. Finally, the City abandoned the substantial-damage rationale and denied permits on the grounds that repair posed a danger to health and safety. PX 60.

70.     But the Court cannot agree that this sequence of events is evidence of any pretext. Rather, there were perfectly reasonable explanations for the City's shifted rationale.  As part of

the appeals process, city inspectors conducted a field investigation (a standard part of the process) and found damage not mentioned in DMAC's submission. DX 28. But when the City asked for more information from DMAC, DMAC never responded. In the absence of this additional information, the City could not finalize any substantial damage determination. PX 60. Thus, it was perfectly reasonable for the City to rely instead on a different rationale. Without sufficient information, it could not make a decision about substantial damage, so it instead turned to a metric—health and safety—for which it did have enough information to reach a decision.

71.     Nor does the May 1, 2018, email from Choyce Morrow change this analysis. In this email, Morrow indicated that the buildings were not substantially damaged. DMAC argues that this email shows the City had made a substantial damage determination. This is incorrect. Read in context, the email specifically addresses repair costs and shows that the City was willing to accept DMAC's costs of repair, even if those costs were below a fair market value. PX 45.

72.     But this email was sent just a week after inspectors from the Flood Management Office conducted their field investigation, and the City had not yet incorporated the findings from the field investigation into its analysis. In fact, the subsequent May 3 email shows that, once the City did consider the investigators' findings, it was concerned about additional damage that DMAC had not reported. DX 28.

73.     Put differently, there are multiple factors that go into a substantial damage determination, including, most significantly, the fair market value of the property, the extent of the damage, and the cost of repairs. The May 1 email addressed how to calculate the cost of repairs given the damage listed. The May 3 email addressed whether the extent of the damage was what DMAC had claimed. It is reasonable for the City to address these two separate issues separately.

74.     DMAC further argues that the City improperly applied Chapter 19 because granting a permit would not increase flooding danger. This argument misconstrues the Ordinance. The Ordinance provides that it aims "to reduce the likelihood that development within this City will increase the dangers of flooding." DX 4 § 19-1(b). Granting the permits—thereby placing low-income residences in a repetitively flooding property in the floodway—increases potential dangers from flooding when compared with not granting the permit to rebuild in this area. This is a proper application of the Ordinance.

75.     DMAC also argues that it was treated differently from Biscayne and that this discrepant treatment shows that the City unfairly targeted Arbor Court. This argument, too, falters.

76.     Biscayne was located near Arbor Court and experienced similar flooding. But fatal to DMAC's argument is that Biscayne, like Arbor Court, never got repair permits to rebuild. Rather, Biscayne—seemingly unlawfully[8]—rebuilt their units without first getting the requisite permits. Eventually, the City and the Flood Control District purchased Biscayne jointly, with each contributing half of the funds (the City's portion came from disaster relief funds). ECF No. 296 at 220:24-222:14. DMAC is understandably frustrated that the City nonetheless bought the Biscayne property after Biscayne violated the Ordinance.

77.     But the fact that the City did not want residents living at either Biscayne or Arbor Court actually lends credence to the City's statement that the permit denial was motivated by genuine health and safety concerns. And, at any rate, DMAC's takings claim is based on the permit denial, not the failed negotiations over a buyout. Thus, the Court finds that the City did not unfairly target Arbor Court when it denied the permits.

---

[8] City officials testified that repairs done without permits were in violation of the City's Flood Ordinance. ECF No. 298 at 270:11-17; ECF No. 299 at 178:18-179:2.

78.     Even if the City had targeted Arbor Court specifically—and, to be clear, the Court finds that it did not—the City still offered a valid reason for being especially concerned about Arbor Court. Arbor Court was HUD-subsidized housing. Not only is it funded by taxpayers, but residents who live in this type of housing cannot simply pick up and move in the same way that residents of other buildings may. Thus, these residents are uniquely vulnerable. So, even if the City had paid more attention to Arbor Court than to other properties, any extra attention would have been for a legitimate reason.

79.     In sum, the Court is not persuaded by DMAC's argument that the City's reliance on Chapter 19 was pretextual. Rather, the Court finds that the City denied the permits due to health and safety concerns created by the substantial risk of flooding at the Property.

### H. Sale Discussions between DMAC and the City

80.     While the permitting appeals process was ongoing, DMAC and the City were separately negotiating a potential sale of Arbor Court to the City.

81.     While Jamila Johnson, Choyce Morrow, and Joe Myers were the main City employees involved with the permitting decision, the buyout discussions involved entirely different City officials. Specifically, the main individuals involved in the buyout considerations were Tom McCasland (the Housing Director), and Ray Miller, an employee who focused on multi-family properties and assisted McCasland. ECF No. 296 at 67:25-68:5, 227:16-21.

82.     On February 20, 2018, Ray Miller indicated that he "ha[d] some irons in the fire to try to come up with a proposal for a buyout, but that will be a long term project at this point." PX 39.

83.     On March 9, 2018, Miller and Derek Sellers prepared a "Decision Request Memorandum" for Tom McCasland regarding a potential Arbor Court project. PX 40.[9] The memorandum explained that "[t]he owner of Arbor Court has indicated on multiple occasions that he is willing to sell or swap Arbor Court," but that "he would like the value of a fully leased repaired Arbor Court." PX 40. The top was the use of DR 16 funds, and the memorandum listed three options: (1) a buyout of Arbor Court; (2) a "swap" to facilitate relocation of Arbor Court; or (3) pursuing other projects. *Id.* The memorandum recommended using the funding for other projects because DR16 has limited funding, the timeline presented an issue, and Harvey funds may be available. *Id.*

84.     On March 15, 2018, Miller emailed Janet Golrick, who worked for HUD, asking for information about the HAP contract. PX 39. He explained that his "department is considering providing an unsolicited bid to purchase the property," but was "limiting [their] conversation with the owner" because the permitting issue had created "a sensitive situation." PX 39. Miller sought information that would help the City to determine the value of the property. *Id.*

85.     At DMAC's request, the City asked DMAC to submit a proposal for a potential buyout of Arbor Court. ECF No. 296 at 209:1-7, 256:17-22.

86.     On July 30, 2018, DMAC sent a proposed option contract for the sale of Arbor Court. PX 61. DMAC's proposed purchase price for Arbor Court was $24.4 million, plus or minus 4% based on a subsequent appraisal. *Id.* at 7 (Contract at 6). If the appraisal was not within 4% of this $24.4 million figure, the proposed contract would have allowed either party to terminate the contract within three business days. *Id.*

87.     At this point in the summer of 2018, the City did not have disaster relief funds from either 2016 or 2017 available. ECF No. 296 at 238:24-239:16. Those funds did not come un

---

[9] The memorandum is dated 2019, but that is a typo. ECF No. 296 at 232:24-233:4.

until roughly the first quarter of 2019. *Id.* at 239: 17-23. This is significant because without funding, the City "do[es]n't do anything," and it is relatively rare for the City to pursue buyouts in the first place. ECF No. 296 at 277:11-20, 278:22-25

88.     In response to DMAC's July 30, 2018, proposal, the City did not purchase Arbor Court for this price. ECF No. 296 at 210:16-17; 271:18-23.

89.     The City did not offer a counterproposal to DMAC's proposed purchase price.

90.     As discussed above, there are two main ways to relocate a property: (1) a buyout; and (2) relocation. DMAC did not submit an application for the City to contribute money to relocate Arbor Court. ECF No. 296 at 244:7-17. Thus, the City did not provide money for DMAC to purchase another property where the HAP budget authority could be moved. *Id.*

### I.     Communications between the City and HUD

91.     As discussed above, DMAC operated Arbor Court as subsidized housing under a HAP contract from HUD. Under this contract, HUD provided payments to DMAC, which substantially increased the value of Arbor Court.

92.     While the City was looking into the possibility of purchasing Arbor Court, it had several communications with HUD related to Arbor Court's HAP contract. The purpose of these communications was twofold: (1) to understand what was happening from HUD's perspective; and (2) to understand what would happen to the HAP contract under various scenarios.

93.     The Court finds as a factual matter that these communications did not cause HUD to revoke the HAP contract. Nevertheless, for the sake of completeness, the Court briefly describes these communications between HUD and the City.

94.     On June 15, 2018, Tom McCasland sent a letter to Brian Montgomery at HUD about Arbor Court. PX 56. DMAC had communicated to the City that HUD wanted Arbor Court

rebuilt. *Id.*; ECF No. 296 at 251:6-12. Thus, McCasland asked Montgomery to clarify whether HUD wished for Arbor Court to be rebuilt at its current location regardless of flood risk, and whether HUD intended to maintain the HAP contract with DMAC at that location. PX 56. McCasland explained that (1) Arbor Court flooded significantly during both the Tax Day Flood and Hurricane Harvey; and (2) the City's Flood Plain ordinance applied to the location, meaning that rebuilding at the same location poses public safety concerns. *Id.*

95.     HUD responded, but its response was not particularly clear one way or the other. ECF No. 206 at 251:3-15.

96.     Further, to inform any discussions related to the City potentially purchasing Arbor Court, Tom McCasland from the City reached out to HUD to find out what would happen if HUD terminated the HAP contract. ECF No. 296 at 266:2-267:7, 268:22-269:7, 274:1-24. PX 61B.

97.     HUD informed the City that, if termination occurred, vouchers and relocation services would be provided to eligible families. PX 61B. HUD also explained, in response to McCasland's inquiry, that pursuant to the 8bb process, a property owner could voluntarily arrange for the HAP budget authority to transfer to another property, subject to HUD approval. PX 61B.

### J.  HAP Contract Transfer

98.     Several months later, on October 18, 2018, HUD sent DMAC a Notice of Default of the HAP contract. PX 65. This letter said that DMAC "is now in default of the property's HAP contract" and "must take" three "corrective actions." *Id.* Those were: (1) completing negotiations with the City about permitting issues; (2) showing that the permits have been received; and (3) providing a plan for the rehabilitation of the buildings. *Id.* The letter stated that

if DMAC fails to take the corrective action, then the HAP contract could be reduced, suspended, or terminated. *Id.*

99.    On November 6, 2018, Morgan Cox, writing on behalf of DMAC, wrote to HUD stating that DMAC was "actively seeking an acquisition of another apartment complex in the State of Texas and, through an 8bb will request The Department to transfer the Budget Authority from Arbor Court to the newly acquired asset." DX 13.

100.    On December 17, 2018, Monica Sussman, on behalf of DMAC, requested the HUD transfer the budget authority for the HAP contract to DM Cullen Park. DX 17; *See* ECF No. 298 at 179: 14-19.

101.    On February 14, 2019, HUD sent a letter to DMAC approving the transfer of budget authority to Cullen Park. DX 15.

102.    DM Cullen Park is a separate entity from DMAC, but the two are closely related. DMAC has eighteen limited partners, including principals Douglas Hickock and Morgan Cox.. ECF No. 298 at 73:19-22.  DM Cullen Park has only two partners: Douglas Hickock and Morgan Cox. *Id.* at 74:1-7.

103.    In fact, DMAC itself has acknowledged its close relationship with DM Cullen Park. This is clear from the letter that Sussman sent to HUD on behalf of DMAC asking HUD to transfer the budget authority for the HAP contract to Cullen Park. DX 17. The letter explained: "Marquis Acquisition, Inc., who controls Owner A [DMAC] is in the process of acquiring Project B, which will be owned by a single—purpose entity affiliate ("Owner B") [DM Cullen Park]." DX 17 at 2. So here, DMAC represents that Marquis Acquisition, Inc. both "controls" DMAC and "acquir[ed]" Cullen Park. The letter also attached a document titled "Certification Re: Acceptance of Budget Authority," signed by Morgan Cox, stating that "Marquis

Acquisitions, Inc., and/or a special purpose entity affiliate" would accept the transfer of budget authority." PX 17 Ex. 10.

104.    Thus, Hickock and Cox—DMAC's principals—benefited from the transfer of the HAP contract to DM Cullen Park. But DMAC itself did not benefit. No benefit was transferred to DMAC as a result of transferring the HAP contract budget authority to DM Cullen Park. ECF No. 298 at 75:12-76:5.

### K.   Valuation of the Property: Before Permit Denial

105.    A central issue in this case relates to the valuation of property. The parties dispute the valuation of the property both before and after the taking.

106.    Richard Marchitelli testified as DMAC's expert on the valuation issue. *See* ECF No. 297 at 12-149 (Marchitelli testimony); PX 73 (Marchitelli report).

107.    The City's expert on these same issues was Joseph Torzewski. ECF No. 299 at 4-133 (Torzewski testimony); DX 30 (Torzewski report).

108.    The first question is how to value Arbor Court *before* the taking. Both experts relied on the income capitalization approach. PX 73 at 52-57; DX 30 at 57-63. Very basically, this approach takes the net operating income (calculated based on rents, vacancy rates, operating expenses, and other factors) and divides the net operating income by the "capitalization rate" to determine the value of a property. *Id.*

109.     Marchitelli testified that, in his view, the market value of Arbor Court before the taking was $24.2 million. ECF No. 297 at 65:14-15; PX 73 at 5. This is based on his view that "[t]he highest and best use" of Arbor Court "was its existing use as a 232-unit garden apartment complex with a HAP contract in place. ECF No. 297 at 31:7-9. He valued the property with the HAP contract in its fully stabilized state. *Id.* at 32:6-8.

110.    Torzewski arrived a different "before" valuation than Marchitelli. He valued Arbor Court at several different stages and under different conditions: in Torzewski's view, the Property was worth $18 million based on HAP contract rent rates before Harvey struck, $12.1 million based on market rent rates before Harvey struck, and $5.9 million based on the income method on the morning of July 17, 2018, just before Houston issued the permit denial letter. ECF No. 299 at 18:9-10, 18:22-19:2, 21:14-20. To arrive at his "before" valuation of $5.9 million, Torzewski valuated the net operating income using the value of the second-floor apartments only, since only those apartments were operable on July 17, 2018, as a result of Hurricane Harvey. ECF 299 at 21:5-13.

111.    Both parties point to additional sources to lend credence to their expert's "before" valuation. First, DMAC points to an Appraiser's Report from February 2017 that was conducted in relation to the refinancing of the property. PX 72. This appraisal estimated that the value of the property was $21.1 million. *Id.* at 140. This appraisal occurred after the Tax Day Flood but before Harvey.

112.    The City points to other numbers. DMAC bought Arbor Court in January 2016 for $11.85 million, ECF No. 297 at 96:6-9, and the City argues that it is unlikely that the Property doubled in value in just over two years. Further, in DMAC's first substantial damage appeal, which it filed with the City on January 10, 2018, DMAC represented that the market value of the structure was $16,633,222. DX 1. A year earlier, DMAC submitted to FEMA signed proofs of loss following the Tax Day Flood represented that the total cash value of the Arbor Court buildings was $12.5 million. DX 33. Finally, the City points to DMAC's sworn tax protests, sworn on both October 25, 2016, and July 27, 2018, swearing that Arbor Court was worth "no more than $6,500,000." DX 18. The discrepancies among these valuations and between these

valuations and the one that DMAC now offers cast doubt on DMAC's claim that the property is worth as much as it now says.

113.    To be clear, the Court finds that the experts for both DMAC and the City rely on flawed assumptions to calculate the value of Arbor Court before permit denial. Marchitelli, DMAC's expert, calculates the value of Arbor Court as though Hurricane Harvey had never happened, and Arbor Court had not been damaged in any way. This methodology is not persuasive. But neither is the Court persuaded by the methodology of Torzewski, the City's expert, who calculated the "before" value of Arbor Court as though it would be kept in its state of disrepair forever. Thus, the Court declines to adopt the "before" valuations of either party's expert.

114.    As a threshold matter, this Court finds that the "before" valuation must be calculated using the value of rents with the HAP contract. The parties agreed that the HAP contract was tied to the property; although HUD could (and subsequently did) agree to transfer the property, absent that action from HUD, the HAP contract applies to one property specifically. This is because the owner agrees to use the property for low-income apartments, and, in return, HUD subsidizes those apartments and provides the owner with a steady stream of income. The effect of the HAP contract is to increase the value of each unit. Although the HAP contract reflects inflated rents, the fact remains that DMAC had recently secured a twenty-year extension of the contract. So, if DMAC remained in compliance, it was entitled to those inflated rents. Thus, the net operating income should be calculated using rents that account for the HAP contract.

115.    Nevertheless, the Court agrees with the City's expert Joseph Torzewski that an inflated HAP contract rate increases the risk of the property because the rents undergo five-year

readjustments. ECF No. 299 at 29:5-16. As discussed below, this increased risk is reflected in a higher capitalization rate, which reduces the value of the property.

116. The Court further finds that it is inappropriate to value the net operating income of the "before" valuation using only the second-floor apartments. It is true that the first-floor apartments were inoperable before the permit denial. This was due to the storm, not to any action taken by the City. Nevertheless, Torzewski's approach using income from only the second-floor apartments assumes that the first-floor apartments would have remained inoperable indefinitely. However, but for the City's action in denying the permits, it would have been possible to bring these units back into operation.

117. That is not to say that Hurricane Harvey has no impact on the valuation of the property. Rather, Harvey substantially reduced the value of Arbor Court. Before the storm, Arbor Court had flooded only once in the last thirty years. But, after Harvey, Arbor Court was a repetitively flooding property that had flooded twice in a sixteen-month period. The Court finds that the valuation of DMAC's expert, Richard Marchitelli, fails to account adequately for the impact of the hurricane.

118. Specifically, Harvey impacted the property's value in at least three ways. First, the capitalization rate reflects the amount of risk in a property. ECF No. 299 at 28:24-29:3. The Court agrees with Torzewski's assessment that Hurricane Harvey made the property riskier because now the property had experienced two instances of significant flooding in a sixteen-month period. *Id.* at 29:3-5. The effect of this risk is to increase the applicable capitalization rate. *See* ECF No. 299 at 94:3-16.

119. Second, the net operating income includes a number of factors. But if tenants are not in units, then those units are not generating that same income. And tenants are displaced from

units when flooding requires those units to be repaired. So, a situation where flooding is more frequent involves greater displacement and lower net operating income. And that became more likely after Hurricane Harvey made Arbor Court a repetitively flooding property.

120.    Thus, the Court finds that Marchitelli's 6.5% capitalization rate is not appropriate. A higher capitalization rate appropriately reflects the increased risks due to repetitive flooding and the risk of a readjustment of HAP contract rates to more accurately reflect the market value.

121.    Third, the property needed repairs. Even under DM Arbor Court's own estimates, the cost to repair Arbor Court was $3.4 million. DX 1. And DMAC had received $3.4 million from insurance (the policy maximum) to rebuild. ECF No. 298 at 80:16-18. Marchitelli's evaluation appraised the property as if it had already been repaired. But it had not been. So, although Torzewski's valuation—assuming that the property could never be fixed before the taking—is incorrect, the "before" value of the property has to deduct the cost of repairs, which are, at minimum, $3.4 million (money that DMAC had, at any rate, received from the insurer).[10]

122.    The Court does not make a precise finding as to the "before" valuation of the Property. It nevertheless concludes that the "before" valuation is likely somewhere between $12 million and $18 million.[11]

### L.  Valuation of the Property: After the Permit Denial

123.    The next question is how to value Arbor Court *after* the taking. Here, too, the parties substantially disagree.

---

[10] The Court's analysis here deducts the value of the property damage (and cost of repairs that had not yet been made) from the "before" valuation. Another way of doing this calculation would be to include this amount in the "before" valuation, but also include this amount in the "after" valuation because the cash value of the repairs was not spent and so was not taken. Either way, the analysis is the same.

[11] This ranges from, at the high end, a calculation using Marchitelli's net operating income number and a 7% capitalization rate for a result of $22.5 million, which is then downward adjusted for the reduced income due to flooding, and further downward adjusted for property destruction that occurred. At the low end, the calculation accounts for Marchitelli's calculation using the HAP contract rate, downward adjusted to reflect the possibility of HAP rent-rate adjustment or contract nonrenewal and the effect of the $3.4 million property damage.

124.    For DMAC, Marchitelli's Report opined that "[d]enial of the permits to repair the hurricane damage results in a complete loss of economic us of the property, also depriving the owner of achieving any return on its investment." PX 73 at 57.

125.    Marchitelli relied on a February 2017 Report conducted by David Pallante & Associates to suggest (1) that rents would need to be between $1.15 - $1.50 per square foot to justify a multifamily development given the characteristics of the immediate area; and (2) development of the property into a market rate apartment without subsidies would not be feasible. ECF No. 297 at 38:2-39:2. Marchitelli testified as to his view that "the cost of demolition, and the cost of site preparation, and the cost of construction render the proposed project infeasible." ECF No. 297 at 39:12-14; *accord id.* at 44:17-25.

126.    Marchitelli further testified that he thinks the value of the land is zero due to the costs of construction, site preparation and demolition. ECF No. 297 at 39:19-40:13, 44:10-16. He testified that he concluded that all of the value was lost "[b]ecause the property could not be operated like it was intended, and it was impossible to tenant the property without the repairs." ECF No. 297 at 65:22-24. To support its estimate of the demolition costs, DMAC also points to the March 2018 Decision Request Memorandum prepared for Tom McCasland by Derek Sellers and Ray Miller, which estimated the cost of demolition to be "up to $615,000." PX 40. Douglas Hickock of DMAC estimated that the cost of demolition was between $500,000 and $1 million. ECF No. 298 at 103:24-104:3.

127.    The Court is not persuaded that Marchitelli's analysis adequately captured the "after" value of the Property. Marchitelli's report stated that the permit denial "results in a complete loss of the economic use of the property." PX 73 at 57. To reach this conclusion, he explained that: (1) the units became uninhabitable; and (2) the buildings will need to be razed

and will be responsible for holding costs. *Id.* But Marchitelli never conducted a highest and best use analysis. ECF No. 252 at 29. He testified that he "considered highest and best use" but "didn't do a detailed analysis." ECF No. 297 at 99:11-12. But there is no indication that Marchitelli's consideration amounted to much more than recognizing that the *prior* highest and best use was no longer feasible.

128.    Torzewski's analysis took a different approach. He estimated that the underlying value of the land is $1.07 million. DX 30 at ii. He also performed a series of calculations at different dates, using the income capitalization approach as though the upper floor could be used (and alternative calculations using the income stream of the entire complex). *Id.* Torzewski also testified that, in his view, the highest and best use of the property was to hold it for future development, but he did not specifically analyze whether there was any possible future development of the property. ECF No. 299 at 107:4-5, 107:24-108:1. The City points to DMAC's July 15, 2021 sworn tax protests, swearing that Arbor Court was worth "no more than $1,529,121." DX 18.

129.    But the Court is also not persuaded by Torzewski's estimate. It is unreasonable to assume that DMAC could continue using the upper-level apartments when the lower level units remained in disrepair. The unreasonableness of this assumption is clear when the Court considers that the fire marshal considered these units not up to code due to the lower level's disrepair.

130.    The Court finds that the property lost most of its value but nonetheless retained some value. Specifically, the Court finds that the remaining value of the land was likely between $500,000 and $ 1 million, which accounts for both the underlying cost of the land and the cost of demolition.

131.     On top of that, the Court finds that DMAC retained the value of the HAP contract. Torzewski, the City's expert, valued the HAP contract at $5.9 million, which accounts for the difference between the value of Arbor Court with the HAP contract and the value of Arbor Court without the HAP contract. ECF No. 299 at 19:10-15. DMAC does not offer a valuation of the HAP contract and seems to dispute whether it has independent value alone and, whether if it did, DMAC retained that value after the permit denial.

132.     DMAC contends that it lost the value of the HAP contract when it could no longer use the HAP contract at the Arbor Court location because it was effectively forced to default on the contract. It thus asked HUD to transfer the HAP contract to DM Cullen Park. DMAC received no consideration in exchange for this transfer.

133.     According to DMAC's telling, the City deprived DMAC of the HAP contract, so HUD transferred it—under this theory of events, the City caused DMAC's loss, and the transfer of the HAP contract resulted in an unrelated windfall to DM Cullen Park. This Court has previously observed that "a fair bit of evidence suggests that Plaintiff was not injured by the transfer of the contract." ECF No. 252 at 33. This remains true. Morgan Cox and Douglas Hickock are the sole partners in DM Cullen Park. They are also principals of DMAC. Hickock worked hard to ensure that the HAP contract remained within a group under the umbrella of Marquis Acquisitions, Inc., Hickock's umbrella group of companies. It defies reason to suggest that DMAC would have worked so hard to achieve this transfer if, in fact, DMAC gained nothing as a result. Framed differently, Hickock and Cox—who were principals at both DMAC and DM Cullen Park—inarguably gained a windfall via DM Cullen Park when that property received the HAP contract. The fact that Hickock and Cox retained the HAP contract's value though a

different entity undoubtedly reduced the incentive for them to find ways for DMAC to retain the HAP contract's value.

134.     Could DMAC have retained the value of the HAP contract instead of receiving no consideration for its transfer to DM Cullen Park? Could a willing buyer who owned multiple properties have purchased Arbor Court, including the HAP contract, and requested that HUD transfer the HAP contract to another of its properties? This seems likely for two reasons: (1) HUD told the City that, if it bought Arbor Court, it could transfer the HAP contract to another property; and (2) HUD ultimately allowed DMAC to transfer the HAP contract to DM Cullen Park. On top of that, no rule prohibited DMAC from purchasing Cullen Park and transferring the HAP contract budget authority from Arbor Court to Cullen Park. ECF No. 307-1 at 129:1-130:12; ECF No. 298 at 181:10-182:2. Rather, the reason that DMAC could not buy another property and ask HUD to transfer the budget authority there was because DMAC lacked the money to do so. ECF No. 298 at 250:16-25.

135.     If a potentially transferable HAP contract impacted the value of the property, then that HAP contract could not have been taken. The Court is skeptical of DMAC's claim that it was impossible for it to have retained any value of the HAP contract. And, at any rate, DMAC has not met its burden to prove this claim.

136.     Accordingly, the Court finds that the City did *not* take the HAP contract's value.[12] Rather, DMAC retained the HAP contract and the associated value until after HUD agreed to transfer the contract to Cullen Park. The Court further finds that the value of the HAP contract after the permit denial was likely between $3 million and $5.9 million.

---

[12] As discussed below, however, this finding does not change the outcome of the Court's analysis, either for DMAC's *Lucas* claim, or under the *Penn Central* factors.

137.     Thus, the total value of Arbor Court, including the remaining HAP contract, after the permit denial was between $3.5 million and $6.9 million.

## III.     CONCLUSIONS OF LAW

1.     The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.

2.     The "paradigmatic taking" involves the "direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). However, a taking can occur even in the absence of such a direct appropriation. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

3.     Although a taking occurs when regulation goes "too far," the Supreme Court "has generally eschewed any set formula for determining how far is too far, choosing instead to engage in essentially ad hoc, factual inquiries." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Pan. Agency*, 535 U.S. 302, 336 (2002) (cleaned up). Significantly, however, this inquiry "aim[s] to identify regulatory actions that are functionally equivalent to . . . classic takings." *Lingle*, 544 U.S. at 539.

4.     The Supreme Court has identified three categories of takings. First, and not relevant here, is a direct physical taking, which occurs when the government "requires an owner to suffer a permanent physical invasion of her property." *Id*. at 538. It is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of" a regulatory taking claim. *Tahoe*, 535 U.S. at 324.

5.     Second, "regulations that completely deprive an owner of all economically beneficial use of her property" likewise constitute a "categorical" taking, except where principles

of nuisance and property law "independently restrict" the owner's use. *Lingle*, 544 U.S. at 538 (cleaned up).  This category "[i]s limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'" *Tahoe*, 535 U.S. at 330 (*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1017 (1992).

6.      Third, government action may effect a taking even if there is neither a physical taking or the complete elimination of all economically beneficial use. This category "is characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Id.* at 322 (cleaned up). Although there is no "set formula" for this third category of taking, courts apply the three factors outlined in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). Those factors examine: (1) "[t]he economic impact of the regulation"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Id.* at 124. Importantly, even under the *Penn Central* framework, "regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking." *Horne v. Dep't of Agric.*, 576 U.S. 350, 364 (2015).

7.      These three inquiries "share a common touchstone" in that they each "aim[] to identify regulatory actions that are functionally equivalent to the classic taking" and, thus, "each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights." *Lingle*, 544 U.S. at 539. If the burden is too severe, a taking has occurred. At the same time, however, the Supreme Court has cautioned against defining takings too broadly: "Land-use regulations are ubiquitous and most of them impact property values in some tangential way—often in completely unanticipated ways. Treating them all as *per se*

takings would transform government regulation into a luxury few governments could afford." *Tahoe*, 535 U.S. at 324.

8.     Thus, "[a] central dynamic of" in how the Supreme Court has approached regulatory takings is "flexibility." *Murr v. Wisconsin*, 582 U.S. 383, 394 (2017). Flexibility is the "means to reconcile two competing objectives": (1) "the individual's right to retain the interests and exercise the freedoms at the core of private property ownership"; and (2) "the government's well-established power to adjust rights for the public good." *Id.* (cleaned up).

### A. Threshold Considerations

9.     Before turning to the merits of DMAC's takings claims, the Court first addresses some threshold considerations. First, the City urges that, as a categorical rule, a permit denial pursuant to a valid flood regulation can never be consider a taking. This argument is unavailing: the Court finds that no such categorical rule is warranted, although that a permit was denied pursuant to a valid flood ordinance is a factor that weights strongly against any finding that a Taking has occurred. Second, the Court observes that, in its Taking Clause analysis, it must make every effort to disaggregate the impact of the governmental action taken in response to Hurricane Harvey from the impact of the hurricane itself..

### 1. Impact of a Valid Flood Ordinance

10.     The City argues that, as a categorical rule, any permit denied pursuant to a valid flood regulation can never be a taking. The City is incorrect.

11.     To support its argument, the City relies on *Adolph v. Federal Emergency Management Agency of the U.S.*, 854 F.2d 732 (5th Cir. 1988). There, the local parish council "passed building ordinances in conformance with FEMA regulations that required that new or

additional structures meet certain elevation requirements." *Id.*  at 734. The plaintiffs in *Adolph* argued that those measures constituted a Taking under the Fifth Amendment. *Id.* at 733.

12.     The Fifth Circuit rejected that challenge, finding it "legally unsupportable." *Id.* at 735. The Fifth Circuit observed that "state flood-management authorities have frequently been sued on allegations that their building restrictions constituted takings," and those claims have been "almost uniform[ly] reject[ed]." *Id.* at 738. For example, *Adolph* favorably cited decisions by the Supreme Court of North Carolina, the Washington Supreme Court,  the Connecticut Supreme Court, and the Georgia Supreme Court, concluding that flood ordinances did not constitute takings, even when those ordinances were either more restrictive than FEMA's measures or when they prohibited all residential development. *Id.* at 738-39 (collecting cases). Ultimately, the Fifth Circuit concluded that "[e]ven assuming that the cost of complying with the land-use regulations is prohibitive (and we do not decide that it is) and recognizing that the market value of plaintiffs' properties has diminished (a fact found by the trial court), these factors are of no consequence here" because there was no taking regardless. *Id.* at 739-40.

13.     As this Court has previously explained, *Adolph* is distinguishable from this case in one key respect: the plaintiffs in *Adolph* brought a facial challenge to the ordinance as a whole, whereas here, DMAC brings an as-applied challenge to the denial of one specific permit. ECF No. 252 at 39-40.

14.     Recently, the Texas Court of Appeals considered how *Adolph* might impact an as-applied takings claim. *City of Houston v. Commons of Lake Houston, Ltd.*, No. 01-21-00369-cv, 2023 WL 162737, at *9-10 (Tex. App. Jan. 12, 2023). The court concluded that *Adolph* is not limited to only facial challenges—"rather, it indicates only that where a local regulation states on its face that it tracks NFIP criteria, courts do not need to look any further to find that the

regulation does not amount to a taking." *Id.* at \*10. But, although that case involved an as-applied challenge, the plaintiffs there still challenged the overall ordinance, not a specific permit denial. That is a different question from the one here because here plaintiffs challenge the denial of permits, not the ordinance itself.

15.     In the Court's view, it would go too far to say that the denial of a permit pursuant to a Flood Ordinance can *never* constitute a taking. "One of the principal purposes of the Takings Clause is to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (citation omitted). A blanket rule as advanced by the City would undermine this purpose. For example, reliance on the Flood Ordinance could be merely a pretextual way of targeting a property for other motives (indeed, that is what DMAC alleges here). A Flood Ordinance could be unfairly or improperly applied. In such cases, the government would be improperly forcing some individuals to bear public burdens.

16.     Nevertheless, that a permit is denied pursuant to a valid Flood Ordinance enacted to comply with FEMA's NFIP is a relevant consideration. It weighs strongly against finding that a permit denial is a taking. Primarily, it significantly impacts the third prong of the *Penn Central* analysis, which looks to the character of the government action. Further, it may be difficult to show that a permit denial pursuant to such a local flood ordinance could significantly disrupt reasonable investment-backed expectations, given the regulatory landscape. These considerations are discussed in more detail below.

17.     Suffice it to say, however, that while the Court could envision a situation where denying a permit due to a flood ordinance would constitute a taking, such a situation would likely be quite rare and only occur in extreme cases where a city abused or improperly applied

the ordinance. Otherwise, the Fifth Circuit's decision in *Adolph* would be meaningless because plaintiffs could simply recast a facial challenge to a flood ordinance as a host of as-applied challenges to permit denials. *Cf. Robles v. San Patricio Cnty.*, No. 2:21-CV-00180, 2022 WL 2619850, at *4–5 (S.D. Tex. June 6, 2022), *appeal dismissed*, No. 22-40420, 2022 WL 18228326 (5th Cir. Aug. 5, 2022).

## 2.    Impact of Hurricane Harvey

18.    When a plaintiff suffers loss after a government action, that alone does not create a taking. Rather, "[t]he plaintiff bears the burden of proving that the government's actions were the direct and proximate cause of the [loss]." *Cox v. Tennessee Valley Auth.*, 989 F.2d 499 (6th Cir. 1993) (table); *accord Esplanade Props., LLC v. City of Seattle*, 307 F.3d 978, 984 (9th Cir. 2002) ("[U]nder both federal and state law a plaintiff must make a showing of causation between the government action and the alleged deprivation."); *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1343 (Fed. Cir. 2018). In the context of permitting, "because it is the permit denial that can effect a regulatory taking, this court must examine the effect of that denial on plaintiffs' property interests." *Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 484 (2009).

19.    This means that the Takings Clause analysis considers only the impact of the *governmental* action on the property. Here, that analysis is someone more complicated because it is difficult to disentangle the effects of the permit denial from the effects of Hurricane Harvey. Hurricane Harvey significantly damaged the property, causing flooding and dangerous conditions. As a result, the property was rendered unusable. In an effort to make the property once again usable, DMAC applied for a permit. That application was denied. These two events— one right after the other—each undoubtably impacted the property. The Taking Clause inquiry,

however, requires the Court to disentangle the effects of these two events which are inextricably interconnected.

20.     As a practical matter, this has the greatest impact on two aspects of the Taking Clause analysis. First, it impacts the economic-impact prong of the *Penn Central* test. This inquiry requires the Court to compare the property's value before the permit denial with the value after the permit denial. But, significantly, the hurricane too reduced the property's value because it turned the property from one that had flooded only once in the last thirty years to a repetitively flooding property that had flooded twice in a sixteen-month period. This reduced the property value. This consideration is discussed in more detail below. *See* Section IV.C.1, *infra*.

21.     Second, this consideration impacts DMAC's reasonable investment-backed expectations.  It is reasonable for governments to respond to natural disasters, including floods. And it is reasonable for governments to respond with stronger measures where, as here, a property has flooded twice in such a short time span. As discussed below, the Court must consider the effect of Hurricane Harvey and the ensuing flooding when considering whether DMAC's investment-backed expectations were reasonable, and the extent to which the governmental action—as opposed to the hurricane—interfered with those expectations. This consideration is also discussed in more detail below. *See* Section IV.C.2, *infra*.

22.     Having addressed these preliminary matters, the Court now turns to the substance of DMAC's claims.

### B.  Total Taking Claim

23.     First, DMAC contends that the permit denial constituted a categorical taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). "[C]ategorical treatment is appropriate . . . where regulation denies all economically beneficial or productive use of land."

*Lucas*, 505 U.S. at 1015. "[T]he categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of all value; the default rule remains that, in the regulatory taking context, we require a more fact specific inquiry." *Tahoe*, 535 U.S. at 332; *see Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 626 (9th Cir. 2020) ("This is a relatively narrow and relatively rare taking category[.]" (cleaned up)).

24.     *Lucas* did not fully define what constitutes "the denial of all economically beneficial or productive use" such that the categorical rule is triggered. Still, *Lucas* gave some initial guidance. First, the "typical[]" case in which there has been a total taking involves a situation in which the government "require[es] land to be left substantially in its natural state." *Lucas*, 505 U.S. at 1018. Second, the "total deprivation of beneficial use" must be so severe as to be "from the landowner's point of view, the equivalent of a physical appropriation." *Id.* at 1017.

25.     Although *Lucas* speaks of economic *use*, not value, courts often look to a property's value when determining whether there is a taking.[13] Indeed, the Supreme Court has subsequently stated that "[i]n the *Lucas* context, of course, the complete elimination of a property's value is the determinative factor." *Lingle*, 544 U.S. at 539; *see Tahoe*, 535 U.S. at 332 ("[T]he categorical rule in *Lucas* was carved out for the extraordinary case in which a regulation permanently deprives property of all value.").

26.     Thus, courts have found that where there is a significant—but not complete— reduction in the value of property, no categorical taking has occurred. *See, e.g.*, *Tenn. Scrap*

---

[13] There appears to be some inconsistency as to whether a land's use or its value is the primary inquiry. *Compare, e.g.*, *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1433 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999) ("Although the value of the subject property is relevant to the economically viable use inquiry, our focus is primarily on use, not value.") *with Bridge Aina Le'a*, 950 F.3d at 627 ("[A]lthough value is determinative, use is still relevant."). At least one court has reconciled this  by explaining that "it is the lack of economically viable use, rather than impact on property values, that triggers categorical treatment for an alleged taking," but that "the complete elimination of a property's value" may nonetheless "be *sufficient* to establish a categorical taking under many circumstances, given the obvious correlation between uses and their market values." *Res. Invs.*, 85 Fed. Cl. at 486-87.

*Recyclers Ass'n, LLC v. Bredesen,* 556 F.3d 442, 456 & n. 6 (6th Cir. 2009) (noting that the Supreme Court has upheld diminutions in value of 75% and 92.5%); *Iowa Coal Mining Co. v. Monroe Cnty.*, 257 F.3d 846, 853 (8th Cir. 2001) (75% diminution in value); *Bridge Aina Le'a*, 950 F.3d at 627-28 (83.4% diminution); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1347 (Fed. Cir. 2004) (92% loss in on part of land's value and 8% loss in another part); *Cienega Gardens v. United States*, 331 F.3d 1319, 1344 (Fed. Cir. 2003) (*Lucas* requires loss of "100% of a property interest's value").

27.     That being said, *Lucas* may still apply even if some nominal property value remains. "Assuming a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest" *Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001). Thus, courts have occasionally found a *Lucas* taking even when the property was worth some amount that slightly exceeded zero. *E.g.*, *Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1117 (Fed. Cir. 2015).

28.     Thus, when a property retains only a tiny residual value, "the relevant inquiry . . . is whether the land's residual value reflected a token interest or was attributable to noneconomic use." *Bridge Aina Le'a*, 950 F.3d at 628. "[A] parcel will typical[ly] retain some quantum of value even without economically viable use." *Res. Invs.*, 85 Fed. Cl. at 488. "Indeed, it is not difficult to identify other circumstances, such as purchasing a parcel to preserve development-free open space or natural land, in which a parcel may have some value despite its lack of economically viable uses." *Id.* Thus, if the residual value is due to a non-economic use, a *Lucas* taking may nonetheless have occurred. But if the residual value results from a possible economic use, then there is no *Lucas* categorical taking.

29.     Put differently, "[w]hen there are no underlying economic uses, it is unreasonable to define land use as including the sale of the land." *Lost Tree Vill. Corp.*, 787 F.3d at 1117. "[T]he mere fact that there is one willing buyer of the subject property, especially where that buyer is the government, does not, as a matter of law, defeat a taking claim." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1433 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999). But when "there are other underlying economic uses," courts "consider the plaintiffs' ability to sell the properties in determining whether there has been a total taking." *Nekrilov v. City of Jersey City*, 45 F.4th 662, 671 n.3 (3d Cir. 2022),

30.     Thus, "[t]he crucial inquiry" is "whether the property use allowed by the regulation is sufficiently desirable to permit property owners to sell the property to someone for that use." *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139 (2d Cir. 1984) (cleaned up); *accord Nekrilov*, 45 F.4th at 671.

31.     That being said, a property may have an economically beneficial use even if it is not profitable. "[T]he central question for a total taking is not 'whether the regulation allows operation of the property as a profitable enterprise for the owners, but whether others might be interested in purchasing all or part of the land for permitted uses.'" *Nekrilov*, 45 F.4th at 671 (quoting *Park Ave. Tower*, 746 F.2d at 139); *see MacLeod v. Santa Clara Cnty.*, 749 F.2d 541, 548 (9th Cir. 1984) ("We are unwilling to equate immediate overall profitability with the requirement of 'economic viability.'"). A plaintiff must show that "across all potential purchasers," there is no economically viable use of the property. *Nekrilov*, 45 F.4th at 671.

32.     For example, in *Nekrilov*, 45 F.4th 662, plaintiffs challenged a regulation barring short-term rentals. One set of plaintiffs had a monthly mortgage payment of $3,300, but could only earn $2,600 per month once the regulation too effect (down from $4,500 per month absent

the regulation). *Id.* at 668. The Third Circuit nonetheless concluded that the property retained economic value. *Id.* at 670-71. The fact that, for one set of plaintiffs, the rental income was less than the mortgage payment did not undermine this conclusion because the property was still being put to economic use. This application is a logical outgrowth of *Lucas*'s admonition that there is no categorical taking even when there is a 95% reduction in value. 505 U.S. at 1019 n.8.

33.     Likewise, a property does not have to *immediately* have value to still have some economically beneficial use. Instead, "[h]olding property for investment purposes can be a 'use' of property." *MacLeod*, 749 F.2d at 547 n.7.

34.     Applying this standard here, it is clear that DMAC has failed to show that no economically beneficial use of the property remained. It is true that the former use of the property as a multi-family HUD subsidized apartment complex was no longer possible. But the Court is not persuaded that no other economically beneficial use remains.

35.     The Court also notes the narrow scope of the City's permit denial. The City denied one specific permit application: to repair Arbor Court so that it could function as it previously existed. The City did not deny permits for any other use. And the Court is persuaded by testimony from City officials explaining that an owner may use the property in any way that it chooses, as long as the use complied with the ordinance. The Court did not hear testimony indicating that DMAC ever looked into any way to comply with health and safety.

36.     At some points, DMAC seems to suggest that the property was in a total loss state because there was debt on the property, and the payment on the debt would far exceed the income that the property could generate after the permit denial. But the fact that DMAC had taken out loans to finance the property does not impact the total taking analysis. As discussed above, the question is whether *any* owner could use the property for an economically beneficial

use. *See Nekrilov*, 45 F.4th at 671. So, even if DMAC suffered a heavy loss, and even if DMAC could not use the property, that alone does not create a *Lucas* taking. Rather, if it could sell the property for a fraction of what it had originally paid, and the buyer could then use it for an economically beneficial use, there has been no total taking, even if DMAC cannot repay its debts.

37.     In sum, *Lucas* categorical takings are limited to the extraordinary circumstances in which no economically beneficial use of the property remains. This is not such a circumstance. Thus, no categorical taking occurred.

### C. Penn Central

38.     When "a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on" how it fares under the *Penn Central* framework. *Palazzolo*, 533 U.S. at 617 (citing *Penn Central*, 438 U.S. at 124. Thus, the next question is whether DMAC has shown that it suffered a taking under *Penn Central*.

39.     As discussed above, the *Penn Central* inquiry is a factual inquiry "require[s] considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Horne*, 576 U.S. at 360. Although courts typically address all three of these factors, when "the force of [one] factor is so overwhelming," that one factor alone may dispose of the taking question. *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984).[14] The Court considers each factor in turn. This inquiry "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992).

---

[14] This is not true of the first factor because the Supreme Court has explained that "a mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe*, 508 U.S. at 645.

### 1.    Economic Impact

40.    First, the Court must examine the economic impact of the permit denial. Although diminution in value along cannot establish a taking, *Penn Central*, 438 U.S. at 131, a greater diminution in value weighs more heavily in favor of finding that a Taking has occurred. "[I]t is not proper to measure economic impact based on a "hypothetical economic result" that assumes a state of affairs that did not exist." *Bride Aina Le'a*, 950 F.3d at 631 (quoting *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013)). Put differently, the Court must consider only the diminution in value that resulted from the governmental action—here, the permit denial. The Court cannot consider the diminution in value that resulted in other factors that reduced the value of the property—here, reduction in value that resulted from repetitive floods at the property.

41.    Here, the economic impact of the regulation cuts in favor of finding a taking. As discussed above, the economic impact of the permit denial was to reduce the property value from between $12 million and $18 million to somewhere between $3.5 million and $6.9 million, including both the land and the HAP contract.[15] This is a reduction in value between 42.5% and 80.5%. The loss of millions of dollars of property value, amounting to as much as 80% of the land is significant. The Court recognizes the significant economic detriment that DMAC endured as a result of the permit denial.

---

[15] To be clear, the Court does *not* credit the City's argument that the Taking Analysis cannot count the HAP contract because the HAP contrast was lost in October 2018—several months after the permit denial. "Because it is the permit denial that can effect a regulatory taking, this court must examine the effect of that denial on plaintiffs' property interests." *Res. Invs*, 85 Fed. Cl. at 484. Put differently, causation requires a showing of what "would have occurred if there had been no government action at all." *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1363 (Fed. Cir. 2018) (cleaned up). So, if the permit denial had caused DMAC to lose the value of the HAP contract, then the Court would consider that loss in value even if that value occurred after the permit denial because the Court's analysis looks at the *effects* of the permit denial. However, because the Court found that DMAC retained the HAP contract's value, it need not delve further into this issue.

42.     But that economic impact alone is not sufficient to create a taking. Indeed, this diminution in value is less than other situations in which courts have routinely found that no takings occurred. *See, e.g.*, *Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 696 (4th Cir. 2018) (assuming 83% reduction in value); *MHC*, 714 F.3d at 1127 (81% reduction in value); *Colony Cove Props.*, 888 F.3d at 451 (diminutions ranging from 75% to 92.5%); *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) ("[W]e are aware of no case in which a court has found a taking where diminution in value was less than 50 percent." (cleaned up)); *Hadacheck v. Sebastian,* 239 U.S. 394 (1915) (value reduced by 92.5% from $800,000 to $60,000).

43.     Thus, the Court finds that this prong of the *Penn Central* analysis cuts in favor of a finding that a taking occurred. As discussed below, however, this prong is outweighed by the other two factors, which together clearly indicate that no taking occurred.

## 2.     Reasonable investment backed expectations

44.     The next prong of the *Penn Central* analysis asks the court to consider the extent of the government's inference with reasonable investment-backed expectation.

45.     Typically, the reasonable investment-backed expectations are evaluated at the time that the owner purchased the property. *Love Terminal Partners*, 889 F.3d at 1345. Thus, "'what is relevant and important in judging reasonable expectations' is 'the regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a*, 950 F.3d at 634 (quoting *Love Terminal Partners*, 889 F.3d at 1345) (internal quotation marks omitted). That is because "those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe & Prods.*, 508 U.S. at 645 (cleaned up). Indeed, the Supreme Court has explained, "[a] reasonable

restriction that predates a landowner's acquisition, however, can be one of the objective factors that most landowners would reasonably consider in forming fair expectations about their property." *Murr*, 582 U.S. at 398. Thus, the existence of the Flood Ordinance must be factored in to whether DMAC's expectations were reasonable.

46.     In addition to the existing regulatory regime at the time of acquisition, "courts must look to the physical characteristics of the landowner's property," including "the physical relationship of any distinguishable tracts, the parcel's topography, and the surrounding human and ecological environment." *Id.* The Supreme Court has noted that "[i]n particular, it may be relevant that the property is located in an area that is subject to, or likely to become subject to, environmental or other regulation." *Id.* For example, "[c]oastal property may present such unique concerns for a fragile land system that the State can go further in regulating its development and use than the common law of nuisance might otherwise permit." *Lucas*, 505 U.S. at 1035 (Kennedy, J., concurring). Here, this means that this prong of the analysis must account for the fact that the Property was in a flood plain, largely in a floodway, and had been repetitively flooded.

47.     For example, in *Flint v. County of Kauai*, 521 F. Supp.3d 978 (D. Haw. 2021), another district court analyzed the effect of a year-long emergency rule limiting access to an area after flooding caused widespread destruction and triggered a number of landslides. The court explained that  "Plaintiffs' expectation that they could utilize their property as a vacation rental with absolutely no limitations or restrictions is not reasonable." *Id.* at 991. "By contrast, it is objectively reasonable that the government would act to protect the public in response to a major natural disaster." *Id.* Put differently, when there is a major natural disaster, reasonable individuals expect the government to take steps to respond. That the government subsequently

did take those steps can hardly disrupt reasonable expectations. This also aligns with a principle recognized by the Fifth Circuit in *Adolph*, 854 F.2d at 738: tightly managed flood regulations are an important part of the overall regulatory landscape.

48.     DMAC argues that they reasonably expected the City to issue repair permits after Hurricane Harvey for a few reasons. First, the City quickly issued repair permits after the Tax Day Flood. DMAC's reliance that the permits would be granted again because they had been granted in the past was misplaced. *Cf. Concrete Pipe*, 508 U.S. at 646 (reliance on original limitation was "misplaced, there being no reasonable basis to expect that the legislative ceiling would never be lifted"). Moreover, DMAC itself view the Tax Day Flood as "an isolated incident." ECF No. 298 at 13:2-3. After Harvey, the flooding was repetitive, not isolated.

49.     Second, the DMAC notes that the City had not ever previously relied on the section of the Flood Ordinance that allowed it to deny repair permits when there is a danger to life or property. But this too is not enough. Hurricane Harvey—hitting Houston and Arbor Court just a year after the Tax Day Flood—was hardly expected. It is reasonable that the City would use new tools in response to a disaster of this magnitude.

50.     Put simply, DMAC's investment-backed expectations were disrupted. But nature, not the City, was the primary disruptor of those expectations. In particular, when DMAC bought Arbor Court in 2016, it bought a property that had not flooded in 30 years. It could not have known that DMAC would shortly flood twice in a sixteen-month period with three-to-four feet of water each time. Once this significant flooding had happened, the City's response was reasonable. So, the repetitive flooding events—not the city—disrupted DMAC's investment backed expectations. Put differently, if DMAC had known, at the time that it purchased Arbor

Court, there would have been two such flood events in such a compressed time frame, it would not have been reasonable to expect the City to continue as though nothing had happened.

51.     Thus, this prong of the *Penn Central* analysis cuts against finding that the permit denial amounted to a taking.

### 3.     Character of government action

52.     Finally, the Court must consider the character of the government action. "The character of the governmental action factor requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition, by obligating the court to inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." *Maritrans Inc. v. United States*, 342 F.3d 1344, 1356 (Fed. Cir. 2003) (cleaned up).

53.     "There is little doubt that it is appropriate to consider the harm-preventing purpose of a regulation in the context of the character prong of a *Penn Central* analysis." *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1281 (Fed. Cir. 2009). "Interference with property is less likely to be considered a taking when it arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Clayland Farm Enterprises, LLC v. Talbot Cnty., Maryland*, 987 F.3d 346, 355 (4th Cir. 2021) (cleaned up). And, again, referring back to the Fifth Circuit's decision in *Adolph*, 854 F.2d at 738, flood management is the type of government action that is typically permissible under the Taking Clause analysis.

54.     Here, the character of the government action is a highly significant factor that weighs heavily in the City's favor. As a factual matter, the Court has found that the rationale for the City's permit denial was properly focused on health and safety. The Court has rejected the

arguments that this rationale was pretextual or that the City improperly targeted Arbor Court. Because the character of the government action related to flood management and was to ensure health and safety, this prong of the analysis strongly undercuts any argument that a taking occurred.

55.     In sum, although the economic impact of the permit denial cuts in favor of finding that there was a taking, the other two factors—interference with reasonable investment-backed expectations and character of the government action—substantially outweigh the first factor. No taking occurred.[16]

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that DMAC has not established that the permit denial at issue amounted to an unconstitutional taking under either *Lucas*'s categorical rule or the *Penn Central* balancing test. Judgment is entered in favor of the City. DMAC shall take nothing.

**IT IS SO ORDERED.**

Signed at Houston, Texas on July 11, 2023.

Keith P. Ellison
United States District Judge

---

[16] For the same reason that there was no permanent taking, there was also no temporary taking.